## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MEREDITH CORPORATION, THE E.W. SCRIPPS COMPANY, SCRIPPS MEDIA, INC., HOAK MEDIA, LLC, HOAK MEDIA OF NEBRASKA, LLC, and HOAK MEDIA OF DAKOTA, LLC, | : : : : : |
| individually and on behalf of all others similarly situated, | : Case No. 09 Civ. 9177 (NRB) : : |
| Plaintiffs, | : **FIRST AMENDED** : **CLASS ACTION COMPLAINT** : |
| v. | : **JURY TRIAL DEMANDED** : : |
| SESAC, LLC and JOHN DOES 1-50, | : : : |
| Defendants. | : : |

Plaintiffs Meredith Corporation, The E.W. Scripps Company, Scripps Media, Inc., Hoak Media, LLC, Hoak Media of Nebraska, LLC, and Hoak Media of Dakota, LLC (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, allege upon information and belief as follows:

### I.      NATURE OF THE ACTION

1.      Plaintiffs are owners of local commercial television broadcast stations ("local stations").  Defendant SESAC, LLC ("SESAC") is a for-profit performing rights organization that licenses rights under U.S. copyright law to publicly perform the musical compositions of its affiliated composers and music publishers

("SESAC Rightsholders").  By this action, Plaintiffs seek, on their own behalf as well as on behalf of a class of similarly situated local stations ("Class Members"), to restrain and prevent SESAC from perpetuating the unlawful exercise of the monopoly power SESAC has amassed, unilaterally and collectively in conspiracy with and among SESAC Rightsholders (collectively, the "SESAC Cartel"), over the licensing to Plaintiffs and other Class Members of the music performance rights they need to broadcast their scheduled programming and commercial announcements.  Plaintiffs also seek to be compensated for damages sustained as a result of the SESAC Cartel's unlawful practices.

## II.　　FACTUAL ALLEGATIONS

### A.　LOCAL STATIONS ARE RESPONSIBLE FOR SECURING MUSIC PERFORMANCE RIGHTS FOR THE MUSIC IN THE VAST MAJORITY OF THEIR PROGRAMMING SCHEDULES, INCLUDING FOR A SIGNIFICANT AMOUNT OF EMBEDDED MUSIC THEY DID NOT SELECT, BUT ARE LOCKED INTO BROADCASTING

2.　　Plaintiffs and other Class Members broadcast a wide variety of programming to local television audiences, with programming schedules generally airing 24 hours a day, seven days a week.  Music is included in nearly all television programming in one way or another – as theme music at the start of the program, as part of transitions in and out of commercials, in the commercials themselves, or as background accompaniment to the dramatic, comedic, talk, news or other programming formats.  The music used in programming on local television is nearly always copyrighted.  With limited exceptions, broadcasts of copyrighted music are "public performances" for which local stations must acquire licenses from, and pay royalties to, the copyright owners.

3.    A portion of a local station's broadcast hours is devoted to programming produced by the local station itself ("locally produced programming"). Local news programs are the most prominent example.  Most of a local station's programming, however, as well as its commercial announcements and public service announcements, are produced by third parties and comes to a local station already "in the can" – with music and other creative elements already irrevocably embedded.

4.    The majority of third-party programming falls into two categories.  First, local stations affiliated with a broadcast network receive network programming from that network.  Music performance rights in network programming supplied by the ABC, CBS, and NBC television networks to their affiliates are secured by these networks on the stations' behalf, and the licensing of such music is not at issue in this lawsuit.  Other television networks, however, such as Fox and the CW Network, do not secure music performance rights for the network programming supplied to their affiliated stations.  Accordingly, the stations affiliated with these networks must secure music performance rights themselves for the network programming they broadcast.

5.    Second, virtually every local station broadcasts syndicated programming produced and distributed by third parties and sold market-by-market to local stations.  Prominent examples of such syndicated programming include "first run" syndicated programs, such as *Entertainment Tonight* and *The Ellen DeGeneres Show*, and "off-network" re-runs of successful network programs, such as *Seinfeld* and *Two and a Half Men*.  Securing the music performance rights for syndicated programs has been, as a matter of entrenched music industry practice discussed further below, typically the responsibility of the local stations rather than that of the program

producer.  The balance of programming provided to local stations by third parties includes movies, sports, religious programming and paid programming or "infomercials."

6.    Local stations do not control the selection of any of the creative elements contained in the third-party-produced programming or commercial announcements they broadcast.  This includes the music used in the programming. Further, local stations typically are contractually prohibited from altering or removing the music or other elements selected by the original producer and embedded in third-party programming.

7.    While one would expect that producers of syndicated programming would obtain all rights necessary for the broadcast of a particular program to enable them to market the program to local stations without legal encumbrances, in practice there is one glaring exception.  When local stations license syndicated programming, the producers/syndicators of such programming contractually convey *all* copyright and other rights needed for broadcast *except* for the music performance rights.  The contracts involved uniquely shift the obligation for securing these music rights to the local stations themselves.

8.    The result of this longstanding industry practice is that composers and music publishers are insulated from competition over the value of the music performance rights embedded in syndicated programming since the producers who select the music do not bargain to obtain such rights, and the entities remitted to doing so – the local stations – lack any bargaining power as to them insofar as the music is already irrevocably embedded in the syndicated programming they have

4

acquired, and securing licenses is a necessity for the stations to legally broadcast programming for which they often have invested millions of dollars to obtain.

9.     As a practical matter, it is not commercially feasible for local stations to obtain the necessary performance rights from producers (so-called "source licensing"). In fact, representatives of Class Members have made good-faith commercial efforts to enter into source licensing arrangements with major syndicators and producers and have been completely rebuffed.

**B.     PERFORMING RIGHTS ORGANIZATIONS FURTHER ELIMINATE COMPETITION BETWEEN COMPOSERS FOR MUSIC PERFORMANCE RIGHTS**

10.     Music performance rights for virtually all of the music broadcast by local stations are offered through licenses from three United States performing rights organizations ("PROs"): the American Society of Composers, Authors and Publishers ("ASCAP"); Broadcast Music, Inc. ("BMI"); and, SESAC.

11.     PROs are licensing entities that aggregate vast numbers of copyrights from numerous different composers and music publishers and offer licenses to users, such as local television stations, affording access to the entire repertories so amassed. The repertories of the three PROs are exclusive of one another but, collectively, represent virtually every copyrighted musical composition in the United States and its territories.

12.     PROs' "all-or-nothing" blanket licensing practices, which systematically eliminate competition between copyright owners to have their compositions included in broadcast programming, exacerbate their anticompetitive potential. All-or-nothing blanket licenses charge the user a pre-determined fee for access to a PRO's entire repertory of music, which neither is tied to, nor varies with,

actual music demand or usage.  The fee paid will be the same – regardless of whether a station uses one composition from the repertory once or 1000 compositions every day.

13.     Because the PRO repertories are exclusive of one another, the ASCAP, BMI and SESAC repertories are not substitutes for one another, and local stations, as a practical matter, must acquire licenses from *each* of these licensing organizations.

14.     For a number of reasons, it is virtually impossible for a local station to scrub its entire schedule of programming of music contained in the repertories of any of the three PROs.  First, as noted, much of the music broadcast by local stations has been pre-selected by third parties and is irrevocably embedded in genres of programming that are fundamental to viable broadcast operations.  This includes music in commercial announcements, the chief source of revenue for local stations.  In addition, for many programs, the music content of individual episodes is not available to local stations at the time of acquisition or even at the time of broadcast.

15.     Second, even when the opportunity to control the music in a given production may present itself, it is not always clear in which PRO's repertory the music resides.  A significant amount of music that cannot accurately be attributed to any given PRO in a timely fashion (or even at all) is contained in local station programming and commercial announcements.

16.     Third, many popular programs include compositions from all three PROs.  A single episode of the syndicated drama *House*, for instance, can have forty or more embedded musical compositions, including compositions from each of the three PROs.  This single episode could not be lawfully broadcast without a license

for each composition – effectively requiring licenses from all three PROs.  With respect to such programs, licenses from the three PROs are complements rather than substitutes.

17.    Without licenses that cover each musical composition, Plaintiffs and other Class Members could not lawfully carry on their broadcast operations.  To act otherwise would risk incurring potentially severe copyright infringement liability. Given the stations' significant investments in syndicated and network programming (that they may be contractually obligated to broadcast), and the necessity to broadcast commercials, the hold-up potential of the current music license system is apparent.

**C.    ANTITRUST CONSENT DECREES CONSTRAIN THE UNLAWFUL EXERCISE OF ASCAP'S AND BMI'S MARKET POWER**

18.    The history of the relationship between local stations and the PROs has been one of continued attempts to limit the anticompetitive effects of the respective PROs' monopoly power over their repertories.  In the early years of their existence, ASCAP and BMI secured exclusive authority to license public performance rights from their respective rightsholders and packaged them into all-or-nothing blanket licenses, affording users access to all of the compositions in their respective repertories. Licensees could not select, and pay for, individual compositions; nor could they obtain public performance licenses directly from any composers or music publishers affiliated with ASCAP or BMI.  A music user's inability or unwillingness to agree to the fees demanded by ASCAP or BMI required the user either to forego use of the music or to face the prospect of prohibitive copyright infringement litigation and potentially staggering statutory damage awards.

19.     The United States Department of Justice long ago recognized the potential for anticompetitive abuse of the collective licensing authority amassed by PROs, and filed civil and criminal antitrust lawsuits against ASCAP and a civil antitrust lawsuit against BMI.  As a result of these challenges, certain of the more salient competitive abuses characterizing those PROs' licensing practices have been constrained for decades by conduct-regulating consent judgments to which both ASCAP and BMI are bound (the "Consent Decrees").  To address new problems and adapt to developing technologies and other changing market conditions, the Department of Justice, with court approval, periodically has modified and updated the Consent Decrees over the past half-century.

20.     The limitations imposed by the Consent Decrees on ASCAP and BMI are designed specifically to constrain the exercise of their market power resulting from: (i) the collection of vast numbers of copyrights from many different owners in one licensing entity with exclusive licensing rights; (ii) the unbridled pricing potential of the all-or-nothing blanket license; and, (iii) the unfair leverage that would stem from their ability to withhold access to all musical compositions in their repertories unless their demanded terms were met.

21.     The Consent Decrees and their subsequent judicial interpretations ameliorate the anticompetitive effects of ASCAP's and BMI's market power by, among other means, mandating that those PROs:

(i)     refrain from obtaining exclusive licenses from their rightsholders that would prevent music users (or those supplying programming to them) from

acquiring music performance rights on an individualized and competitive basis in direct dealings with ASCAP's and BMI's composers and music publishers;

(ii)    offer broadcast licensees, such as Plaintiffs and other Class Members, economically viable alternatives to the all-or-nothing blanket license (including, but not limited to, so-called "per program" licenses discussed further in ¶ 26) to facilitate and foster competitive licensing of music performance rights;

(iii)    refrain from withholding access to their repertories in the event of a fee negotiation impasse, thereby eliminating the ability of these PROs to extract supracompetitive license fees by threatening to withhold the licenses local stations need to operate their businesses; and

(iv)    offer licenses to all users requesting them at rates subject to judicial review for their reasonableness, with ASCAP and BMI bearing the burden of proof in any such court proceeding.

**D.    SESAC'S ANTICOMPETITIVE ACTIONS INCLUDE EXACTLY THE TYPE OF CONDUCT PROHIBITED BY THE CONSENT DECREES AND RESULT IN THE VERY ANTICOMPETITIVE EFFECTS THAT THE CONSENT DECREES WERE DESIGNED TO PREVENT**

22.    Unlike ASCAP and BMI, SESAC is not subject to a consent decree or any similar limitation on its ability to exercise its market power. SESAC flaunts its freedom from the competitive safeguards afforded by the Consent Decrees and has clearly demonstrated its intention to take full advantage of its monopoly power by engaging in many of the very same practices that ASCAP and BMI were barred from continuing and the Consent Decrees were designed to prevent. Indeed, these anticompetitive practices are the wellspring of SESAC's recent commercial success – measured not only in terms of the number and prominence of rightsholders it has been

able to induce to defect to SESAC from ASCAP and BMI, but also in the ever-more-exorbitant license fees it has collected from local stations.

23.     SESAC's practices are not necessary to create a market and offer no procompetitive effects.  To the contrary, its practices are no less naked restraints of trade than were those of ASCAP and BMI prior to their regulation by the Consent Decrees.  In fact, in several critical ways, SESAC's conduct is even more pernicious than the pre-Consent Decrees conduct of ASCAP and BMI.

24.     First, a key weapon in SESAC's anticompetitive arsenal is its refusal to offer local stations economically viable alternatives to its all-or-nothing blanket license.  SESAC's blanket license requires payment of pre-determined fees unrelated to actual usage, let alone any demonstrable value, of compositions in the SESAC repertory.  The rigid and unvarying pricing structure of such a license not only forces local stations to pay for music they do not want or use, it discourages them from seeking alternative sources of music performing rights (or from asking their program suppliers to acquire such rights on their behalf).  Even if such direct negotiations were successful, the result simply would be that local stations themselves (or in combination with their program suppliers) would pay twice for the same rights, as the fee format of SESAC's all-or-nothing blanket license affords *no* fee credit for those musical compositions already otherwise licensed in separate transactions with the copyright owner.

25.     Second, unlike ASCAP and BMI, SESAC is not required to offer any economically viable alternative to its blanket license.  Indeed, it does not do so. Both ASCAP and BMI offer a per program license.  Like the blanket license, the per

program license enables the licensee to perform any and all compositions in the PRO's repertory, and to do so as many times as desired, for the entirety of the broadcast day. The per program fee level, however, is based only on those programs broadcast during the license period containing otherwise unlicensed repertory music.  Thus, the per program licenses offered by ASCAP and BMI enable local stations to reduce their license fees by (i) reducing or eliminating the number of programs that contain unlicensed performances of the PRO's music and/or (ii) acquiring the license rights needed for particular locally produced programs directly from the copyright owner.

      26.     As discussed further below, while SESAC purports to offer a per program license alternative to its blanket license, the terms are so egregious that the offer is made in name only.  Indeed, virtually every local station in the United States currently takes SESAC's blanket license, including many that previously took a per program license from SESAC when, for a brief period, independent arbitrators adjudicated its terms.

      27.     Given this fee structure, it is unsurprising that SESAC has been able to raise the price for its blanket license to Plaintiffs and other Class Members – even when their overall consumption of SESAC-licensed music has decreased.  Such a result flies in the face of basic economic principles of supply and demand and is further evidence of SESAC exercising its market power.

      28.     Third, SESAC has enhanced the competition-foreclosing power of its blanket license by serving, *de facto* or *de jure*, as the exclusive licensing agent for its Rightsholders for many compositions in its repertory.  SESAC has imposed a variety of terms in contracts with SESAC Rightsholders designed to limit the utility and

availability of direct licensing as a competitive alternative to SESAC's blanket license. For instance, SESAC Rightsholders have been required to first refer any direct licensing request to SESAC, to limit any direct license to 12 months duration, and to charge a rate equal to or greater than SESAC's equivalent rate. SESAC has sought to further discourage direct licensing by imposing contract conditions that reduce the SESAC Rightsholder's income as a consequence of direct licensing, including by amounts equivalent to SESAC's standard licensing rate. These conditions have effectively allowed SESAC to significantly foreclose the option of direct licensing by ensuring that any direct licenses can be offered on terms no more favorable than the terms offered by SESAC.

29.     Fourth, unconstrained by any requirement that it issue music users licenses promptly upon request and at "reasonable" fees subject to judicial review, SESAC has threatened to withhold access to its entire repertory as a means to extract supracompetitive fees from local stations. This has had the desired effect (for SESAC) of forcing local stations to sign onto SESAC's blanket license at the price levels demanded by SESAC.

30.     Fifth, unlike ASCAP and BMI, membership in SESAC is by invitation only. Recognizing that local stations have invested in and are "locked into" music selected by third parties, SESAC has strategically raided ASCAP and BMI to entice (through the prospect of supracompetitive returns) composers whose compositions either: (i) are embedded in established syndicated and unlicensed network programming to which Plaintiffs have made substantial and irreversible economic commitments; (ii) are widely incorporated in Plaintiffs' locally produced programs; or

(iii) are included in enough commercials that, collectively, would be essentially impossible for Plaintiffs to avoid.  For instance, SESAC has contracted with composers whose compositions are included in leading first-run syndicated talk shows (*e.g.*, *The Ellen DeGeneres Show*, *Dr. Phil*, *Dr. Oz*), magazine programs (*e.g.*, *Entertainment Tonight*), game shows (*e.g.*, *Wheel of Fortune* and *Jeopardy*), as well as off-network syndicated programming (*e.g.*, *Seinfeld*, *Two and a Half Men*, *Will & Grace*).  Local stations spend tens of millions of dollars to obtain such programming.  This investment will be lost if they are unable to obtain performance rights from SESAC.

31.      SESAC also has supplemented its core membership with numerous other, less prominent composers and publishers whose compositions occasionally appear in other programs or in commercials.  SESAC, thus, has prevented a local station from eliminating its need for a SESAC license in the rare circumstance when the station does not broadcast any programs that regularly contain compositions in the SESAC Repertory.

32.      Sixth, SESAC furthers its unlawful practices by unfairly refusing to disclose accurately the full contents of its repertory.  Thus, local stations have no practical way to avoid using SESAC music: even when they know a program's music content before they commit to broadcasting it, they cannot reasonably ascertain with sufficient confidence which compositions are within the SESAC repertory.  In short, to operate their businesses, Plaintiffs are *compelled* to deal with SESAC – and can do so only on SESAC's terms.

33.      Finally, the coordinated conduct of SESAC and SESAC Rightsholders is a critical component in the success of SESAC's anticompetitive

scheme. Even were a station potentially able to "program around" any given individual rightsholder demanding supracompetitive fees, and even were a station able to manage the risk of accidentally infringing the composition of a single composer or music publisher, SESAC's aggregation of compositions from hundreds of different sources into a single repertory – the contents of which are not accurately and completely disclosed – presents a commercially unmanageable risk of inadvertent infringement for local stations.

E.    **SESAC'S SCHEME TO RESTRAIN TRADE AND ELIMINATE PRICE COMPETITION IN THE LICENSING OF MUSIC PERFORMANCE RIGHTS HAS HAD ACTUAL INJURIOUS EFFECTS**

34.    SESAC exploits its market power by extracting supracompetitive license fees from Plaintiffs and other Class Members. These fees not only are greatly in excess of what its individual SESAC Rightsholders could obtain if they had to compete with each other to get their music included in television programs in the first place, but also are inflated above what local stations (or their program suppliers) would pay if they could negotiate directly with SESAC Rightsholders for the specific music they actually need and use – or even what they pay for similar uses to BMI or ASCAP. Indeed, it is the expectation of receiving these supracompetitive fees that attracts composers and music publishers to accept SESAC's invitation to leave ASCAP and BMI (and the Consent Decrees' restrictions on their conduct) to join the SESAC Cartel.

35.    The capitulation of all or nearly all local stations to SESAC's egregious and inflexible licensing fee demands underscores SESAC's market power. While SESAC's repertory is significantly smaller than that of ASCAP or BMI, the rights to musical compositions licensed by SESAC are not available from ASCAP or BMI. SESAC's strategic acquisitions of key television composers and compositions,

14

its effective refusal to offer anything other than all-or-nothing licenses, its hide-the-ball tactics regarding the contents of its repertory, and its ability to withhold its repertory from local stations have enabled SESAC to secure from Plaintiffs and other Class Members licenses on anticompetitive terms and at supracompetitive fees that are unlawful.

36.     SESAC previously had been willing to negotiate fees on an industry-wide basis with the Television Music License Committee ("TMLC"), an industry association that negotiates with ASCAP and BMI on behalf of local television broadcasters and recommends to local television stations the licenses it successfully negotiates.  On two prior occasions, when SESAC and the TMLC were unable to reach agreement, SESAC agreed to empower independent arbitrators to set the fees for the local television industry.  SESAC now, however, makes its fee demands directly on Plaintiffs and other Class Members on what amounts to a take-it-or-leave-it basis.

37.     In the months preceding the expiration of the January 1, 2005 – December 31, 2007 license period, the fees and terms of which were set by arbitration, the TMLC attempted to negotiate the terms of a new industry-wide license with SESAC that it could recommend to local television stations.  These efforts were fruitless, and following the termination of its negotiations with the TMLC, SESAC sent to local television stations, throughout the United States and its territories, form license agreements with substantial and unjustified automatic annual increases.  These automatic increases guarantee SESAC year-to-year revenue growth, regardless of changes in the use of its repertory or market conditions.  When many Class Members, including Plaintiffs, objected and attempted to negotiate on price with SESAC, SESAC

refused to negotiate fees and often responded by sending letters threatening copyright infringement litigation if the stations failed to enter into agreements to pay the fees demanded.

38.     SESAC typically declined to provide "interim" licensing (necessary for the station to avoid the risk of copyright infringement), except on a short-term basis.  Even these interim licenses typically required advance payment of what amounted to the full supracompetitive blanket license fee demanded.

39.     SESAC's imposition of supracompetitive rates often was accompanied by intimidation tactics designed to leverage the commercial necessity of its repertory.  For example, during so-called "negotiations," SESAC often would ignore station owners' communications and delay confirmation of extensions of interim licenses until only days before the expiration of existing agreements.  Such tactics heightened the pressure on local stations to accept SESAC's demands or face a commercially unreasonable risk of prohibitive infringement litigation.

40.     SESAC also has refused to offer local stations an economically viable per program license or any other viable alternative to its all-or-nothing blanket license.  Between April 1, 2005 and December 31, 2007, SESAC offered stations a per program license.  Pursuant to an agreement between SESAC and the TMLC, the terms of the license were set by an independent panel of arbitrators following a lengthy arbitration proceeding.  More than 250 local stations chose to operate under this alternative per program license, including local stations owned by Plaintiffs, to better control the fees owed to SESAC.

41.     Following the expiration of the 2005-2007 license period (and the arbitrators' temporary authority to set fees and terms), SESAC changed the terms of the per program license it purported to offer.  These changes effectively eliminated local stations' ability to reduce the license fees owed to SESAC by decreasing their use of SESAC music or obtaining at least some of the rights to perform affiliated compositions in direct license transactions.

42.     Per program license fees are determined, in large part, on the basis of which programs actually contain otherwise unlicensed performances of the PRO's music.  The music embedded in a program is determined by reference to a list of the music cues contained in the program ("cue sheet") prepared by the program producer.  For programming produced by third parties, local stations do not always have access to cue sheets and per program fees are determined with reference to cue sheet information maintained by the PRO.  In some instances, neither the PRO nor the station has access to a cue sheet.  For example, there are no cue sheets for commercials.  Thus, per program licenses typically contain a default assumption about the music content of programs in the absence of a cue sheet.

43.     For the per program license offered by SESAC between 2005 and 2007, the panel of arbitrators set a default presumption that, except for a set list of programs recognized as regularly containing SESAC music, only five percent of third-party produced programming for which neither SESAC nor the station had a cue sheet would be deemed to contain SESAC music.  Following the expiration of the arbitrators' authority to set the terms of the SESAC per program license, SESAC increased this default presumption *tenfold* – to fifty percent – way beyond any reasonable expectation

based on SESAC's share of compositions.  Given the number of programs for which neither local stations nor SESAC have cue sheets, this change resulted in a significant spike in fees that eradicated the opportunity that stations had to reduce their fees by operating under a per program, rather than a blanket, license – regardless of the steps they took to clear rights to music they could identify as part of the SESAC repertory.

      44.     Further, local stations have no effective means to dispute whether a program contained SESAC music – leaving SESAC as the ultimate arbiter of what fees the per program license would generate.

      45.     The combination of these and other revisions resulted in a SESAC per program license that made it nearly impossible for local stations to lower their fees due to SESAC under its blanket license, even when they reduced the level of SESAC music they used or were able to license some of the music directly.  While hundreds of stations, including some of the stations owned by Plaintiffs, currently operate under the ASCAP and BMI per program licenses, which must be offered under the Consent Decrees, very few stations (if any) currently use the SESAC per program license, given its economically unreasonable terms.

      46.     For example, seven of Plaintiff Meredith Corporation's ("Meredith") twelve stations took a per program license from SESAC during the 2005-2007 license period.  Following the expiration of that regulated period, Meredith attempted to negotiate a viable per program license with SESAC.  Such a license would have been particularly useful for Meredith, as many of its stations reduced the amount of SESAC music they were using (mostly by reducing the amount of SESAC music used in local programming).  SESAC, nevertheless, refused to offer a viable per

program license.  Indeed, Meredith's station KPHO was unable to save money under SESAC's revised per program offer – even though it was able to identify only *one* program with attributable SESAC music.  Ultimately, Meredith was forced to capitulate to SESAC's demands and purchase a blanket license for all its stations, including the seven stations that took a per program license from SESAC during the 2005-2007 license period.

47.     Similarly, half of the local stations owned and operated by Plaintiff The E. W. Scripps Company and its subsidiaries (collectively, "Scripps") took a per program license from SESAC during the arbitration-regulated period.  Attempts to convince SESAC to continue to offer its stations a viable per program alternative failed. Like Meredith's stations, Scripps' stations also reduced the amount of local programming using SESAC music but, nevertheless, were unable to lower their SESAC fees under the per program license terms dictated by SESAC.  Thus, Scripps, like Meredith, ultimately was forced to capitulate to SESAC's demands and purchase a blanket license for all of its stations.

48.     SESAC has not limited its exercise of monopoly power to the primary broadcast signal transmitted by television stations.  Instead, the SESAC Cartel is extending its reach into new technologies, such as station websites and digital multicasting, imposing supracompetitive pricing that bears little or no relationship to the overall use or value of SESAC-licensed music in the relevant context.

49.     There are no procompetitive justifications for SESAC's conduct. SESAC's blanket licenses do not contribute to, nor are they necessary for, the creation of a market for the licensing of music performance rights.  Indeed, SESAC provides *no*

services or transactional efficiencies that cannot be provided by ASCAP or BMI, whose Consent Decrees and consequent judicial supervision specifically ameliorate the otherwise anticompetitive effects flowing from the collective nature of PRO activities. SESAC has neither increased the quantity or quality of music available to users and consumers, nor created any net efficiencies from which consumers may benefit.

50.     Defendants' violations of the antitrust laws have caused and continue to cause injury to competition for music performance licenses to Plaintiffs, the other Class Members, and to the public generally.  The public ultimately pays the price for SESAC's anticompetitive behavior.  Plaintiffs and the other Class Members are forced to pay supracompetitive fees to SESAC with resources that otherwise could be devoted to improving the quality of the programming they offer, expanding the range of their programming, or developing the innovative new channels for programming delivery increasingly demanded by consumers.

### III.   JURISDICTION AND VENUE

51.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to enjoin Defendants' violations of the antitrust laws, which have caused and continue to cause injury to competition and consumers.

52.     Defendants' acts, as described herein, affect interstate commerce in the licensing of non-dramatic performance rights in copyrighted musical compositions across the United States.

53.     This Court has subject matter jurisdiction over the federal antitrust law claims alleged herein under 15 U.S.C. §§ 15 and 26 and 28 U.S.C. §§ 1331, 1337, 2201 and 2202.

54.     Venue is proper before this Court under the provisions of 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants have resided in, transacted business in, or were found in this District, and because a substantial part of the events giving rise to the violations alleged occurred in this District, and a substantial portion of the affected interstate trade and commerce described in this Complaint, has been carried out in this District.

55.     This Court has personal jurisdiction over Defendants because, *inter alia*, Defendants: (i) have transacted business throughout the United States, including in this District; (ii) have substantial contacts within the United States, including in this District; and/or (iii) were engaged in an illegal antitrust conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.


## IV.     PARTIES

### A.     Plaintiffs

56.     Meredith is a corporation organized and existing under the laws of the State of Iowa, with its principal place of business located in Des Moines, Iowa. Meredith is engaged, *inter alia*, in the operation of local commercial television stations, which broadcast network, syndicated, and locally-produced television programming, as well as commercials and public service announcements to television viewers in Arizona, Connecticut, Georgia, Kansas, Michigan, Missouri, Nevada, South Carolina,

Tennessee, Oregon and Washington.  Meredith has been licensed by SESAC to publicly perform musical compositions and, at least for the period commencing January 1, 2008, has paid more for the licensed rights than it would have in the absence of SESAC's antitrust violations.

57.    The E.W. Scripps Company ("E.W. Scripps") is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located in Cincinnati, Ohio.  Plaintiffs Scripps Media, Inc. ("Scripps Media"), a directly wholly-owned subsidiary of E.W. Scripps, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Cincinnati, Ohio.  E. W. Scripps and Scripps Media are engaged, *inter alia*, in the operation of local commercial television stations, which broadcast network, syndicated, and locally-produced television programming, as well as commercials and public service announcements to television viewers in Arizona, Florida, Kansas, Maryland, Michigan, Missouri, Ohio, and Oklahoma.  E. W. Scripps' and Scripps Media's stations have been licensed by SESAC to publicly perform musical compositions.  At least for the period commencing January 1, 2008, E. W. Scripps and Scripps Media paid more for the licensed rights than they would have in the absence of SESAC's antitrust violations.

58.    Plaintiff Hoak Media, LLC d/b/a Hoak Media Corporation ("Hoak Corp.") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Dallas, Texas.  Plaintiff Hoak Media of Nebraska, LLC, a wholly-owned subsidiary of Hoak Corp., is a corporation organized and existing under the laws of the State of Delaware, headquartered in

Hastings, Nebraska.  Plaintiff Hoak Media of Dakota, LLC, a wholly-owned subsidiary of Hoak Corp., is a corporation organized and existing under the laws of the State of North Dakota, headquartered in Dallas, Texas.  Together, Plaintiffs Hoak Media of Nebraska, LLC, Hoak Media of Dakota, LLC and Hoak Corp. are referred to herein as "Hoak."  Hoak is engaged, *inter alia*, in the operation of local commercial television stations, which broadcast network, syndicated, and locally-produced television programming, as well as commercials and public service announcements to television viewers in Colorado, Florida, Louisiana, Nebraska, North Dakota, South Dakota, and Texas.  Hoak's stations have been licensed by SESAC to publicly perform musical compositions and, at least for the period commencing January 1, 2008, Hoak has paid more for the licensed rights than it would have in the absence of SESAC's antitrust violations.

**B.    Defendants**

59.    Defendant SESAC is a for-profit limited liability company organized and existing under the laws of the State of Delaware.  According to its website, SESAC maintains its headquarters at 55 Music Square East, Nashville, Tennessee.  SESAC has executive offices in New York, New York, as well as offices in Los Angeles, California, Atlanta, Georgia and Miami, Florida.  SESAC also has an office in London, England.

60.    SESAC is engaged in the business of licensing public performance rights in the copyrighted musical compositions of its affiliated composers and music publishers to music users in a broad array of industries.  SESAC operates by: (i) obtaining rights from selected composers and publishers to license public performances of their copyrighted compositions; (ii) issuing blanket licenses to users of

its repertory and collecting license fees from them; (iii) distributing royalties to its affiliated composers and publishers; and (iv) distributing profits to its owners.

      61.    The true names and capacities, whether individual, corporate, or otherwise, of Defendants JOHN DOES 1 through 50, inclusive, currently are unknown to Plaintiffs, and therefore, Plaintiffs sue those Defendants by such fictitious names. The DOE Defendants are co-conspirators with SESAC and have facilitated, adhered to, participated in, and/or communicated with others regarding the antitrust conspiracy alleged herein. The DOE Defendants include, among others, composers and music publishers whose identities are unknown at the present time because SESAC has refused to disclose the entirety of its current repertory. Plaintiffs may seek leave to insert the names and capacities of these fictitiously named Defendants together with charging allegations, when obtained, if not already set forth herein.

## V.    **RELEVANT MARKET, MARKET SHARE AND MARKET POWER**

      62.    As described above, local stations are locked into broadcasting programming for which they must obtain performance rights for embedded music. Licenses from neither ASCAP nor BMI would provide such rights and as such, neither PRO is a substitute for SESAC. Further, it is virtually impossible for local stations to obtain through either direct or source licensing the necessary rights for the entirety of a local station's broadcast schedule. Only in conjunction with a viable per program license, which SESAC has altered (and can even eliminate) at its whim, would direct or source licensing of part of a broadcast schedule be potential substitutes. And, as

explained above, SESAC has transformed its per program license into an illusory "option" that really is no option at all.

63.     SESAC's targeted solicitation of composers has resulted in its repertory of compositions being common in television programming and commercials. For this and the other reasons enumerated above, local stations simply cannot avoid SESAC music.  As a result, every or nearly every local television station in the country has succumbed to SESAC's market power and paid for its supracompetitively priced blanket license.

64.     Therefore, the relevant antitrust product market in this case is the performance rights to the copyrighted material in the SESAC repertory, which repertory changes throughout the Class Period ("SESAC Repertory Performance Rights Market").  Because SESAC's anticompetitive practices have effectively eliminated direct and source licensing as potential alternatives, SESAC's share of the SESAC Repertory Performance Rights Market essentially is 100 percent.  If SESAC were to increase license fees in a significant and non-transitory fashion – which it has done – local stations, such as Plaintiffs, would nevertheless be forced to accept the price demanded by SESAC – which they have.  This is testimony to the monopoly power created, exercised, and abused by the SESAC Cartel, a power achieved not by business acumen, objective historical circumstances, or superior products, but instead by the unlawful practices described herein.

65.     The relevant geographic market is the United States and its territories.

## VI.   **ANTICOMPETITIVE EFFECTS OF DEFENDANTS' PRACTICES**

66.    The purpose and effect of Defendants' conduct is to provide the SESAC Cartel with the market power to force Class Members, including Plaintiffs, to accede to SESAC's demands and pay its supracompetitive fees.  Unlike the case with the remaining PROs, there is: (i) no judicially mandated right of access to SESAC's repertory; (ii) no mechanism available for enforcement of judicially determined "reasonable" rates for SESAC-licensed music; (iii) no economically feasible alternative license to facilitate the direct or source licensing of individual SESAC compositions; and (iv) no limitation on SESAC's securing exclusive license arrangements with its members.

67.    SESAC Cartel members reap the rewards of these unlawful arrangements by sharing in SESAC's monopoly rents – or the proceeds of the supracompetitive blanket license fees SESAC extracts from Class Members.  SESAC Rightsholders are rewarded by supracompetitive royalties, and SESAC's owners are rewarded by supracompetitive profits (SESAC is the only for-profit PRO). Accordingly, SESAC Cartel members are remunerated based not on the value of any individual composition, nor on the prices that their individual compositions would command in a competitive marketplace, nor even on the prices that their compositions would command under the restrictions imposed on ASCAP and BMI.  Instead, their compensation is all that can be obtained by SESAC's unlawful licensing system – unfettered by the "restrictions" of competition.

## VII.   CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action against Defendants under Rule 23(a), (b)(2) and (b)(3) on behalf of all members of the following Class (collectively, the "Class"):

> All owners of local commercial television stations in the United States and its territories that obtained licenses for music performing rights from SESAC during the period from January 1, 2008 to date (the "Class Period"), excluding the owned and operated affiliated stations of the ABC, CBS, and NBC networks.

69.     Plaintiffs believe there are more than 250 owners of local commercial television stations in the Class.  Collectively, members of the Class own well over 1000 local television stations.  Members of the Class are sufficiently numerous and geographically dispersed throughout the United States that joinder of all such members is impracticable.

70.     Questions of law and fact common to the Class are:

(a)     Whether Defendants engaged in an unlawful contract, combination or conspiracy to fix, raise, maintain or stabilize prices;

(b)     The identity of participants in the alleged unlawful contract, combination or conspiracy;

(c)     Whether the alleged unlawful contract, combination, or conspiracy violated Section 1 of the Sherman Act;

(d)     The duration of the unlawful contract, combination, or conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants in furtherance of the unlawful contract, combination, or conspiracy;

(e)     Whether Defendants' monopolistic practices violated Section 2 of the Sherman Act;

(f)     Whether Defendants' conduct amounts to copyright misuse;

(g)     Whether the conduct of the Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and other members of the Class;

(h)     Whether Plaintiffs and other members of the Class are entitled to an injunction to enjoin the unlawful conduct of the Defendants, as alleged in this Complaint;

(i)     The effect of the alleged unlawful contract, combination, conspiracy, or monopolistic practices on prices for music licenses Defendants sold to members of the Class during the Class Period; and

(j)     The appropriate measure of damages sustained.

71.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages and injunctive relief.

72.     By engaging in the unlawful conduct and practices alleged in the Complaint, Defendants have acted on grounds that apply generally to Plaintiffs and all members of the Class.  Final injunctive relief or corresponding declaratory relief, therefore, is appropriate respecting the Class as a whole.

73.     Plaintiffs' claims are typical of the claims of all members of the Class and Plaintiffs will fairly and adequately protect the interests of the Class.

Plaintiffs, local stations and direct licensees of music performing rights from SESAC have been injured by the same unlawful and anticompetitive conduct alleged in the Complaint.  Plaintiffs' interests are consistent with, and not antagonistic to, those of the other members of the Class.

74.     Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

75.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated local television stations to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many members of the Class that otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint.  This class action presents no difficulties in management that would preclude maintenance as a class action.

76.     The Class is readily definable and is one for which records likely exist in SESAC's files.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS):
### UNLAWFUL AGREEMENT IN RESTRAINT OF TRADE
### (SHERMAN ACT, SECTION 1, 15 U.S.C. § 1)

77.     Plaintiffs incorporate and reallege each and every allegation set forth in Paragraphs 1 through 76 as though repeated and realleged here in full.

78.    SESAC, its affiliated composers, authors and music publishers, including the DOE Defendants, have continuously engaged in an unlawful contract, combination or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

79.    The contract, combination or conspiracy has consisted of continuing agreements to fix, peg, raise, stabilize, effect and tamper with market prices for licenses for copyrighted musical compositions in the SESAC Repertory Performance Rights Market in violation of Section 1 of the Sherman Act.

80.    The aforesaid Sherman Act Section 1 violations have had the following anticompetitive effects in the SESAC Repertory Performance Rights Market:

(a)    Price competition between and among SESAC Rightsholders in the licensing of performance rights in copyrighted musical competitions has been eliminated or suppressed;

(b)    Anticompetitive price structures for music performance rights have been established and maintained;

(c)    Plaintiffs and members of the Class have been deprived of the benefits of free competition in the determination of prices, royalty rates and fees;

(d)    Plaintiffs and members of the Class have been effectively denied an opportunity to license one or more SESAC compositions on any viable basis other than through a blanket license covering all the copyrighted musical compositions in SESAC's repertory;

(e)      Plaintiffs and members of the Class have been effectively denied an opportunity to license one or more SESAC compositions on any basis other than one requiring them to forego free choice in licensing performance rights in copyrighted musical compositions of SESAC's affiliated composers, authors and music publishers, and compelling them to accept and pay for performance rights they neither use nor want in order to obtain the rights they actually need;

(f)      Plaintiffs and members of the Class effectively have been denied an opportunity to license one or more SESAC compositions on any basis other than that requiring supracompetitive and arbitrarily determined fees bearing no relation to actual usage;

(g)      Plaintiffs and members of the Class have been forced to pay excessive license royalties they otherwise would not have paid in the absence of Defendants' anticompetitive conduct;

(h)      Actual and potential competition in licensing public performance rights in the compositions of SESAC's affiliated composers, authors and music publishers has been adversely affected, excluded and prevented; and

(i)      Competition in the form of alternatives to the SESAC blanket license has been adversely affected, excluded and prevented.

81.      Defendants' foregoing actions constitute *per se* unlawful price-fixing agreements.  Alternatively, Defendants' foregoing actions constitute unreasonable restraints of trade.

31

82. Defendants threaten to, and will, continue the aforesaid violations of Section 1 of the Sherman Act, causing injury and damage to competition, unless the injunctive relief sought herein is granted.

### SECOND CLAIM FOR RELIEF (AGAINST SESAC ONLY): MONOPOLIZATION (SESAC REPERTORY PERFORMANCE RIGHTS MARKET) (SHERMAN ACT, SECTION 2, 15 U.S.C. § 2)

83. Plaintiffs incorporate and reallege each and every allegation set forth in Paragraphs 1 through 82 as though repeated and realleged here in full.

84. SESAC has unlawfully obtained and maintained power over the price of the license fees and the power to exclude license competition in the SESAC Repertory Performance Rights Market.

85. SESAC has exercised monopoly power over Plaintiffs and members of the Class that have had no choice other than to take blanket licenses from SESAC on terms dictated by SESAC and distorted by the unlawful activities alleged herein.

86. SESAC has willfully maintained monopoly power in the SESAC Repertory Performance Rights Market through overt exclusionary acts, such as: (i) preventing select SESAC-affiliated composers from entering into direct license agreements with music users; (ii) tying together all musical compositions, including both unwanted and desired compositions and both feature and non-feature music, into an all-or-nothing blanket license; (iii) refusing to offer Plaintiffs and members of the Class a viable alternative form of license to its all-or-nothing blanket license; (iv) refusing to offer users fair and reasonable interim licenses pending resolution of negotiations; and (v) refusing to negotiate in good faith, which have restrained and

impeded the growth of its existing or potential competitors and competitive licensing arrangements. This conduct has violated and continues to violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

87.     Such violations and the effects thereof are continuing and will continue unless the injunctive relief sought herein is granted.

### THIRD CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS): CONSPIRACY TO MONOPOLIZE (SHERMAN ACT, SECTION 2, 15 U.S.C. § 2)

88.     Plaintiffs incorporate and reallege each and every allegation set forth in Paragraphs 1 through 87 as though repeated and realleged here in full.

89.     SESAC possesses monopoly power in the SESAC Repertory Performance Rights Market.

90.     Unlike ASCAP and BMI, SESAC only permits composers, authors and music publishers to become SESAC members by invitation. In this way, SESAC is able to control the composition of its membership, limiting it to those composers, authors and music publishers that maximize its leverage over SESAC customers.

91.     In selecting potential members, SESAC has actively courted composers, authors and music publishers known to have content embedded in popular television content.

92.     SESAC has induced these composers, authors and music publishers to join SESAC by promising increased revenues, incentives, revenue guarantees, and upfront payments, over and above those offered by ASCAP and BMI.

SESAC's ability to offer such inducements is predicated on its ability to charge license fees at unreasonable and supracompetitive rates.

93.     SESAC's ability to charge supracompetitive prices, unconstrained by any consent decree, is notorious among rightsholders, as is SESAC's willingness to pass along some of its supracompetitive gains to its members in the form of increased license payments.  As a practical matter, SESAC is known to allow its members to obtain effective royalty rates for their works over and above those available from the judicially-supervised PROs.  SESAC members join SESAC knowing of, and intending to profit from, the anticompetitive practices of the SESAC Cartel.

94.     SESAC Rightsholders have contributed to the SESAC Cartel by, among other things, agreeing not to offer direct licenses to their copyrighted works at rates below those offered by SESAC, and by agreeing to accept lower royalties from SESAC as a penalty for offering direct licenses.

95.     Defendants have a specific intent to monopolize the SESAC Repertory Performance Rights Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

96.     SESAC, its affiliated composers, authors and music publishers, including the DOE Defendants, have conspired to monopolize the SESAC Repertory Performance Rights Market.  By virtue of the exclusionary and anticompetitive actions of Defendants, as well as their agents and co-conspirators, Defendants have engaged in anticompetitive conduct that has furthered their conspiracy to monopolize the SESAC Repertory Performance Rights Market.

97.     Such violations and the effects thereof are continuing and will continue unless the injunctive relief sought herein is granted.


## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class, pray for relief as follows:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

B.     The Court adjudge and decree that:

1.     Defendants have contracted, combined and conspired to restrain interstate trade and commerce in the SESAC Repertory Performance Rights Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.     Defendant SESAC has acquired, willfully maintained, and abused monopoly power through exclusionary acts, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, in the SESAC Repertory Performance Rights Market;

3.     Defendants have conspired for SESAC to acquire, willfully maintain, and abuse monopoly power through exclusionary acts, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, in the SESAC Repertory Performance Rights Market;

4.     By violating the antitrust laws as alleged herein, Defendants and all other members of the SESAC Cartel have misused the

copyrights licensed by SESAC for anticompetitive and unlawful purposes, the adverse effects of such misuse are continuing, and such copyrights should be declared unenforceable until such time as adequate relief is entered to remedy the violations alleged, and the effects of the violations are dissipated;

5.     Defendants and all other members of the SESAC Cartel, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants and the other members of the SESAC Cartel, or in concert with them, be permanently enjoined and restrained from, directly or indirectly continuing to impose the unlawful price-fixing agreements and other unlawful conduct detailed in this Complaint, and from engaging in any other combination, conspiracy, contract, agreement, understanding or concert of action having a similar purpose or effect and from adopting or following any practice, plan, program or device having a similar purpose or effect;

6.     Defendants and all other members of the SESAC Cartel, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants and the other members of the SESAC Cartel, or in concert with them, be permanently enjoined and restrained from instituting, or threatening to institute, copyright infringement actions directed against the use by Plaintiffs, and

members of the Class, of copyrighted musical compositions licensed by

SESAC, until the effects of the anticompetitive conduct described herein

have been dissipated.

C.     The Court order Defendants to pay Plaintiffs and the Class three-

fold the amount of damages the Court determines that each has sustained by reason of the

violations of the Sherman Act herein described;

D.     The Court award Plaintiffs the costs and disbursements of this

action, including attorneys' fees, and pre-judgment and post-judgment interest as

permitted by law;

E.     The Court grant such other relief as may be necessary or

appropriate to dissipate fully the effects of Defendants' unlawful activities as alleged

herein, and to permit and restore free and open competitive conditions in the marketplace;

and

F.     The Court grant such other and further relief as may be necessary

and appropriate.

Dated:  New York, NY
    March 18, 2010

           Respectfully submitted,

           By :
             HELENE D. JAFFE

           HELENE D. JAFFE
           R. BRUCE RICH
           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           (212) 310-8000

           CARRIE M. ANDERSON
           WEIL, GOTSHAL & MANGES LLP
           1300 Eye Street, N.W.
           Washington, D.C.  20005
           (202) 682-7000

           *Counsel for Plaintiffs*