**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

MEREDITH CORPORATION, *et al.*    :
             :
             :
v.             :   Case No. 09 Civ. 9177 (PAE)
             :
SESAC, LLC, *et al.*      :
             :

_____

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
<u>TO DEFENDANT SESAC, LLC'S MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................7

I.      Local Station Programming and the Need for Licenses From All Three PROs .................7

II.     SESAC Has Exploited Its Monopoly Power To Harm Local Stations .............................10

        A.      Unlike ASCAP and BMI, SESAC Is Not Subject to Any Constraints .................10

        B.      The Development of SESAC's Monopoly Power ...................................13

        C.      SESAC's Collective Licensing ..............................................................14

        D.      SESAC's Restrictive Agreements with Key Affiliates .........................15

        E.      SESAC's Artificially Inflated Blanket License Fees and Illusory Per
                Program License ...................................................................................18

LEGAL STANDARD .........................................................................................................24

ARGUMENT ......................................................................................................................26

I.      Overwhelming Evidence Precludes Summary Judgment Against Plaintiff's *Per Se*
        Claim Under Section 1 of the Sherman Act.....................................................................27

        A.      SESAC's Blanket License.....................................................................28

        B.      SESAC's Direct Licensing Restrictions................................................34

II.     Overwhelming Evidence Precludes Summary Judgment Against Plaintiffs' *Rule of
        Reason* Claim Under Section 1 of the Sherman Act and Monopolization Claims
        Under Section 2 of the Sherman Act.................................................................................37

        A.      Required Factual Showing for the Relevant Product Market ................38

        B.      Required Factual Showing for the Claims .............................................41

        C.      SESAC's Assertion That Plaintiffs Cannot Establish That There Are No
                Realistic Alternatives to the Blanket License is Meritless....................45

        D.      SESAC's Assertion That Plaintiffs Cannot Demonstrate Harm to
                Competition is Contrary to Settled Law and is Refuted by the Economic
                Evidence.................................................................................................49

CONCLUSION....................................................................................................................57

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Affiliated Music Enters., Inc. v. SESAC, Inc.*,
   160 F. Supp. 865 (S.D.N.Y. 1958), *aff'd*, 268 F.2d 13 (2d Cir. 1959) ........................13, 29, 30

*Argus, Inc. v. Eastman Kodak Co.*,
   801 F.2d 38 (2d Cir. 1986) ...................................................................................................52

*Alden-Rochelle Inc. v. ASCAP*,
   80 F. Supp. 888 (S.D.N.Y. 1948) ..............................................................................28, 30, 53

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246 (2d Cir. 1987) ...............................................................................................25

*ASCAP v. MobiTV Inc*,
   681 F.3d 76 (2d Cir. 2012)..................................................................................................56

*ASCAP v. Showtime/The Movie Channel, Inc.*,
   912 F.2d 563 (2d Cir. 1990) ............................................................................................1, 56

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990)...........................................................................................................50

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ...........................................................................................54

*Broadcast Music, Inc. v. Columbia Broadcast System, Inc., et al.*,
   441 U.S. 1 (1979)....................................................................................................... *passim*

*BMI v. DMX, Inc.*,
   726 F. Supp. 2d 355 (S.D.N.Y. 2010), *aff'd*, 683 F.3d 32 (2d Cir. 2012) ..........6, 11, 12, 33, 56

*Buffalo Broad. Co. v. ASCAP*,
   546 F. Supp. 274 (S.D.N.Y. 1982), *rev'd*, 744 F.2d 917 (2d Cir. 1984)...........32, 46, 47, 48, 56

*CBS v. ASCAP*,
   620 F.2d 930 (2d Cir. 1980) ..............................................................................25, 26, 47, 57

*City of Anaheim v. S. Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992) .............................................................................................25

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)...........................................................................................................25

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984) ................................................................................................................ 2

*Dickson v. Microsoft*,
   309 F.3d 193 (4th Cir. 2002) .................................................................................................. 33

*Eastman Kodak v. Image Technical Servs.*,
   504 U.S. 451 (1992) ......................................................................................................... 25, 42

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
   129 F.3d 240 (2d Cir. 1997) ................................................................................................... 37

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ......................................................................................................... 26, 28

*M. Witmark & Sons v. Jensen*,
   80 F. Supp. 843 (D. Minn. 1948) ................................................................................. 29, 30, 56

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
   468 U.S. 85 (1984) ................................................................................................................ 32

*New York ex rel. Spitzer v. Feldman*,
   No. 01 Civ. 6691 (SAS), 2003 U.S. Dist. LEXIS 11759 (S.D.N.Y. July 10, 2003) ............... 33

*In re Publ'n Paper Antitrust Litig.*,
   609 F.3d 51 (2d Cir. 2012) ............................................................................................... 25, 52

*Regent Ins. Co. v. Storm King Contracting, Inc.*,
   No. 06 Civ. 2879 (LBS), 2008 WL 563465 (S.D.N.Y. Feb. 27, 2008) .................................... 35

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) .............................................................................................................. 13

*Application of THP Capstar Acquisition Corp.*,
   756 F. Supp. 2d 516 (S.D.N.Y. 2010) ................................................................................. 6, 11

*United States v. ASCAP (In re Application of Buffalo Broad. Co.)*,
   Civ. No. 13-95 (WCC) (MHD), 1993 WL 60687 (S.D.N.Y. Mar. 1, 1993) ....................... 12, 56

*United States v. ASCAP*,
   2001-2 Trade Cas. (CCH) ¶ 73,474 (S.D.N.Y. June 11, 2001) .............................................. 10

*United States v. ASCAP*,
   1940 Trade Cas. (CCH) ¶ 56,204 (S.D.N.Y. 1941) ............................................................... 10

*United States v. BMI*,
   1940-43 Trade Cas. (CCH) ¶ 56,096 (E.D. Wis. 1941) ......................................................... 10

iii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*United States v. BMI*,
    1996-1 Trade Cas. (CCH) ¶ 71,379 (S.D.N.Y. Nov. 18, 1994)...............................................10

*United States v. Time Warner,*
    No. MISC.A. 94-338 (HHG), 1997 WL 118413 (D.D.C. Jan. 22, 1997) ...............................50

*United States v. Visa* (2d Cir. 2003)
    344 F.3d 229 (2nd Cir. 2003) ...................................................................................................49

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..................................................................................................................26

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
    668 F.2d 1014 (9th Cir. 1982) ...........................................................................................11, 33

*WPIX, Inc. v. Broad. Music, Inc.*,
    09 Civ. 10366, Opinion and Order (S.D.N.Y. Apr. 27, 2012)...........................................11, 33

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)..................................................................................................................52

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012), *cert. denied*, 133 S.Ct. 2025 (2013) .........................................41

**Statutes, Rules & Regulations**

17 U.S.C. § 114(e)(1)....................................................................................................................59

17 U.S.C. § 504(c) ...........................................................................................................................8

141 Cong. Rec. S 11954 (1995). ............................................................................................... 59-60

**Other Authorities**

ABA SECTION OF ANTITRUST LAW, MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST
    CASES, 2005 Edition (2005).......................................................................................................53

Mem. of United States on Decree Constr. Issues, *Broad. Music, Inc. v. DMX, Inc.*, No. 08 Civ.
    216 (LLS) (S.D.N.Y. Apr. 13, 2010) ................................................................................. 12-13

## INTRODUCTION

Plaintiffs and the putative class are commercial local television broadcasters (collectively, "local stations") who seek antitrust relief from the unlawful conduct of defendant SESAC, LLC ("SESAC"), one of three U.S. performance rights organizations ("PROs").  The anticompetitive potential of PRO licensing has long been recognized.  SESAC and the other two PROs, the American Society of Composers, Authors and Publishers ("ASCAP") and Broadcast Music, Inc. ("BMI"), each aggregates under one licensing roof, and each licenses *collectively* at a fee determined by the PRO, the public performance rights to very large numbers of musical works controlled by the thousands of otherwise competing copyright owners (composers and music publishers) who affiliate with them.  As the Second Circuit has recognized, this licensing system acts to eliminate price competition between and among the PROs' affiliated copyright owners to have their works publicly performed.   *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d. 563, 570 (2d Cir. 1990) ("in the licensing of music rights, songs do not compete against each other on the basis of price").

In the case of ASCAP and BMI, arrangements that would otherwise plainly be condemned as naked restraints of trade amongst horizontal competitors have survived judicial scrutiny in large part because of the conduct-regulating antitrust consent decrees to which each is a party.  As the Supreme Court has observed, in assessing the legality of those PROs' conduct under the antitrust laws, "the substantial restraints" placed on ASCAP, BMI and their affiliated rightsholders by their consent decrees "cannot be ignored."  *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 24 (1979) ("*BMI*").

Those consent decrees, which are the result of earlier challenges both by the Antitrust Division of the U.S. Department of Justice ("DOJ") and private litigants to ASCAP's and BMI's

licensing practices, impose a number of significant constraints upon those organizations' activities to rein in their monopoly pricing power.  Specifically as they relate to the local stations, those restrictions include:

- requiring ASCAP and BMI to issue licenses to the local stations on request, averting threats of copyright infringement for the stations' failure to accede to these PROs' license fee demands;

- empowering the federal court in this District, which supervises the decrees, to act as a "rate court" in setting "reasonable" license fees in the event of negotiating impasse;

- requiring ASCAP and BMI to acquire solely *non-exclusive* rights to license the public performance rights to their affiliated rightsholders' works; and

- mandating that ASCAP and BMI offer local stations economically viable alternative forms of license beyond a fixed-fee blanket license (specifically, per program and adjustable-fee blanket licenses), thereby enabling stations to secure public performance rights to at least portions of their music uses either directly from composers and music publishers ("direct licenses") or through program suppliers who themselves would acquire those rights on the stations' behalf ("source licensing"), and to do so without double paying for the same rights.

These decretal provisions, as enforced by the courts, have played a pivotal role in affording the local stations access to competitive options for rights clearances other than through the PROs' preferred fixed-fee blanket licenses, and also have resulted in dramatic fee reductions for stations accessing music through ASCAP and BMI blanket licenses.

The ameliorating features of the ASCAP and BMI consent decrees have, in large part, prevented ASCAP's and BMI's practices from "automatically be[ing] declared illegal" under the Sherman Act, *BMI*, 441 U.S. at 24 (1979).[1]  They nevertheless remain subject to "discriminating examination under the rule of reason," *id.,* which requires "an inquiry into the market power and market structure designed to assess [the] actual effect" of the challenged restraint of trade. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

---

[1] In fact, as we discuss *infra* at 31-32, ASCAP's licensing practices prior to its 1950 decree amendment were condemned as *per se* illegal in circumstances that are parallel to those presented by this action.

The SESAC conduct challenged by this suit, however, features the very same sorts of anticompetitive activities in which ASCAP and BMI engaged *prior* to being regulated – with the same anticompetitive effects.   SESAC thus has created and enabled a horizontal agreement among the 23,000 copyright holders who affiliate with it (collectively, "affiliates") through which price competition between and among those affiliates to have their works performed by local stations has been eliminated.   Under this collective pooling arrangement:

- SESAC offers local stations only one viable form of license: an "all-or-nothing" blanket license that affords access to the entire repertory of SESAC affiliates' works at a price fixed by SESAC that does not vary with the extent of a local station's actual need for or use of SESAC music.

- SESAC has entered into *de facto* exclusive license arrangements with key television music composers the purpose and effect of which are to ensure that local stations can secure licenses to those composers' works only via SESAC's take-it-or-leave it (and be sued) blanket license.

- SESAC has refused to offer local stations economically viable license alternatives to its fixed-price blanket license, such that the stations lack any economic incentive to secure direct or source licenses relating to the works even of those SESAC affiliates who are not tied up through exclusivity; to engage in such efforts would entail the stations paying twice for the same performance rights – once directly to the rightsholder or program supplier and then again to SESAC via the compelled, unvarying-fee blanket license.

Coupling the licensing vise so created with its ability to arbitrarily withhold access to its repertory from a recalcitrant local station and with its freedom from any mandated third-party fee-setting mechanism akin to the ASCAP and BMI rate courts, SESAC has exploited its monopoly power to impose exorbitant overcharges on local stations in recent years.   This lawsuit seeks to end such anticompetitive behavior.

In a well-reasoned 40-page decision denying SESAC's motion to dismiss, Judge Buchwald comprehensively analyzed the plaintiffs' allegations and the extensive antitrust jurisprudence governing PROs.  She concluded that plaintiffs' allegations, if proven, stated

violations of Sections 1 and 2 of the Sherman Act.  Judge Buchwald clearly laid out the architecture of this case and what evidence plaintiffs would need to prove their claims.  Yet remarkably, other than a passing reference, SESAC's motion for summary judgment entirely ignores Judge Buchwald's decision.  Mem. at 11.[2]

Specifically, with respect to the relevant product market in which to analyze the economic effect of SESAC's licensing practices, Judge Buchwald concluded that plaintiffs "adequately alleged that performance rights to songs in the SESAC repertory are not interchangeable with performance rights to songs in the repertories of other PROs" based on these three allegations: (i) "virtually all composers affiliate with only one of the three PROs"; (ii) "almost all stations have licenses from all three PROs"; and (iii) "local stations have not reacted to SESAC's price increases by replacing SESAC licenses with alternative licenses."  MTD at 25.[3]  With respect to the lawfulness of SESAC's licensing practices, Judge Buchwald concluded that four factual allegations "[were] sufficient to state a claim for a § 1 violation":  (i) "SESAC has entered into exclusive licensing arrangements with [affiliates]"; (ii) "SESAC does not offer a viable per-program license"; (iii) "it is virtually impossible for local stations to avoid SESAC music"; and (iv) "the SESAC blanket license's fee structure effectively forecloses alternative licensing options." Id. at 34-35.[4]

---

[2] "Mem." refers to the Mem. of Law in Support of Def. SESAC LLC's Mot. for Summ. J., filed under seal on June 14, 2013.  Unless otherwise noted herein, emphasis is added in italics.

[3] "MTD" refers to the Court's Memorandum & Order, Meredith Corp. v. SESAC LLC, No. 09 Civ. 9177, (S.D.N.Y., Mar. 8, 2011) (Dkt. 33), which has been attached to the Declaration of Eric S. Hochstadt in Support of Plaintiffs' Opposition to Defendant SESAC LLC's Motion for Summary Judgment as Exhibit 218 for the Court's ease of reference.

[4] Judge Buchwald determined that the analysis in this case under Sections 1 and 2 was essentially the same.  MTD at 39 (concluding that "the conduct that plaintiffs allege violates § 2 is the same as the conduct underlying its § 1 claim" and that "having sustained plaintiffs' § 1 claim based on these allegations," the Court found that "plaintiffs have plausibly alleged that SESAC's monopoly power has been maintained or acquired through the alleged exclusionary conduct").

Guided by that decision, the parties engaged in extensive fact and expert discovery. Mem. at 13. That discovery produced far more than evidence that simply gives rise to "material issues of fact" capable of defeating SESAC's motion for summary judgment. Plaintiffs uncovered "smoking gun" documents and *overwhelming* evidence to support the core facts, including:

1. U.S. composers affiliate with one, but only one, of the three U.S. PROs;

2. SESAC jointly licenses the works of 23,000 separate and otherwise competing composers and music publishers;

3. Each SESAC affiliate authorizes SESAC to determine the terms on which, and prices at which, to license, as a bundle, *all* of their works and the works of all other SESAC affiliates, in the form of a blanket license;

4. SESAC's authority to license the public performance rights of its key affiliates with music in local television programming is, as a practical matter, on an *exclusive* basis;

5. SESAC affiliates are well aware of, agree to, and participate in, the SESAC licensing scheme that only serves to increase the license fees that SESAC exacts from local stations;

6. In the face of SESAC's licensing practices, including its unwillingness and/or inability to comprehensively identify the music in its repertory, no local station can avoid airing programming containing SESAC music. Thus, all local stations must – and do – have a SESAC license, even though they also have licenses from ASCAP and BMI;

7. The only viable form of license that SESAC offers to local stations is a blanket license at an "all or nothing" price;

8. Because local stations have no realistic alternative to taking the SESAC blanket license, SESAC's collective licensing regime has shielded its affiliates from competition to have their works performed by the local stations;

9. Stations have been forced to continue taking a SESAC blanket license despite significant multi-year license fee increases instituted by SESAC; and

10. As a result, local stations have no choice but to take a SESAC blanket license on the terms, and at the fees, demanded by SESAC.

Consistent with Judge Buchwald's opinion, this evidence is clearly sufficient to defeat SESAC's summary judgment motion.

Plaintiffs' antitrust claims are further supported by the expert opinions of Professor Adam B. Jaffe, a qualified Ph.D. economist well versed in the areas of antitrust economics, PROs, and music licensing.  Professor Jaffe has testified, and been cited favorably, by courts in this District (including by Judges Cote and Stanton, who respectively oversee the ASCAP and BMI rate courts) and the Second Circuit.[5]  Professor Jaffe concluded that SESAC has eliminated price competition among its affiliates by aggregating their copyrights into a single blanket license that is collusively priced and rendered any alternative to the blanket license economically nonviable to local stations.  Professor Jaffe determined that SESAC used the monopoly power it has derived from its 100% share in the market for the performance rights to the copyrighted works in the SESAC repertory to harm local stations by forcing them to take the SESAC blanket license at artificially inflated fee levels.  Professor Jaffe's analysis conservatively estimates that SESAC *overcharged local stations by nearly 30%* between 2008 (the beginning of the class period) and 2012 (and the overcharges have continued in 2013).  To remedy this harm, Professor Jaffe opined there are injunctive remedies available that would create opportunities for competition in the relevant product market.

By contrast, SESAC's motion is not supported by the opinions of any economic expert. SESAC's motion does not rely on, cite, or even attach the report or testimony of Dr. David Evans, the economist SESAC retained in this case.  This omission speaks volumes about the weakness of SESAC's antitrust positions.

---

[5] *See Application of THP Capstar Acquisition Corp.*, 756 F. Supp. 2d 516 (S.D.N.Y. 2010); *BMI v. DMX, Inc.*, 726 F. Supp. 2d 355 (S.D.N.Y. 2010).  These decisions adopted Professor Jaffe's analysis and were affirmed by the Second Circuit.  *See BMI v. DMX, Inc.*, 683 F.3d 32 (2d Cir. 2012).

Unable to address the framework that Judge Buchwald established for this case and the fact and expert evidence that precludes summary judgment thereunder, SESAC's motion reflects nothing more than an attempt to reassert defenses against the pleading that have already been rejected as a matter of law and now are utterly undermined by the fully developed factual record. This is not a remotely close case at summary judgment, and the notion that plaintiffs have not raised material disputed facts for a jury to decide is virtually frivolous. As SESAC tacitly acknowledges, and as Judge Buchwald observed in denying SESAC's motion to dismiss, all other similar lawsuits "were decided after *full trial on the merits*." MTD at 30-32; *see* Mem. at 9-11. With this record, there is absolutely no basis for a different – and unprecedented – result here. Plaintiffs are plainly entitled to prove their claims at trial.

Accordingly, plaintiffs respectfully request that SESAC's motion be denied.

## STATEMENT OF FACTS

At its core, this case is about how SESAC – an outlying, unconstrained PRO – has colluded with its affiliates to amass monopoly power over local stations in order to unlawfully extort artificially high license fees. Before turning to SESAC's unlawful behavior, to better appreciate how SESAC has been able to attain and exploit this posture, we provide contextual background, drawn from the record of the case.

## I.  Local Station Programming and the Need for Licenses From All Three PROs

Local stations broadcast a mix of programming, the majority of which is (i) transmitted by the networks with which local stations may be affiliated; and (ii) produced by third parties, such as syndicated programs (*e.g., House*, *Seinfeld*, and *Wheel of Fortune*), movies, and infomercials. In addition, local stations broadcast programming they produce, such as local

news.[6]  Music is contained in all such programming as well as in the commercials that local

stations air.[7]

　　　With limited exceptions, local stations are responsible for obtaining licenses for the

broadcasts of copyrighted music in all of the programming and commercial announcements they

air.[8]  If a station broadcasts a copyright-protected performance of a musical work without

permission, it faces the threat of statutory penalties for copyright infringement that can be as high

as $150,000 per infringed work.[9]  These penalties are not conditioned upon the economic

significance of the infringement, and the lack of intent to infringe is not a defense.  SESAC is

well aware – and takes full advantage – of the fact that "[t]he copyrights of … songs are

federally protected with significant penalties for infringement" and that "the penalties for using

SESAC content without a license are extremely severe…."[10]

　　　Unlike all of the other rights a local station needs to air third-party produced

programming and commercial announcements (including those for artistic outputs such as a

script, visual images, acting, and direction), which are secured by their producers and conveyed

to local stations, the public performance rights are left to the local stations themselves to procure

– in many cases long after creation of the programming or announcement and the selection of the

music contained therein.[11]  In those circumstances, stations have turned to ASCAP, BMI, and

SESAC for the necessary performing rights licenses, a need that historically has been

---

[6] Pls.' L.R. 56.1 Supplemental Statement of Undisputed Facts ("Pls.' 56.1 Stmt."), at ¶ 140; Pls.' Responses to Def.
SESAC's L.R. 56.1 Statement of Undisputed Facts ("56.1 Response"), at ¶ 5.  Both documents were filed under seal
contemporaneously herewith.

[7] 56.1 Response ¶ 1.

[8] The ABC, CBS, NBC, Univision, and TeleFutura television networks obtain "through-to-the-viewer" licenses from
the three U.S. PROs covering public performances of the music embedded in their programming, including
performances made by their local-station affiliates when those stations broadcast the programming.  Accordingly, no
separate licenses are needed by the local stations affiliated with these networks to perform the music in these
programs.  56.1 Response ¶ 17.

[9] 17 U.S.C. § 504(c).

[10] Pls.' 56.1 Stmt. ¶ 139.

[11] 56.1 Response ¶ 16.

predominantly fulfilled by those PROs' issuance of blanket licenses that convey the right to unlimited performance of any music within the PRO's repertory at a fixed price that is unaffected by the extent of a station's actual music performance.[12]  Because this traditional, PRO-preferred form of blanket license bundles all of the works of the PRO-affiliated composers and publishers and is offered only on an all-or-nothing basis, it eliminates any incentive for local stations to attempt to obtain licenses pertaining to specific musical works by other means, specifically, via direct or source licensing.  The PROs and their affiliates are thereby insulated from competing to license performances of their works to local stations.[13]

Local stations cannot mitigate the anticompetitive consequences the blanket license by playing one PRO off another and choosing to secure licenses from fewer than all PROs.  Such competition is unavailable because the license arrangements entered into between the PROs and composers and music publishers contractually limit a given rightsholder to affiliating with only one PRO at a time.[14]  Since the 1990s, SESAC has grown its repertory significantly[15] such that the rights it licenses infuse much local station programming.  SESAC currently has 23,000 affiliated writers and publishers, certain of whom control the rights to music that appears in some of the most popular programs on local television, such as *Entertainment Tonight, Dr. Phil, Ugly Betty, Grey's Anatomy, Seinfeld*, and *House*.[16]  Insofar as copyrighted music from the repertories of all three PROs appears in the range of station programming, the stations have no alternative but to obtain licenses from each PRO.[17]

---

[12] 56.1 Response ¶ 31.

[13] Pls.' 56.1 Stmt. ¶¶ 288, 290-91.

[14] 56.1 Response ¶ 20.

[15] Between 2003 and 2012 alone, the number of SESAC affiliates nearly tripled from 8,000 to 22,000.  Pls. 56.1 Stmt. ¶ 124; 56.1 Response ¶ 41.

[16] Pls. 56.1 Stmt. ¶¶ 132-136; 56.1 Response ¶ 41.

[17] Pls.' 56.1 Stmt. ¶¶ 207-209; 56.1 Response ¶ 33.  In addition, the local stations are contractually barred from changing the music in programming and commercials produced by third parties.  Pls. 56.1 Stmt. ¶¶ 143-145; 56.1 Response ¶ 11.

Moreover, SESAC has made it virtually impossible to determine what music broadcast by local stations is in the SESAC repertory.  For one, SESAC itself often does not know if a particular program contains SESAC-repertory music as its own database of music use information is incomplete.[18]  SESAC's own consultant found that SESAC was missing such "cue sheet" information for a substantial portion of programming on local stations.[19]  For another, SESAC will not provide stations with complete and up-to-date information of all of the works in its repertory in any usable form.[20]  Thus, while SESAC is smaller than ASCAP and BMI, a license from SESAC is no less essential to the local stations than a license from ASCAP or BMI. As a SESAC owner candidly stated, "[i]t would be *impossible* for a … station to operate without a SESAC license."[21]

## II. SESAC Has Exploited Its Monopoly Power To Harm Local Stations

### A.  Unlike ASCAP and BMI, SESAC Is Not Subject to Any Constraints

In an effort to rein in the monopoly power amassed by ASCAP and BMI in their earlier years as a result of their collective licensing practices, the DOJ brought antitrust enforcement actions challenging certain of those PROs' licensing activities.  These lawsuits resulted in judicially approved consent decrees.  *See United States v. Broad. Music, Inc.*, 1940-43 Trade Cas. (CCH) ¶ 56,096 (E.D. Wis. 1941); *United States v. ASCAP*, 1940-43 Trade Cas. (CCH) ¶ 56,204 (S.D.N.Y. 1941).[22]  As noted above, important components of those consent decrees, as amended, are provisions: (i) barring those PROs from obtaining exclusive rights to license their

---

[18] Pls.' 56.1 Stmt. ¶¶ 279-283.
[19] Pls.' 56.1 Stmt. ¶ 283.
[20] Pls.' 56.1 Stmt. ¶¶ 285-287.
[21] Pls.' 56.1 Stmt. ¶ 210; 56.1 Response ¶ 20.
[22] These consent decrees have been amended over time.  *United States v. Broad. Music, Inc.*, 1996-1 Trade Cas. (CCH) ¶ 71,379 (S.D.N.Y. Nov. 18, 1994); *United States v. ASCAP*, 2001-2 Trade Cas. (CCH) ¶ 73,474 (S.D.N.Y. June 11, 2001).

affiliated copyright owners' works;[23] (ii) requiring ASCAP and BMI to grant licenses to any user upon written request; (iii) providing users with recourse to a rate court that is tasked with setting "reasonable" fees in the event that the parties cannot come to an agreement; and (iv) requiring that local stations be afforded economically viable alternatives to the blanket license, such as a per program license[24] and (as recently judicially determined) an adjustable-fee blanket license.[25]

The compulsory license and rate court protections have afforded the local stations sorely needed relief from those PROs' arbitrary license fee demands and reduced fee levels significantly below those sought by those PROs.[26] As important, the decree protections and the aid of court intervention have provided local stations with several license alternatives to the PROs' favored all-or-nothing blanket license that are designed to bring the pricing of music performance rights more closely in line with actual station music usage, as well as to give individual stations an economic incentive to negotiate source and direct licenses to fulfill at least part of their music licensing needs.

As noted by Judge Dolinger, the availability of the per program license "provides, in itself, potential competition to the blanket license and the possibility of a bridge to greater source and direct licensing by the stations. Indeed, this potential for enhancing the competitiveness of the music licensing market presumably explains why the per program provision was included in

---

[23] This non-exclusivity extended solely to the PROs' license authority *vis-a-vis* users; it did not bar ASCAP or BMI from obtaining licensing authority from rights holders exclusive to other PROs.

[24] A "per program license" is an alternative license form to the blanket license that enables a local station to secure at least some of the performance rights it requires in competitive-market transactions and thereby reduce the overall license fee it pays to a PRO. Under the per program license, a station is able to reduce the fee it pays to a PRO when it "clears" one or more of its programs of music from that PRO via source and direct licensing or by simply eliminating that music from programs it produces. An adjustable-fee blanket license provides credits for works the performance rights to which have been separately acquired via source and direct licensing transactions. Unlike with the per program license, there is no need to clear an entire program of the PRO-affiliated works for the station to receive a credit.

[25] *Application of THP Capstar Acquisition Corp.*, 756 F. Supp. 2d 516 (S.D.N.Y. 2010); *Broad. Music, Inc. v. DMX, Inc.*, 726 F. Supp. 2d 355 (S.D.N.Y. 2010); *Broad. Music Inc., v. DMX, Inc.*, 683 F.3d 32 (2d Cir. 2012); *WPIX, Inc. v. Broad. Music, Inc.*, 09 Civ. 10366, Opinion and Order (S.D.N.Y. Apr. 27, 2012).

[26] *See infra* n. 197.

the 1941 [ASCAP] Decree." *United States v. ASCAP (In re Application of Buffalo Broad. Co.)*,

Civ. No. 13-95 (WCC) (MHD), 1993 WL 60687, at *54 (S.D.N.Y. Mar. 1, 1993).  Similarly, the

adjustable-fee blanket license, as noted by the DOJ in *Broad. Music, Inc. v. DMX, Inc.*,

> enables a music user to pit rights holders against one another in direct
> licensing competition.  This competition would make the music licensing
> market more similar to other competitive markets in our economy where a
> user negotiates directly with sellers and will choose to buy more from those
> sellers that offer the best terms.  As a group, the [PRO] rights holders would
> prefer to avoid bidding against each other to offer the best direct licensing
> terms.[27]

In stark contrast to ASCAP and BMI, SESAC is subject to none of the aforementioned

restrictions on the exercise of its monopoly power.  Indeed, as Ira Smith, one of SESAC's prior

owners unabashedly admitted to Steven Swid and Freddie Gershon, his co-owners:

> SESAC is a unique company.  We are neither subject to an anti trust consent
> decree and its significant attendant requirements.  By virtue of these decrees
> and through the use or threat of rate courts, per program and direct
> licensing, the [Television Music License Committee] has succeeded in
> significantly reducing the blanket license fees and actual total fees paid to
> our competitors.  We are not obligated to offer per program or per piece
> licenses or obligated to attend rate courts.  *These are significant advantages*
> *for a for profit company and distinguishes us from our competitors.  We*
> *diminish ourselves as a company to the extent we allow others to erode*
> *these distinctions.*[28]

A SESAC consultant candidly acknowledged, along the same lines: "Unlike BMI and ASCAP,

[SESAC's]… operations are not subject to the United States Department of Justice scrutiny.  *This*

*freedom from regulation results in higher license fees per title.*"[29]

Except in the rare instances where it voluntarily relinquished aspects of its monopoly

power, SESAC has exploited and continues to exploit its dominance over local stations.  In fact,

---

[27] Mem. of United States on Decree Constr. Issues, *Broad. Music, Inc. v. DMX, Inc.*, No. 08 Civ. 216 (LLS), at 3
(S.D.N.Y. Apr. 13, 2010).
[28] Pls.' 56.1 Stmt. ¶ 162; 56.1 Response ¶ 46.
[29] Pls.' 56.1 Stmt. ¶ 166; 56.1 Response ¶ 46.

SESAC is engaging in precisely the activities engaged in by ASCAP and BMI prior to government challenge and remediation under consent decrees.[30]

### B. The Development of SESAC's Monopoly Power

SESAC was founded in 1932, and operated for many years on the fringe of the music performance licensing market, focusing on the licensing of religious and European concert and stage music.[31]  In 1992, Stephen Swid, Ira Smith, Freddie Gershon, and financial investor Allen & Co. purchased SESAC for ▮▮▮▮▮ and developed a plan to grow the company and increase license fees dramatically.[32]  Central to this effort was SESAC's signing up a critical mass of affiliates, including the recruitment away from ASCAP and BMI of a sufficient number of high-profile composers whose music is in syndicated television programming.  The poaching of these marquee composers with works already embedded in programming broadcast by local stations – at premiums to their ASCAP and BMI distributions[33] – was designed to ensure that local stations would have no choice but to take a SESAC license.[34]  SESAC's status as an unconstrained PRO and its resulting ability to exercise the monopoly power it amassed, in collusion with its affiliates, was the basis for the ▮▮▮▮▮ investment in 2007 by financial

---

[30] It is of no consequence that, in 2008, the DOJ declined to bring an enforcement action against SESAC. Mem. at 11.  In the United States, private antitrust suits "provide a significant supplement to the limited resources available" to the DOJ.  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).  That is why Congress created a system of dual enforcement of the Sherman Act.  In addition, insofar as SESAC systematically destroyed its document production to the DOJ prior to commencement of this action (Pls.' 56.1 Stmt. ¶ 165), there is no way to compare the scope of information submitted by SESAC to the DOJ to that more currently produced here – including via more than 50 third-party subpoenas.   There is, in any event, reason to be skeptical of the completeness and candor of SESAC's disclosures to the government.  For example, adverting to his deposition by the DOJ, former SESAC co-owner Freddie Gershon had this to say in an internal email to Ira Smith during a dispute over how to divide the spoils of SESAC's ill-gotten gains: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Pls.' 56.1 Stmt. ¶¶ 162-163; 56.1 Response ¶ 121.
 *See, e.g.*, *Affiliated Music Enters., Inc. v. SESAC, Inc.*, 160 F. Supp. 865, 867, 870 (S.D.N.Y. 1958); Pls.' 56.1 Stmt. ¶ 125.
[32] *See, e.g.*, Pls.' 56.1 Stmt. ¶ 125.
[33] Pls.' 56.1 Stmt. ¶¶ 125, 216, 220.
[34] *See, e.g.*, Pls.' 56.1 ¶ 220.

investor Och-Ziff. [35]  SESAC's anticompetitive strategy bore even more fruit for its owners late

last year when they sold 75% of SESAC for a reported $600 million. [36]

### C.  SESAC's Collective Licensing

SESAC currently licenses the public performance rights of some 23,000 different

composer and music publisher rightsholders. [37]  Virtually all of these affiliates have signed a

"standard form agreement" that is, for all intents and purposes, non-negotiable. [38]  That

agreement provides that "SESAC shall be the sole and exclusive performing rights organization

to represent [the affiliate];" that the affiliate "grants  to SESAC ... [a]ll of [the affiliate's] rights to

publicly perform and to license others to publicly perform, all or any part of [the affiliate's]

Works…" as well as "[t]he right ... to collect performing rights licensing income" and "to

allocate and to distribute royalties or other monies collected on [the affiliate's] behalf." [39]

SESAC, in turn, offers to users such as the local stations a license in bundled form

enabling the public performance of any or all of the works so amassed. [40]  A licensee cannot

obtain from SESAC a license to the works of any individual SESAC affiliate or to any subset of

SESAC's affiliates.  If a licensee wants a SESAC license to perform *any* of the works in the

SESAC repertory, it must take a license to *all* of the works in that repertory. [41]

SESAC's affiliates are plainly aware that their public performance rights are bundled by

SESAC and offered only on a collective basis.  SESAC states as much on its website: "*[o]n*

*behalf of* many thousands of songwriters and music publishers, SESAC offers blanket license

---

[35] Pls.' 56.1 Stmt. ¶¶ 126; 213-214.
[36] Pls.' 56.1 Stmt. ¶ 127; 56.1 Response ¶ 22.
[37] Mem. at 1, 3; Pls.' 56.1 Stmt. ¶ 124; 56.1 Response ¶ 41.
[38] *See, e.g.*, Pls.' 56.1 Stmt. ¶¶ 218-219; 56.1 Response ¶ 49.
[39] *See, e.g.*, Pls.' 56.1 Stmt. ¶ 207; 56.1 Response ¶ 51.
[40] Mem. at 1; Pls.' 56.1 Stmt. ¶¶ 124, 212; 56.1 Response ¶ 33.
[41] *See, e.g.*, Pls.' 56.1 Stmt. ¶ 124; 56.1 Response ¶ 34.

agreements that authorize the performance of *all the compositions in the SESAC repertory."*[42]   It

is SESAC's desire and intent "*to discourage as much as possible its affiliates' doing direct or*

*source licenses*…."[43]   These affiliates recognize that this collective licensing scheme is in their

best economic interest, enabling them to earn licensing royalties free of the give-and-take of a

competitive environment such as would be engendered by a marketplace featuring significant

source and direct licensing transactions.  As acknowledged by Stephen Arnold, one of SESAC's

highest-grossing affiliates, to a SESAC owner: █████████████████████

████████████████████████████████████████

████████████████████████████████████████

████[44]

### D.  SESAC's Restrictive Agreements with Key Affiliates

In its dealings with certain key affiliates, SESAC has executed confidential

"supplemental agreements"[45] that add provisions above and beyond those in the "standard form

agreement."  These confidential provisions are explicitly designed to eliminate the affiliate's

ability to engage in licensing transactions competitive with SESAC's own license offering,

whether in the form of direct or source licensing.[46]  SESAC does not dispute the existence of

these restrictions or their effectiveness in preventing such direct dealings.  Mem. at 23.

The first type of restriction employed by SESAC is a requirement that the affiliate first

"refer" the license request to SESAC; only if SESAC cannot reach an agreement can the affiliate

---

[42] Pls.' 56.1 Stmt. ¶ 124.
[43] Pls.' 56.1 Stmt. ¶ 246; 56.1 Response ¶ 53.
[44] Pls.' 56.1 Stmt. ¶ 243; 56.1 Response ¶ 53.
[45] Pls.' 56.1 Stmt. ¶¶ 219-220; 56.1 Response ¶ 73.
[46] In fact, when Stephen Arnold left BMI for SESAC and entered into a restrictive affiliation agreement, he agreed with SESAC to terminate all of his then-existing direct license agreements with local stations.  Pls.' 56.1 Stmt. ¶ 131, 164(a).

then enter into the license ████████████████████████████████████████[47]  This

price-fixing provision is present, for example, in SESAC's current agreement with affiliate

Jonathan Wolff – the composer of music embedded in programs such as *According to Jim,*

*Seinfeld, Will & Grace, Less than Perfect,* and *Reba* – which was made effective January 1, 2005

and will run through December 31, 2016.[48]  The clear intent and effect of this type of provision is

to fix the price of a direct or source license and prevent any competition between SESAC and its

affiliates.  Either SESAC will get the business, or if it does not, the rightsholder is prevented

from offering or accepting terms that are more favorable to the licensee than the terms of the

SESAC license.

     The second type of restriction on direct and source licensing used by SESAC is the

imposition of significant and arbitrary economic penalties as a disincentive to competition.  For

example, Stephen Arnold's 2008-2011 affiliate agreement was modified to contain this type of

restriction at the specific instruction of SESAC's top executives and owners.[49]  Mr. Arnold was

required to pay a ████████ penalty for the first such license he entered into and more severe

penalties for additional licenses.[50]  Similarly, the 2007-2013 supplemental agreement of Danny

Lux – the composer of music embedded in programs such as *Boston Legal, Grey's Anatomy, Ally*

*McBeal, The Good Wife,* and *The Bachelor* – imposes penalties ranging from ████████████

per direct or source license.[51]

     Regardless of the type of restriction on direct dealings, the purpose and effect of those

restrictions was well understood by SESAC and its key affiliates: to eliminate the possibility of

competition with the blanket license.  For example:

---

[47] *See, e.g.*, Pls.' 56.1 Stmt. ¶¶ 226-227; 56.1 Response ¶ 50.
[48] *See, e.g.*, Pls.' 56.1 Stmt. ¶¶ 134, 226.
[49] Pls.' 56.1 Stmt. ¶ 237.
[50] Pls.' 56.1 Stmt. ¶ 240.
[51] Pls.' 56.1 Stmt. ¶ 245.

- Stephen Arnold's lawyer, Mike Tolleson, told Mr. Arnold: "It is in the supplemental [affiliate] agreement that [SESAC's] Dennis [Lord]… attempted to restrict [the] right [to issue direct licenses] by adding provisions and procedures designed to *discourage* you from doing it. I think Dennis has worked hard to 'artfully' draw this language in a way *designed to avoid an anti-trust violation. I think it is possible *they can't legally prevent you from issuing a direct license so they have just made it nearly impossible.* I think this means they would be reluctant to have this blow up publicly."[52]

- Mr. Tolleson testified that he and Mr. Arnold "felt [direct licensing] was something that [they] were limited, *prohibited from doing*….[S]tations were wanting to make various business arrangements and [Mr. Arnold] was restricted from doing that as a result of the terms of [his SESAC affiliate] contract."[53]

- Mr. Tolleson wrote to SESAC that Mr. Arnold will not issue direct licenses *"because of the penalty clauses*."[54]

- While being examined on affiliate Danny Lux's 2007-2013 supplemental agreement, Mr. Lord testified that *a direct license "never happened, hasn't happened won't happen."*[55]

- Don Jasko, a SESAC and industry consultant, advised a potential affiliate, Joel Simon, during negotiations with SESAC: *"SESAC seems determined to discourage as much as possible its affiliates' doing direct or source licenses…."*[56]

As SESAC owner Mr. Gershon admitted, these restrictions are a classic *"quid pro quo*."[57]

SESAC wanted to be assured that its key affiliates – many of whom it lured from ASCAP and

BMI with "premium[]" advances and guarantees – did not compete with SESAC and thereby

"dilute" SESAC's artificially inflated blanket license fee revenues.[58]

Professor Jaffe's analysis demonstrated that the music composed by the key SESAC

affiliates subject to these restrictions is contained in significant programming aired by local

stations. Indeed, data from SESAC's files for the bulk of the class period beginning in 2008

reveals that SESAC locked up with these types of agreements affiliates who collectively

---

[52] Pls.' 56.1 Stmt. ¶ 238; 56.1 Response ¶ 79.
[53] Pls.' 56.1 Stmt. ¶ 239.
[54] Pls.' 56.1 Stmt. ¶ 241.
[55] Pls.' 56.1 Stmt. ¶ 247.
[56] Pls.' 56.1 Stmt. ¶ 246; 56.1 Response ¶ 74.
[57] Pls.' 56.1 Stmt. ¶ 217.
[58] *Id.*

accounted for between ███████████ of SESAC's reported local television royalty distributions.[59]  It is thus evident that these restrictions affect a quantitatively and qualitatively important portion of local station programming, and thereby make it virtually unavoidable that stations will air programming with music composed by affiliates subject to them.

### E.  SESAC's Artificially Inflated Blanket License Fees and Illusory Per Program License

Following its 1992 change of ownership, SESAC began to increase dramatically the fees it demanded from local stations, even in the absence of any commensurate increase in station usage of SESAC's repertory.  In an attempt to ameliorate this situation, beginning in 1996, the Television Music License Committee ("TMLC") – which represents local stations in certain music licensing matters but had never previously negotiated with SESAC agreed with SESAC to commence industry-wide negotiations with SESAC.  In late 2007, SESAC stopped negotiating with the TMLC, and returned to a posture in which it deals directly with individual stations and station groups.

#### 1.  Pre-2008 SESAC License Negotiations

SESAC and the TMLC were able to reach agreement on industry-wide license fees covering the periods 1995-2000 and 2001-2004.  The 2001-2004 license agreement contained a provision specifying that the parties would attempt to negotiate an extension for 2005-2007, with the proviso that if agreement could not be reached, SESAC could elect to have the license terms for that follow-on period determined by commercial arbitration.  As part of this agreement, if SESAC chose to arbitrate, it agreed to offer a first-ever SESAC per program license for the period from April 1, 2005 to December 31, 2007.  No agreement was reached and, at SESAC's

---

[59] Pls.' 56.1 Stmt. ¶ 137; 56.1 Response ¶ 73.

election, an arbitration was held in 2006 to determine fees and license terms for the 2005-2007 period.

In addition to setting industry-wide license fees covering the 2005-2007 period, the arbitration panel also established a formula for a viable per program license, following, in broad outline, the concept and formula that had been established previously for ASCAP and BMI.[60]  As with the ASCAP and BMI per program licenses, this new type of SESAC license provided local stations, for the first time, with some opportunity, albeit for a period of very limited duration, to secure performance rights directly in competitive market transactions and/or to reduce their reliance on SESAC-repertory music and thereby achieve meaningful savings on their otherwise applicable blanket license fees.  Out of the approximately 1,100 local stations licensed by SESAC, 180 stations utilized the SESAC per program license on a retroactive basis for 2005, saving a total of approximately $575,000 out of the overall blanket license fee of $16 million.[61] In 2006, 185 stations took the per program license, resulting in just under $1 million in savings (out of the overall blanket license fee of $17.6 million); and 248 stations took the per program license in 2007 resulting in approximately $2 million in savings (out of the overall blanket license fee of $19.3 million).[62]  The 2007 savings represented approximately 43% of the-otherwise applicable blanket license fee obligations of the stations electing the per program license.[63]  This growth pattern in the number of stations electing the per program license – and the commensurate growth in their license fee savings – is similar to the pattern experienced by the industry following the first meaningful offers of per program licenses by ASCAP and BMI. As local stations have had more time to go into the marketplace and secure licenses from

---

[60] Pls.' 56.1 Stmt. ¶ 170; 56.1 Response ¶ 96.
[61] Pls.' 56.1 Stmt. ¶ 250; 56.1 Response ¶ 95.
[62] *Id.*
[63] *Id.*

copyright owners in more competitive transactions (in the form of direct and source licenses), the number of stations electing the ASCAP and BMI per program licenses has continued to increase, as have industry savings far below blanket license fees.  Today, there are well over 400 stations that are licensed via the ASCAP and BMI per program licenses.

The TMLC's efforts to negotiate with SESAC for new industry-wide blanket and per program licenses for the period commencing January 1, 2008 proved to be fruitless.[64]  SESAC demanded exhorbitant license fees and unjustified fee increases and refused to arbitrate, freely held the prospect of filing copyright infringement lawsuits over the heads of recalcitrant licensees, and unilaterally changed the terms of the arbitrated per program license to deny stations a viable alternative to the blanket license.

### 2. 2008-2012 SESAC Blanket License Fees

Once freed from the 2005-2007 arbitral oversight and any obligation to negotiate with the TMLC, SESAC demanded excessive license fees from local stations in direct communications. Barely a month before the existing licenses were set to expire, on November 27, 2007, SESAC sent identical new license offers to all local stations covering the period 2008-2012.[65]  SESAC's initial license fee demand for a 2008 license was an across-the-board 10% increase in the station's blanket license fee over the 2007 level,[66] despite the overall decline in the use of SESAC music on local television during the prior license period.[67]  SESAC granted limited categorical exceptions to its fee demands, and as a result, certain stations and station groups were able to slightly reduce the level of fee increase by demonstrating that their programming mix had changed or by being able to provide SESAC with the administrative convenience of licensing

---

[64] Pls.' 56.1 Stmt. ¶¶ 177-180; 56.1 Response ¶ 98.
[65] Pls.' 56.1 Stmt. ¶¶ 180-181; 56.1 Response ¶ 99.
[66] Pls.' 56.1 Stmt. ¶ 181; 56.1 Response ¶ 99.
[67] Pls.' 56.1 Stmt. ¶ 176; 56.1 Response ¶ 99.  SESAC sought to justify the 10% increase based upon the arbitration panel's fee determination for the 2005-2007 license period.  *See, e.g.*, Pls.' 56.1 Stmt. ¶ 181.

multiple stations on a group-wide basis.[68]  Where SESAC was willing to accept a lesser fee

increase as a result of signing a group broadcaster license, it required that all stations in those

groups forego the right to take a per program license for the entirety of the license period.[69]  As

for the fees for the remainder of the term of the license, SESAC provided stations with two

options: either accept a five-year license with an annual license fee increase of 6.95% or take a

shorter term, one-year renewable license, with annual fee increases of 10%.[70]

Many stations told SESAC that its fee demands were entirely divorced from normal

market forces – especially in the midst of the 2007-2008 financial crisis – given that SESAC

music use by local stations had declined, the industry was in the throes of a major downturn,

other suppliers were not asking for price increases and were offering reductions, and there were

no foreseeable changes that could justify SESAC's continued fee increases for every year of the

license term.[71]  SESAC ignored these concerns and, in some cases, informed the local stations

that it was withdrawing interim authorization for performance of its music and that the station

would be subject to copyright infringement lawsuits if it did not agree to the license terms

demanded.[72]  SESAC went so far as to send cease-and-desist letters to the stations that, as of

January 2008, had not yet signed licenses.[73]  Unsurprisingly, given their need to secure licenses

for their uses of SESAC music, all local stations eventually gave in and signed licenses at the

fees, and on the terms, dictated by SESAC.

---

[68] Pls.' 56.1 Stmt. ¶ 186; 56.1 Response ¶ 113.
[69] Pls.' 56.1 Stmt. ¶ 186; 56.1 Response ¶ 112.
[70] Pls.' 56.1 Stmt. ¶ 181; 56.1 Response ¶ 102.
[71] Pls.' 56.1 Stmt. ¶¶ 183-185.
[72] Pls.' 56.1 Stmt. ¶¶ 189-192; 56.1 Response ¶ 107.
[73] Pls.' 56.1 Stmt. ¶ 189; 56.1 Response ¶ 107.

Group owner Gannett's characterization of its dealings with SESAC during this period captures the broader industry's sentiment:  As Daniel Reynolds, manager of music licensing for Gannett Broadcasting testified:

> [I]n my 30-year career, I have never been through a negotiation like I went through with SESAC….  Terms were dictated to us with no … rational basis for these enormous fees.  The economy's going through essentially a meltdown….  The vast majority of the people that we did business with were willing to negotiate.  SESAC dictated fees to us that were insane….[74]

The license fees that SESAC was able to exact from local television stations covering the 2008-2012 period reflect its exercise of monopoly power.  Professor Jaffe conservatively calculated that, between 2008 and 2012, SESAC extracted fees from local stations that were nearly 30% greater than the fees that would have been charged but for SESAC's anticompetitive behavior.[75]

### 3.  The 2008-2012 SESAC Per Program License

SESAC has never wanted to offer local stations any alternative to its all-or-nothing blanket license.[76]  It relented briefly when it elected to arbitrate fees for the 2005-2007 period, a contractual condition of which required SESAC to offer a per program license for that period.  Contemporaneous SESAC documents make clear that SESAC viewed this one-time contractual obligation as a bad thing: insofar as it opened the door to more competitive licensing transactions and put some constraint on SESAC's ability to secure monopoly profits, it created a "revenue shortfall."[77]  As soon as SESAC was free of its obligation to offer a per program license, on terms determined by the arbitrators to make that license a feasible alternative to the blanket license, it modified the terms of that license in order to render it commercially infeasible.  The

---

[74] Pls.' 56.1 Stmt. ¶ 187.
[75] Pls.' 56.1 Stmt. ¶ 301.
[76] Pls.' 56.1 Stmt. ¶ 249.
[77] Pls.' 56.1 Stmt. ¶¶ 251-254.

local stations were thereby remitted to having no choice but to take SESAC's all-or-nothing blanket license.[78]

To render the per program license unusable, SESAC modified the 2005-2007 per program license formula in several key respects.  Professor Jaffe analyzed each of these modifications in detail and concluded that each lacked any legitimate basis and, when taken collectively, rendered the per program license completely illusory.[79]  In brief summary, SESAC:

- increased *tenfold* the charge for programs with unidentified music;[80]

- removed contractual language in the per program license that stated that SESAC would accept music cue sheets from local stations or their agent so that the stations could demonstrate that certain of their programs did not contain SESAC music, and are thus not subject to fee;[81]

- substantially increased the fees for SESAC-affiliated music embedded in commercials (incidental music) and appearing in the background of live events (ambient music), without demonstrating any increased use or value of such music;[82] and

- substantially increased the charges intended to cover SESAC's administrative costs, without demonstrating that its administrative costs had in fact increased.[83]

These changes led to the precise result SESAC intended; as of 2008, and continuing to this day, *not a single local station elected the per program license*, in contrast to the nearly 250 stations – representing approximately 24% of total 2007 SESAC blanket license fees – that had done so as of 2007.[84]  Station group after station group advised SESAC that the revised per program license was "illogical,"[85] "worthless,"[86] "onerous and operationally cumbersome,"[87] "all

---

[78] Pls.' 56.1 Stmt. ¶ 215.  *See also id.* Pls.' 56.1 Stmt. ¶ 249.
[79] Pls.' 56.1 Stmt. ¶ 270.
[80] Pls.' 56.1 Stmt. ¶ 255; 258.  A significant portion of the programming broadcast on local stations contains unidentified music.  Pls. ¶¶ 277-282.  Even SESAC's own per program consultant pointed out to one of SESAC's owners that this change was economically irrational.  Pls.' 56.1 Stmt. ¶ 259.
[81] Pls.' 56.1 Stmt. ¶ 258.
[82] Pls.' 56.1 Stmt. ¶¶ 256; 255.
[83] Pls.' 56.1 Stmt. ¶¶ 257; 255.
[84] Pls.' 56.1 Stmt. ¶¶ 193, 250, 268-269.
[85] Pls.' 56.1 Stmt. ¶ 261.
[86] Pls.' 56.1 Stmt. ¶ 262.

but useless"[88] and "a sham."[89] The non-viability of SESAC's post-2007 per program license was confirmed by Music Reports, Inc. ("MRI"), the leading provider of per program license services to local stations, which determined, following analysis and contrary to its economic self-interest, that it could not recommend that any of its client stations elect using it.[90]

### 4. The Post-2012 License Period

No meaningful change in the stations' licensing circumstance has come about since the expiration of the 2008-2012 local station SESAC licenses. SESAC has continued to engage in the full range of anticompetitive conduct and the local stations continue to be harmed by it. License fees have remained at the inflated 2012 levels – well above those that would emerge in a workably competitive market, and stations still have no viable alternative to the SESAC blanket license.[91] Indeed, but for this lawsuit, SESAC would almost certainly have continued to demand further license fee increases from local stations. It is only "[b]ecause of the pendency of [this] litigation … [that SESAC is] maintaining the status quo with respect to license fees, keeping your 2012… license fees in effect for 2013…."[92] As SESAC's CEO, Mr. Swid, cynically testified: "[W]e decided that the litigation is on and we decided not to raise fees. We could always raise fees at the end of the litigation when we win."[93]

## LEGAL STANDARD

The law is well-settled that summary judgment is appropriate only when, "after construing in the light most favorable to the non-moving party and drawing all reasonable

---

[87] Pls.' 56.1 Stmt. ¶ 261.
[88] *Id.*
[89] *Id.*
[90] Pls.' 56.1 Stmt. ¶ 160.
[91] Pls.' 56.1 Stmt. ¶ 194. SESAC did make one minor change to the per-program license – it reduced the fee applied to infomercials with unidentified music. This change had virtually no impact on the viability of the per-program license. To this day, not a single local station has been able to take the per-program license.
[92] *Id.*
[93] *Id.*

inferences in its favor, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *In re Publ'n Paper Antitrust Litig.*, 609 F.3d 51, 61 (2d Cir. 2012) (internal quotations and citations omitted). Given that defendant SESAC is the summary judgment movant, the Supreme Court has made clear that "the evidence of [plaintiffs] is to be believed" and "[plaintiffs'] version of any disputed issue of fact is presumed correct…." *Eastman Kodak v. Image Technical Servs.*, 504 U.S. 451, 456 (1992). Furthermore, "[s]ummary judgment is not a substitute for trial." *Publ'n Paper*, 609 F.3d at 61. The Second Circuit has made clear that "when the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to [those] inferences remains within the province of the fact-finder at a trial." *Id.* (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)).

Additionally, in antitrust cases, it is black-letter law that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). In analyzing claims under Section 1, "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *Id.* Similarly, in evaluating claims under Section 2, "[i]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.... We are dealing with what has been called the 'synergistic effect' of the mixture of the elements." *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992).

## ARGUMENT

Plaintiffs have far more to preclude summary judgment than material issues of fact.

Plaintiffs have *overwhelming* evidence on each of their three claims against SESAC for: (i)

unreasonably restraining trade in violation of Section 1; (ii) monopolization in violation of

Section 2; and (iii) conspiring to monopolize in violation of Section 2.  The challenged SESAC

licensing practices are "plainly anticompetitive" and, thus, *per se* illegal under Section 1.  *Leegin*

*Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007).  Under that legal standard,

Plaintiffs have come forward with material facts demonstrating the existence of unlawful price-

fixing agreements between and among SESAC and its affiliates.[94]  In addition, Plaintiffs have

demonstrated that, at the very least, there is a genuine dispute as to whether the "anti-competitive

effects" of the challenged SESAC licensing practices in the market for performance rights to the

copyrighted material in the SESAC repertory "outweigh [the] pro-competitive effects" – if any –

and, thus, violate Section 1 under the "rule of reason."  MTD at 27 (quoting *CBS v. ASCAP*, 620

F.2d 930, 934 (2d Cir. 1980)).  Finally, Plaintiffs have presented ample material facts

demonstrating that SESAC has monopoly power in the relevant market and maintains that

monopoly power through its anticompetitive conduct.  As the Supreme Court has made clear,

although "the mere possession of monopoly power, and the concomitant charging of monopoly

prices, is not … unlawful," such behavior is unlawful when "*it is accompanied by an element of*

*anticompetitive conduct*."  *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S.

398, 407 (2004).  That is precisely what plaintiffs have put at issue by coming forward with

overwhelming evidence that SESAC has commanded higher license fees from local stations *not*

---

[94] Although Judge Buchwald chose not to analyze SESAC's blanket license under the *per se* rule at the motion to dismiss stage, none of the record evidence was before the Court at that time.  Moreover, even if the Court reaches a similar conclusion with respect to SESAC's blanket license, Judge Buchwald never addressed the issue of *per se* treatment of the agreements between SESAC and its key affiliates containing direct license restrictions on price as explained below in Section I.B.

because of its "superior product, business acumen, or historic accident," but as a result of SESAC's "willful acquisition [and] maintenance of [monopoly] power." *Id.*[95]

## I. Overwhelming Evidence Precludes Summary Judgment Against Plaintiffs' *Per Se* Claim Under Section 1 of the Sherman Act

Under the antitrust laws, horizontal agreements among competitors to fix prices are condemned as *per se* illegal without any need to study the effect of the restraint in the market. *See Leegin*, 551 U.S. at 886.  SESAC's licensing arrangement with its affiliates, whereby SESAC issues competition-foreclosing blanket licenses on their behalf, constitutes just such a horizontal agreement.  SESAC's blanket license is the means by which SESAC and its affiliates, by agreement, eliminate competition over the licensing of music performing rights to local stations in favor of *collectively* negotiated and fixed licensing fees.  As Professor Jaffe has explained, under this blanket license, "there is no room for competition to determine the level of the associated license fees" the same as if "composers and publishers formed a *cartel* for the sale of music performance rights."[96]  In addition, SESAC and certain of its key affiliates have agreed that those affiliates will not compete with SESAC or cheat on the SESAC cartel.  These restrictions – in writing – effectively preclude those affiliates from licensing the public performance rights to their musical works directly to local stations or to the stations' program producers on their behalf, in direct competition with the SESAC blanket license.  The all-or-nothing nature of the blanket license pricing structure magnifies the anticompetitive effects of such restrictions: having no choice but to accede to SESAC's blanket license terms in order to lawfully perform these key affiliates' music in programs they air, the stations are stripped of any

---

[95] Because Judge Buchwald concluded that a rule of reason analysis under Section 1 and the monopolization and conspiracy to monopolize analyses under Section 2 overlap to a large extent here, no separate arguments under each of those claims is necessary.  *See supra* n. 4.

[96] Pls.' 56.1 Stmt. ¶ 288.

incentive to attempt to clear their remaining uses of SESAC music directly or at the source since to do so would result in their paying twice for the same rights.

Both sets of agreements between SESAC and its affiliates give rise to *per se* scrutiny under Section 1 and there are, at the very least, disputed material facts as to the existence of those unlawful agreements.

## A.   SESAC's Blanket License

### 1.   Plaintiffs' *Per Se* Claim Is Entirely Consistent with Precedent

According to SESAC, because the Supreme Court in *BMI* concluded that the blanket licenses *offered by consent decree-restrained ASCAP and BMI*, on a fact record that stipulated that all of those PROs' arrangements with affiliates were *nonexclusive*, should be judged under the rule of reason, *a fortiori* "plaintiffs' *per se* claim" challenging SESAC's blanket license "is barred."  Mem. at 28.  This reasoning is specious, given the utterly distinct nature of SESAC's own licensing practices and relationships with its affiliates, as well as the lack of any comparable judicially-imposed constraints on the exercise of its monopoly power.  The apposite legal analogy is not to *BMI*, but to court precedents addressing ASCAP's conduct *before* it was reined in by its consent decree, and at a time when its conduct mirrored far more closely SESAC's own current behavior.  That precedent condemned the ASCAP blanket license outright as a blatant price-fixing arrangement, obviating any need for examination of the blanket license's potentially redeeming qualities.

Specifically, in *Alden-Rochelle, Inc. v. ASCAP*, 80 F. Supp. 888 (S.D.N.Y. 1948), operators of motion picture theaters challenged certain provisions of ASCAP's by-laws that prevented ASCAP's members from simultaneously conveying motion picture theater performance rights to movie producers at the time they conveyed synchronization, *i.e.*,

recording, rights in their works to those producers.  This practice forced theater exhibitors to take

blanket licenses from ASCAP to secure the necessary performance rights which ASCAP and its

members agreed to withhold from the producers.  A court in this District recognized the

completely artificial and economically anomalous nature of that restraining arrangement, which

served to eliminate the competition over the pricing of music performance rights that would

otherwise have occurred at the time of music selection and concluded that ASCAP had thereby

violated Section 1.  "Where the power to fix prices is created by an agreement among those who

control a substantial part of an industry and who should do business on a competitive basis in a

free market, the reasonableness of the prices or the good intentions of the combining units would

not absolve them from the charge that they have violated the anti-trust laws."  *Id.* at 895.

These same practices were condemned outright in *M. Witmark & Sons v. Jensen*, 80 F.

Supp. 843 (D. Minn. 1948).  There, ASCAP members sued operators of motion picture theatres

for copyright infringement for performing films without obtaining the public performance rights

to the music in those films.  Although copyright infringement was established, the district court

denied the ASCAP members any relief because their "method of doing business" violated

Section 1:  "It seems undeniable that there is no competition among [ASCAP] members.

Competition is effectually restrained because all licenses are granted by [ASCAP] under its

control and domination.  All earnings derived from licenses are pooled and divided among the

members…. The reasonableness or unreasonableness of the rates does not militate against the

absolute control of [ASCAP] to fix prices.  The vice of the arrangement is apparent…." *Id.* at

849.

Tellingly, the only district court outside of this case that has ever examined SESAC's

licensing practices reached a similar conclusion.  In *Affiliated Music Enters., Inc. v. SESAC,* 160

F. Supp. 865, 867 (S.D.N.Y. 1958), a court in this District, reacting to SESAC's "business of acquiring from the owners of copyrighted music the *exclusive* right to license the public performance for profit of the copyrighted compositions – known as the performance rights," concluded: "[SESAC's] affiliation agreement is the classic pooling of rights and sharing of revenue struck down as violative of Section 1 of the Sherman Act in [*Alden-Rochelle*] and [*Witmark*]." *Id.* at 875.

SESAC is quick to point out that the district court dismissed the complaint in *Affiliated* (but not that it did so on an entirely separate ground)[97] and that the Second Circuit ultimately concluded that the district court's finding of *per se* illegality was unnecessary under the facts presented. Mem. at 31 n.10. Yet neither of those dispositions undermines the reasoning employed by the district court, characterizing SESAC's blanket license as *per se* illegal following the rulings in *Alden-Rochelle* and *Witmark* – reasoning that applies squarely here.

The license cartel erected by SESAC leaves local stations no option but to deal with SESAC on its terms. Some 23,000 separate composers and music publishers have collectively pooled their copyrights and agreed to delegate to SESAC the determinations as to the terms on which, and prices at which, an all-or-nothing blanket license will be granted to users. The pooled royalties resulting therefrom are distributed amongst these copyright owners on the basis of arbitrary determinations made by SESAC.[98] A sufficient number of SESAC affiliates have effectively delegated exclusive licensing rights to SESAC such that, in combination with the

---

[97] The district court concluded that Affiliated, which was a competitor to SESAC that was funded by BMI, lacked standing to bring a private antitrust action under Section 4 of the Clayton Act. 160 F. Supp. at 875-77. While Affiliated did not allege sufficient facts to demonstrate injury as a competitor, the district court remarked in *dictum* that "the exaction of annual blanket fees on collective licenses regardless of the needs or requirements of a user might result in injury to the users." *Id*. at 876. That is precisely the injury the local station users complain of here and why, as set forth below, SESAC's arguments regarding the lack of harm to competition are utterly baseless. Mem. at 33-44.
[98] Pls.' 56.1 Stmt. ¶ 213.

pricing structure of the blanket license and SESAC's refusal to offer any meaningful license alternatives that would facilitate direct and source licensing, local stations are completely locked into taking the blanket license at the price demanded by SESAC.

As Professor Jaffe demonstrated, since 2008, SESAC affiliates receiving *nearly* ▮ of the royalties distributed by SESAC for music in local station programming have restrictions in their affiliation agreements with SESAC that effectively prevent them from entering into direct and source licenses.[99]  What is more, as SESAC acknowledges, the affiliation agreements with restrictions also contain confidentiality provisions that prevent any station from even knowing which programs contain SESAC repertory music that is composed by SESAC affiliates that are subject to restrictions on their ability to issue direct licenses.  More generally, SESAC has afforded the local stations with no reliable means of identifying the works in SESAC's license repertory[100] – another deliberate element in SESAC's scheme to foreclose competition in the licensing of music performance rights to its affiliated rightsholders' musical works.

Even were key affiliates not tied up in *de facto* exclusive license arrangements and even assuming local stations otherwise were able to acquire performance rights in the SESAC-repertory works they broadcast through direct or source licensing, they still would have no incentive to pursue such relief.  The structure of the all-or-nothing blanket license, combined with SESAC's refusal to offer any meaningful alternative license that would, in effect, credit local stations for music rights secured by other means, eliminates any incentive for the station to secure direct and source licenses.  The end result of pursing such market alternatives would simply be that the local stations would pay twice for access to the same performance rights –

---

[99] Pls.' 56.1 Stmt. ¶ 137; 56.1 Response ¶ 73.
[100] Pls.' 56.1 Stmt. ¶¶ 285-287.

once through their/their program suppliers' direct dealings and again via unvarying payments under the blanket license.[101]

A core premise of the ASCAP/BMI jurisprudence on which SESAC seeks to rely is the very availability – legally and practically – of realistic alternatives to the all-or-nothing blanket license.  *BMI*, 441 U.S. at 11 ("the [consent] decree guarantees the legal availability of direct licensing of performance rights by ASCAP members; and … there are *no practical impediments preventing direct dealings*"); *Buffalo Broadcasting*, 744 F.2d at 925 (recognizing that the Supreme Court "characterize[d] the blanket license" at issue in *BMI* as one in which "'each individual remained free to sell his own music *without restraint*'") (citing *NCAA v. Bd. of Regents of the Univ. of Okla.,* 468 U.S. 85 (1984) (emphasis in original).  The local stations utterly lack such realistic alternatives as to SESAC, which seeks to escape antitrust condemnation by coat-tailing on the *result* of ASCAP/BMI jurisprudence without subjecting itself to the *conduct constraints* underlying those results.  The Supreme Court in *BMI* repeatedly emphasized that the "restrictions" in the ASCAP and BMI consent decrees impose "substantial restraints" on ASCAP and BMI's behavior that cannot be "ignored" in an antitrust analysis.  441 U.S. at 24.[102]  Those predicate facts have no application to the stations' licensing circumstances at the hands of SESAC.  Thus, not only is SESAC not entitled to the benefit of the results of the ASCAP/BMI challenges – reached *after trial* and under the rule of reason; for the reasons elaborated, its practices warrant *per se* condemnation.

---

[101] Pls.' 56.1 Stmt. ¶¶ 290, 297; 56.1 Response ¶ 15.
[102] *Accord BMI*, 441 U.S. at 13 ("[I]t cannot be ignored that the Federal Executive and Judiciary have carefully scrutinized ASCAP and the challenged conduct, have imposed restrictions on various of ASCAP's practices, and, by the terms of the decree, stand ready to provide further consideration, supervision, and perhaps invalidation of asserted anticompetitive practices.").

### 2. SESAC's Blanket Licensing Practices Plainly Constitute Concerted Action

Against the plain reality and a record to support it, SESAC makes the astonishing assertion that "plaintiffs cannot establish that the conduct of which they complain results from concerted action." Mem. at 14. According to SESAC, "there is no evidence that SESAC's affiliates agree to any of the conduct that the plaintiffs criticize, including the issuance of blanket licenses" and that there is "no evidence that SESAC's bilateral agreements with its affiliates are agreements for SESAC to undertake the conduct that the complaint attacks." *Id*. at 1, 24.[103] The very Supreme Court decision, *BMI*, on which SESAC otherwise, however improperly, relies, refutes any such notion. The Court there recognized that the PROs' blanket licensing arrangements by their very nature "*plainly involve concerted action*." 441 U.S. at 10. SESAC's feeble efforts to distinguish its parallel license structure from that of ASCAP and BMI do not alter this fundamental reality.[104] Mem. at 26-27.

Beyond the dearth of legal support for SESAC's position,[105] its contention is further belied by the record evidence. SESAC's affiliates are plainly aware that their public performance rights are bundled by SESAC and offered in the form of the blanket license at

---

[103] SESAC appears to believe that there is some requirement in antitrust law to name a defendant's co-conspirators. Mem. at 18-19. There is no such requirement. *See, e.g., New York ex rel. Spitzer v. Feldman*, 01 Civ. 6691 (SAS), 2003 U.S. Dist. LEXIS 11759, at *10-11 (S.D.N.Y. July 10, 2003) ("a plaintiff '[is] not required to sue all of the alleged conspirators inasmuch as antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy'") (quoting *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1053 (9th Cir. 1982)).

[104] By way of example, SESAC asserts that BMI is controlled by broadcasters. While it is the case that BMI's board is composed mainly of retired broadcasters, those broadcasters have no control over any of BMI's licensing dealings. In fact, the broadcaster board members are prevented from having any say in license fee negotiations. If SESAC's characterization of BMI were correct (and it is not), then it is difficult to understand why those very broadcasters would sue BMI for antitrust violations and invoke the consent decree rate court protections – which they have done numerous times over the years. *See, e.g., BMI*, 441 U.S. 1; *WPIX, Inc. v. Broad. Music, Inc.*, 09 Civ. 10366, Opinion and Order (S.D.N.Y. Apr. 27, 2012).

[105] SESAC's reliance on decisions dismissing "rimless" hub and spoke conspiracies also is misplaced. Mem. at 21. For example, in *Dickson v. Microsoft*, 309 F.3d 193, 203-04 (4th Cir. 2002), Microsoft and the original equipment makers with whom Microsoft had allegedly unlawful agreements did *not* compete with one another. Here, by contrast, as Professor Jaffe has explained, *see supra* § I.B, SESAC and its affiliates could compete with one another "but for" SESAC's anticompetitive behavior.

prices set by SESAC.  That is the very premise of their arrangements with SESAC, and the basis

on which a number of key television writers agreed to defect from ASCAP and BMI, namely, to

enjoy even greater rewards from television performances of their music in the form of

guarantees, advances and anticipated larger income distributions from SESAC's blanket license

collections.[106]  SESAC acknowledges this pact on its website: "*On behalf of* many thousands of

songwriters and music publishers, SESAC offers blanket license agreements that authorize the

performance of *all the compositions in the SESAC repertory.*"[107]

What is more, SESAC unabashedly has made known to potential affiliates that it is

"*determined to discourage as much as possible its affiliates' doing direct or source*

*licenses....*"[108] As acknowledged by Stephen Arnold, one of SESAC's top affiliates, to a SESAC

owner: ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████[109]

Thus, both the inherent nature and structure of the blanket license, as well as the explicit

understandings communicated between SESAC and its affiliates, provide more than ample basis

for a jury to conclude that the challenged practices involve concerted activity between and

among competitors aimed at restricting price competition in licensing music performance rights

to local stations.

## B.  SESAC's Direct Licensing Restrictions

As demonstrated above, SESAC's key affiliates with music aired on local television have

provisions in their affiliation agreements that prevent them from directly licensing their

---

[106] *E.g.*, Pls.' 56.1 Stmt. ¶¶ 125, 212-217, 220, 243, 296.
[107] Pls.' 56.1 Stmt. ¶ 124.
[108] Pls.' 56.1 Stmt. ¶ 246; 56.1 Response ¶ 74.
[109] Pls.' 56.1 Stmt. ¶ 243; 56.1 Response ¶ 53.

performance rights to local stations or their program suppliers, thereby forcing local stations to

take the SESAC blanket license in order to perform their works.  SESAC's attempts to blunt the

anticompetitive force of these agreements fail.

SESAC first contends that these direct license restrictions "are not *per se* unlawful

because they are not *naked* price restraints." Mem. at 33 n.11.  This position is baseless.  The

record contains powerful evidence demonstrating that SESAC explicitly dictated the prices for

direct licenses that its key affiliates could charge so that no local station would take one.  *See*

*supra* § II.D.  As Stephen Arnold pointedly told SESAC:  "the [direct license] *rates you want me*

*to quote* make it literally impossible for any station to benefit from the per program, as overall

fee [] exceeds the blanket." [110]

SESAC next argues that its direct license restrictions cannot give rise to *per se* liability

because they are not "horizontal" agreements between competitors but, rather, are "vertical"

agreements that must be evaluated under the rule of reason. Mem. at 31-32. [111]  SESAC's

assertion that it has a typical vertical supplier-distributor relationship with its affiliates is flatly

wrong.  As Professor Jaffe explained, the relationship between SESAC and its affiliates "is an

---

[110] Pls.' 56.1 Stmt. ¶ 164(d).

[111] SESAC also asserts that plaintiffs' "theory is flatly contradicted by the complaint."  Mem. at 31.  SESAC is incorrect.  The first claim for relief for a violation of Section 1 is not limited to a challenge to SESAC's blanket license.  *See* FAC. ¶¶ 77-82.  Indeed, the very allegation cited by SESAC is from a part of the complaint describing "SESAC's anticompetitive actions" of which plaintiffs' challenge to the SESAC blanket license is described separately from plaintiffs' challenge to direct license restrictions in its contracts with key SESAC affiliates. *Compare* FAC ¶ 24 (all-or-nothing blanket license), *with* FAC ¶ 28 (direct license restrictions).  The fact that there is an interrelationship between the direct license restrictions and the all-or-nothing blanket license, whereby the former prevents any cheating on the cartel, cannot be used as a basis by SESAC to limit its potential exposure under the antitrust laws.  Further, SESAC cannot credibly claim any prejudice from having to defend direct license restrictions that it admittedly has agreed to with its key affiliates.  Mem. at 23.  In any event, it is well-settled that the pleadings can conform to the evidence at any time under Rule 15(b).  *See, e.g., Regent Ins. Co. v. Storm King Contracting, Inc.*, No. 06 Civ. 2879 (LBS), 2008 WL 563465, at *13 (S.D.N.Y. Feb. 27, 2008).

inherently horizontal relationship,"[112] as SESAC is setting the price for a bundle of all of its otherwise competing rights-holders' products.

Further, "the very existence of [restrictive agreements between SESAC and its key affiliates] is inconsistent with the conception of the relationship between SESAC and its rightsholders as a purely vertical one."[113]   As Professor Jaffe explained:

> In a purely vertical relationship, a distributor or other intermediary (such as SESAC) between an upstream seller (such as one of its affiliates) and a downstream buyer (such as a local television station) would not have any legitimate incentive to restrict the sales between that upstream seller and potential downstream customers.  *Therefore, the fact that SESAC has chosen actively to restrict direct licensing by its affiliates, and/or to fix the price at which such direct licenses would occur, in order to maintain the inflated blanket license fees it charges users, demonstrates that SESAC is in a horizontal relationship to its affiliates, a relationship that could be competitive if such competition were not actively suppressed.*[114]

Accordingly, "the nature of the relationship between SESAC and its affiliates is not, in fact, the kind of straightforward vertical one" that SESAC seeks to portray.[115]  At a minimum, there is a factual dispute as to whether SESAC and its affiliates are potential competitors.

This conclusion is not overtaken by the paltry counter-proof proffered by SESAC, which cites the testimony of two SESAC affiliates, David Catalano and Stephen Arnold – the former for the proposition that he would never enter into direct licenses with stations and the latter for the proposition that he did not view himself as competing with SESAC.  Mem. at 32.  The inferences that SESAC asks the Court to draw from this testimony are improper.  Contrary to SESAC's characterization, Mr. Catalano testified that he in fact negotiated some direct licenses.[116]  For his part, Stephen Arnold entered into many direct licenses with local stations when he was affiliated

---

[112] Pls.' 56.1 Stmt. ¶ 288.
[113] *Id.*
[114] *Id.*
[115] Pls.' 56.1 Stmt. ¶ 289.
[116] 56.1 Response ¶ 75.

with BMI, but agreed with SESAC to terminate them upon joining SESAC.[117]  Since becoming a

SESAC affiliate, Mr. Arnold was repeatedly approached by stations requesting direct licenses,

wanted to negotiate direct licenses but for years was prohibited from doing so by SESAC, and

actually entered into direct licenses after restrictions were ultimately watered down in his current

affiliate agreement entered into several years after the filing of this lawsuit.[118]  In no event do the

cherry-picked snippets of testimony cited by SESAC, nor SESAC's reliance on inapposite case

law,[119] demonstrate, as a matter of law, that the direct licensing restrictions are vertical restraints

that cannot give rise to *per se* liability.  To the extent varying inferences might be drawn from

that testimony, on this summary judgment motion, plaintiffs are entitled to have those drawn in

*their* favor.

Accordingly, summary judgment against plaintiffs' *per se* claim under Section 1 should

be denied.

## II. Overwhelming Evidence Precludes Summary Judgment Against Plaintiffs' *Rule of Reason* Claim Under Section 1 of the Sherman Act and Monopolization Claims Under Section 2 of the Sherman Act

Material issues of fact also preclude a grant of summary judgment in SESAC's favor on

the issues of whether SESAC's licensing practices otherwise violate Sections 1 and 2, even if not

determined to be *per se* illegal.  In denying SESAC's motion to dismiss, Judge Buchwald

detailed the allegations which, if proven, would result in liability.  The overwhelming weight of

the record evidence compels the conclusion that plaintiffs have more than proven their case as to

---

[117] Pls.' 56.1 Stmt. ¶ 164(a).

[118] Pls.' 56.1 Stmt. ¶¶ 228-244, 248.

[119] Finding no support in the PRO jurisprudence for its attempt to recast its behavior as a benign system of dual distribution whereby a manufacturer competes with its distributors, SESAC reaches for completely inapposite support elsewhere.  Its reliance on *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) is misplaced as that was a "run-of-the-mill exclusive distributorship controversy, where a former exclusive distributor attempted to protect its competitive position vis a vis its supplier."  That is not the circumstance presented here, involving instead SESAC preventing its key affiliates from competing, thereby rendering the SESAC blanket license as the only mechanism to obtain permission to perform songs in the SESAC repertory.

each of those allegations.  At this summary judgment juncture, it suffices that plaintiffs have raised triable issues of fact as to each element.

### A.  The Required Factual Showing for the Relevant Product Market

Judge Buchwald first determined the elements which, if proven, would establish the relevant product market in which SESAC's licensing practices are to be analyzed.[120]  She concluded that three factual allegations "adequately alleged that performance rights to songs in the SESAC repertory are not interchangeable with performance rights to songs in the repertories of other PROs," and that, if proven, they would establish that the relevant product market is composed of the works in the SESAC repertory.  MTD at 25.  Specifically, these allegations are that: (i) "virtually all composers affiliate with only one of the three PROs"; (ii) "almost all stations have licenses from all three PROs"; and (iii) "local stations have not reacted to SESAC's price increases by replacing SESAC licenses with alternative licenses."[121]

The record evidence is overwhelming – indeed virtually uncontested – with respect to each of those allegations:

1.  "virtually all composers affiliate with only one of the three PROs";

  - As SESAC admits, "[e]ach PRO has a repertory of works.  The repertories of the three PROs are exclusive of one another but, collectively, encompass *virtually* every musical composition in the United States and its territories."[122]

  - According to Professor Jaffe, "[c]omposers or publishers of works appearing on local television almost always grant the right to license the public performance of their works to a PRO.  In the U.S., virtually all composers grant the right to the public performance of their works to one of the three U.S. PROs."[123]

2.  "almost all stations have licenses from all three PROs";

---

[120] The parties do not dispute that the relevant geographic market is the United States.  MTD at 13, n. 8.
[121] MTD at 25.
[122] 56.1 Response ¶ 20.
[123] Pls.' 56.1 Stmt. ¶ 209.

- SESAC's economic expert stated "that *virtually all significant rights-users* enter into licenses with all three PROs."[124]

- Professor Jaffe concurred that local stations have historically acquired blanket licenses from each of ASCAP, BMI, and SESAC and that "essentially all stations do carry licenses from all three PROs." [125]

3. "local stations have not reacted to SESAC's price increases by replacing SESAC licenses with alternative licenses."

- An investment summary by SESAC's financial owner, Och-Ziff, admits that the *"[n]ecessity of use of SESAC material has led to virtually 100% renewal rates."*[126]

- Another investment memorandum by that SESAC owner states that "[h]istorically, SESAC has had considerable *leverage* in negotiations with licensees given the importance of the music of SESAC affiliates, and we anticipate this to continue . . . ."[127]

- A chart prepared by SESAC consultants, CSG Partners and EFA Partners, demonstrates SESAC's *"Extremely High Retention Rate"* of licensees and that, even after SESAC altered its per program license terms and raised its blanket license rates in 2008, "[a]ll stations renewed" with SESAC maintaining a 100% renewal rate.[128]

- A SESAC diligence memorandum, prepared by Goldman Sachs and edited by SESAC executives, states: "There is *very little risk* that SESAC would start to lose licensees . . . . SESAC has increased the number of licensed locations each and every year.  This trend will continue for many years."[129]

- A Meredith representative wrote to a SESAC representative responding to SESAC's termination of Meredith's interim license pending post-2007 negotiations: "I am very disappointed and disturbed by your ending our interim authorization . . . . If you have no flexibility, then *I feel like I have a gun to my head.  As* I'm sure you are well aware, our counsel advises that we cannot go without a SESAC music license and you are forcing me to take the license you have offered."[130]

- A Hoak representative wrote to a SESAC representative during post-2007 license discussions: "I am powerless to resist your demand for higher rates since the onerous

---

[124] Pls.' 56.1 Stmt. ¶ 206.
[125] Pls.' 56.1 Stmt. ¶ 208.
[126] Pls.' 56.1 Stmt. ¶ 271.
[127] Pls.' 56.1 Stmt. ¶ 214.
[128] Pls.' 56.1 Stmt. ¶ 214.
[129] Pls.' 56.1 Stmt. ¶ 215.
[130] Pls.' 56.1 Stmt. ¶ 190.

effects of copyright law violations provide you with an advantage that make negotiations over rate one-sided against this small market broadcaster."[131]

- Professor Jaffe observed that despite stations' protests during the post-2007 license discussions that "fee demands seemed to be entirely divorced from normal market forces, … that SESAC music use had declined, the industry … was in the throes of a major downturn, and there was no reason to believe that any of this would change in such a way as to justify the continued [license rate] increases … *[i]n the end, virtually all stations eventually gave in to SESAC's demands*…."[132]

Plaintiffs have thus come forward with specific evidence to prove the facts that Judge Buchwald ruled would establish the relevant product market and are entitled to a trial on that issue. This is especially so given that the Supreme Court has held that "[t]he proper market definition … can be determined only after a *factual inquiry* into the *commercial realities* faced by consumers." *Kodak*, 504 U.S. at 482 (reversing summary judgment for the defendant).

SESAC attempts to recast its previously rejected attacks on the plaintiffs' relevant product market by claiming – incorrectly – that Professor Jaffe has testified that "*nothing* is reasonably interchangeable with SESAC's blanket license – in which case the relevant product market is just the market for the blanket license, and competition with SESAC is logically impossible." Mem. at 16. SESAC distorts Professor Jaffe's testimony on this issue, which makes his position clear: The SESAC blanket license is the only viable option to local stations *because* "[t]he combined effect of SESAC and its rightsholders' behavior has been to eliminate competition to license music from the SESAC repertory in local television."[133] But for these anticompetitive actions, the relevant market would include more than just the SESAC blanket license.[134] Thus, Professor Jaffe's opinions are entirely consistent with the relevant product market and fully support "plaintiffs['] alleg[ation] that SESAC's conduct has made the blanket

---

[131] Pls.' 56.1 Stmt. ¶ 192.
[132] Pls.' 56.1 Stmt. ¶ 193.
[133] Pls.' 56.1 Stmt. ¶ 293.
[134] Pls.' 56.1 Stmt. ¶¶ 293-294.

license the only viable option for acquiring performance rights to songs in the SESAC repertory"

– which Judge Buchwald concluded constituted a relevant product market.[135]  MTD at 19.

### B.  The Required Factual Showing For The Claims

Turning to SESAC's licensing practices, Judge Buchwald concluded that four factual

allegations "[were] sufficient to state a claim for a § 1 violation."  *Id*. at 34-35.  These are that: (i)

"SESAC has entered into exclusive licensing arrangements with [affiliates]"; (ii) "SESAC does

not offer a viable per-program license"; (iii) "it is virtually impossible for local stations to avoid

SESAC music"; and (iv) "the SESAC blanket license's fee structure effectively forecloses

alternative licensing options."

Here, too, there is wealth of specific evidence supporting each allegation:

1.  "SESAC has entered into exclusive licensing arrangements with [affiliates]";[136]

- SESAC's agreements with affiliates that SESAC refers to as the "heavy hitters,"
  including Stephen Arnold (a top news music composer), Jonathan Wolff (*Seinfeld* and
  *Will & Grace*), Robert DeMarco and Michael Egizi (*Dr. Phil* and *Entertainment
  Tonight*), Danny Lux (*Boston Legal* and *Grey's Anatomy*), and Jeff Beal (*Monk* and
  *Ugly Betty*), all contain executed "supplemental agreements" that contain direct
  licensing restrictions in one form or another.[137]

- These supplemental agreements contain clauses that, for example, require affiliates to
  (1) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (2) charge
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; (3)
  issue direct licenses only for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and/or (4)
  allow that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



---

[135] Professor Jaffe's opinions also belie SESAC's argument that "[i]t cannot be wrongful to 'monopolize' a market
in which, by definition, nobody else compete."  Mem. at 17.  The only reason "nobody else can compete" is because
of SESAC's anticompetitive behavior.  Thus, SESAC's arguments for dismissal of plaintiffs' claims under Section 2
on this same basis are meritless.

[136] "The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to
strengthen its position, which may ultimately harm competition."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254,
270 (3d Cir. 2012), *cert. denied*, 133 S.Ct. 2025 (2013) (citation omitted).  That is precisely the purpose for which
SESAC has entered into *de facto* exclusive licensing arrangements with its key affiliates.  Antitrust law does not
contain "[a]n express exclusivity requirement" and courts "look past the terms of the contract to ascertain the
relationship between the parties and the effect of the agreement in the real world." *Id*.  Thus, "*de facto* exclusive
dealing claims are cognizable under the antitrust laws."  *Id*.

[137] Pls.' 56.1 Stmt. ¶¶ 131-137, 219.

███████████████

- Where local stations had control over music, such as their local news programming, SESAC enforced these restrictions against Stephen Arnold.  SESAC then delayed determining a direct license price, and eventually provided a price that the composer himself deemed excessive.[139]

- SESAC also used economic penalties to prevent certain key affiliates from issuing direct licenses.[140]

- SESAC executive Dennis Lord testified bluntly that a direct license by a SESAC affiliate so restricted "never happened, hasn't happened *won't* happen."[141]

- As Professor Jaffe explained, the clear economic intent and effect of these restrictive provisions is to eliminate the possibility of any meaningful competition with the SESAC blanket license.[142]

2.  "SESAC does not offer a viable per-program license" (*i.e.*, SESAC does not afford local stations an economically meaningful alternative to the fixed-fee blanket license);

- In 2008, once freed of an obligation to offer a meaningful per program license (the key terms of which were set by arbitration), SESAC, while nominally retaining the per program license as an option, changed its pricing formula in several critical respects for the express purpose of "*lower[ing] potential savings* for any given station" so that "*fewer stations elect[] a PPL.*"[143]

- These changes to the per program formula included:  (1) increasing *tenfold* the charge for programs with unidentified music; (2) removing contractual language in the per-program license stating that SESAC would accept music cue sheets from local stations, which were used to demonstrate that a given program did not contain SESAC music and was therefore not subject to fee; (3) increasing the charge for administrative costs; and (4) increasing the charge for incidental and ambient music.[144]

- Numerous stations complained to SESAC that these changes made the per program license unworkable.[145]

---

[138] Pls.' 56.1 Stmt. ¶ 222.
[139] Pls.' 56.1 Stmt. ¶ 164(b)-(c); 56.1 Response ¶ 121.
[140] Pls.' 56.1 Stmt. ¶¶ 240-245.
[141] Pls.' 56.1 Stmt. ¶ 247.
[142] Pls.' 56.1 Stmt. ¶ 223.
[143] Pls.' 56.1 Stmt. ¶ 254.
[144] Pls.' 56.1 Stmt. ¶¶ 255-259.
[145] Pls.' 56.1 Stmt. ¶ 261.

- MRI determined, following analysis and contrary to its economic self-interest, that it could not recommend that any of its client stations elect using the post-2007 SESAC per program license.[146]

- SESAC admitted that the 2008 per program license was not an economically viable alternative during negotiations with at least one station group.[147]

- Professor Jaffe concluded that SESAC "modified the per program license . . . so as to render it economically non-viable to stations," which forced stations to "take a SESAC blanket license jointly priced at artificially high rates without any meaningful connection to the extent of a station's use of SESAC music."[148]

- SESAC's changes were effective in achieving its goal.  While 248 stations took a per program license in 2007, *no* stations have operated on the per program license from 2008 onward.[149]

3.  Because of SESAC's actions, "it is virtually impossible for local stations to avoid SESAC music";

- Almost verbatim with plaintiffs' allegations, SESAC's financial owner Och-Ziff wrote that "[i]t would be *impossible* for a … station to operate without a SESAC license."[150]

- The exclusive licensing arrangements between SESAC and its key affiliates affect a quantitatively and qualitatively important portion of local station programming, making it virtually unavoidable that stations will air programming with music composed by affiliates subject to those restrictions.[151]

- SESAC will not provide stations with complete and up-to-date information of all of the works in its repertory in any usable form, thereby eliminating the stations' ability to determine if particular programs contain SESAC music.[152]

- As attested to by a Meredith representative, it is impossible to determine whether a program contains SESAC music, in part because composers can switch their PRO affiliation before a show airs.[153]

- Hoak and Scripps representatives similarly testified that many shows do not provide music cue sheets, which are often the only way to determine whether a show contains SESAC music.[154]

---

[146] Pls.' 56.1 Stmt. ¶ 260.
[147] Pls.' 56.1 Stmt. ¶ 264.
[148] Pls.' 56.1 Stmt. ¶ 270.
[149] Pls.' 56.1 Stmt. ¶¶ 193, 250, 268-268.
[150] Pls.' 56.1 Stmt. ¶ 271.
[151] Pls.' 56.1 Stmt. ¶¶ 125, 137, 220.
[152] Pls.' 56.1 Stmt. ¶¶ 285-287.
[153] Pls.' 56.1 Stmt. ¶¶ 275-276.

- SESAC employees themselves admitted that they do not receive cue sheets for all programs.[155]

- As Professor Jaffe noted, "[t]he only way the station could avoid performing music for which it does not have the performance rights would be to scrutinize the music content of every program delivered to it, and refuse to broadcast any program that contains music for which the station does not have the performance right."  This task is made impossible by SESAC because it "does not make available an up-to-date repertory database in usable form."[156]

4. "the SESAC blanket license's fee structure effectively forecloses alternative licensing options"

- As a result of its anticompetitive conduct, SESAC eliminated any basis on which to license its music other than its blanket license.[157]

- Stephen Arnold testified that the blanket license structure forecloses alternate licensing arrangements: "if a station is on a blanket [license], then there is no reason for a direct license.  [The station] would just be paying the composer twice."[158]

- Professor Jaffe has opined that under SESAC's blanket licensing regime, any efforts made by local stations to secure performance rights by means other than through the SESAC blanket license would result in the station paying twice for those performance rights.[159]

- SESAC has locked up key affiliates controlling significant amounts of music in local television programming, preventing them from licensing stations or their program suppliers directly.  Thus, even if a station could avoid paying twice for performance rights, the most critical SESAC affiliates were prevented by SESAC from entering into transactions that could effectuate station savings.[160]

- Professor Jaffe opined that "[t]he combined effect of SESAC and its rightsholders' behavior has been to eliminate competition to license music from the SESAC repertory in local television."[161]

- Professor Jaffe concluded that "the economic effect of [the blanket license] is the same as if all U.S. composers and publishers formed a cartel for the sale of music performance rights."[162]

---

[154] Pls.' 56.1 Stmt. ¶¶ 277-278.
[155] Pls.' 56.1 Stmt. ¶¶ 279-282.
[156] Pls.' 56.1 Stmt. ¶ 287.
[157] Pls.' 56.1 Stmt. ¶ 288-298.
[158] Pls.' 56.1 Stmt. ¶ 297.
[159] Pls.' 56.1 Stmt. ¶ 290; 56.1 Response ¶ 15.
[160] See *infra* 16-19.
[161] Pls.' 56.1 Stmt. ¶ 300.

From the foregoing, it is evident that plaintiffs have come forward with a plenitude of evidence demonstrating, at a bare minimum, that material factual disputes exist under the legal framework that Judge Buchwald established and determined would give rise to antitrust violations on the part of SESAC. Indeed, to the extent there are issues identified by Judge Buchwald as to which there are not material issues of fact, the record evidence conclusively established those issues *in Plaintiffs' favor*.

### C. SESAC's Assertion That Plaintiffs Cannot Establish That There Are No Realistic Alternatives to the Blanket License Is Meritless

Ignoring the record evidence discussed above, SESAC asserts that plaintiffs "cannot establish that alternatives to SESAC's blanket licenses were not realistically available," and therefore, that SESAC should be entitled to summary judgment. Mem. at 16. Before addressing the specific merits of SESAC's contention, we note its utter inconsistency with its dispositive admission that it "has no independent antitrust obligation to offer a per-program license – or, for that matter *any* alternative to the blanket license." *Id.* at 41 (emphasis in original).

### 1. SESAC's Post-2007 Per Program License Was Not Realistically Available

SESAC asserts that "[r]egardless of whether any stations *took* SESAC's per-program license for the period in question, the plaintiffs cannot show that – as an objective matter – that license was not realistically available." *Id.* at 16. This claim is absurd. As a result of deliberate changes that SESAC made to its per program license, the number of stations taking that license dropped *from 248 in 2007 to zero in 2008* and thereafter.[163] There can be no better *objective* evidence that SESAC's per program license was not, in fact, realistically available. Local stations with millions of dollars in commerce at stake – hundreds of which had taken a SESAC per program license and saved money thereby – made the business decision to forego entirely the

---

[162] Pls.' 56.1 Stmt. ¶ 288.
[163] Pls.' 56.1 Stmt. ¶¶ 193, 250, 268-269.

SESAC per program license because it was no longer economically viable.  To the extent that SESAC suggests that this was all a pretext orchestrated by hundreds of stations to willingly forego savings in order to manufacture evidence for an antitrust lawsuit, that implausible argument is for the jury.

Moreover, SESAC does not contest that its intent in modifying the per program license was anything other than to limit the utility of that license and thereby eliminate any competition to its blanket license by removing any incentive for the local stations to seek out direct and source licenses under more competitive conditions.  *Id.* at 51.  Indeed, in discussing the changes SESAC was contemplating to its per program license, SESAC consultant Barry Massarssky admitted that "[SESAC] has a very tight timeframe to *strike directly at the stations*…"[164] SESAC's economic expert in turn conceded that "[t]he changes in the [per-program license] formula from 2005-2007 to 2008-2012 did have the effect of *decreasing the savings* from the [per-program license]."[165]  This is consistent with MRI's conclusion that local stations would not be able to benefit from availing themselves of the post-2007 per program license.[166]

SESAC's effort to rely on the assertedly "materially identical" circumstances in *Buffalo Broadcasting*, Mem. at 51, is entirely misplaced.  Unlike the record facts here, at the time of that litigation, there was no history of local stations electing the ASCAP and BMI per program licenses.  In any event, the Second Circuit expressly relied on the fact that the ASCAP and BMI per program licenses – unlike the SESAC per program license – were subject to rate court oversight in this District to ensure that their fees and terms in fact afforded local stations realistically available alternatives to the blanket license.  744 F.2d at 927 ("[E]ven if there were evidence that showed the [per] program license rate to be too 'high,' that price is always subject

---

[164] Pls.' 56.1 Stmt. ¶ 253.
[165] Pls.' 56.1 Stmt. ¶ 270.
[166] Pls.' 56.1 Stmt. ¶ 260; 56.1 Response ¶ 37.

to downward revision….  The availability of a judicially enforceable requirement of a 'reasonable fee' precludes any claim that the [per] program license rate is too high….").  Indeed, after the local stations sought rate court intervention, and following Magistrate Judge Dolinger's 1993 ruling finally making the per program license an economically viable alternative to the blanket license, local stations flocked in large numbers to that license, no differently than occurred following the 2005-2007 TMLC-SESAC arbitration.

### 2. SESAC's Actions Have Foreclosed Any Ability of Local Stations To Secure Direct and Source Licenses

In a further effort to demonstrate that plaintiffs "cannot establish that alternatives to SESAC's blanket licenses were not realistically available," SESAC contends that "the record overwhelmingly is one of local stations *not trying* to obtain [source and direct] licenses – in which case, as a matter of law, [plaintiffs] cannot demonstrate that direct and source licenses were not realistically available."  Mem. at 16-17, 52.  This argument is similarly specious.

Any evaluation of the significance of plaintiffs' self-help efforts must be preceded by a determination as to the feasibility of engaging in them in the first place.  The Second Circuit has made clear that "[a]n antitrust plaintiff is not obliged to pursue *any imaginable alternative*, regardless of cost or efficiency, before it can complain that a practice has restrained competition."  *Buffalo Broadcasting*, 744 F.2d at 925 (quoting *CBS Remand*, 620 F.2d at 936).  Where, as the instant record establishes, SESAC has (i) operated under a blanket license that affords the local stations no economic incentive to pursue source or direct licensing, since to do so would result only in double-paying for the same rights, (ii) tied up key television composers so that any efforts by either stations or their program suppliers to secure rights by other means would be futile, and (iii) deliberately manipulated the pricing of a per program license so as to

make it an unworkable alternative to the blanket license,[167] the notion that the stations should bear responsibility for any asserted failure to pursue alternatives more actively rings hollow.

There is, in any event, ample record evidence of efforts by plaintiffs (and other local stations) to pursue licensing alternatives.  With respect to direct licenses, as a general matter, there has been widespread resort to such licensing since ASCAP and BMI began to offer a viable per program license in the wake of Judge Dolinger's *Buffalo Broadcasting* rate determination, particularly to secure rights to perform music in locally-produced programs such as local news.[168]  In addition, there are numerous examples of stations trying to secure direct licenses from local news composer Stephen Arnold during the brief period when SESAC offered a viable per program license.[169]  The record shows the futility of those efforts as a result of the outlandishly high prices SESAC compelled Arnold to quote based on the restrictions in his SESAC affiliation agreement.[170]

With respect to source licenses, both the local stations and MRI have tried to secure them, with little – albeit some – success.[171]  By way of example, Belo, the owner of twenty local television stations, attempted to secure source licenses as part of its negotiations for renewals of certain syndicated programming agreements.[172]  These efforts failed and Belo was unable to secure a single source license.[173]  Similarly, MRI, acting on behalf of local stations, approached a number of producers of syndicated programming, in an effort to explore the possibility of securing source licenses covering the SESAC music in certain of the their programs.  These

---

[167] To this point, *see Buffalo Broadcasting*, 744 F.2d at 926 n.7: "[T]he [per] program license, *if available*, may *facilitate* the stations' efforts to pursue direct licensing and source licensing."
[168] *See, e.g.*, Pls.' 56.1 Stmt. ¶ 196.
[169] Pls.' 56.1 Stmt. ¶ 228.
[170] Pls.' 56.1 Stmt. ¶ 164(a)-(b).
[171] Pls.' 56.1 Stmt. ¶ 202.
[172] Pls.' 56.1 Stmt. ¶ 197.
[173] *Id.*

efforts similarly proved unsuccessful.[174]  Contrary to SESAC's suggestion, these efforts to secure

source licenses were not a litigation tactic.  Negotiating and securing source licenses on behalf of

local stations is an important aspect of MRI's business – and MRI has been in the business of

negotiating such licenses long before this litigation began.[175]  In fact, "MRI has been

instrumental in securing and administering source licenses to major syndicated programs, which

have helped the industry save millions of dollars in music license fees."[176]

### D.  SESAC's Assertion that Plaintiffs Cannot Demonstrate Harm To Competition Is Contrary to Settled Law and is Refuted by the Economic Evidence

Judge Buchwald held that plaintiffs' claims adequately alleged that SESAC's licensing

practices have serious anti-competitive effects that outweigh any pro-competitive benefits with

the result being harm to competition.  Nevertheless, SESAC seeks dismissal again on the ground

that plaintiffs cannot establish harm to competition.  Mem. at 15-16.  To support this claim,

SESAC asserts that: (i) "plaintiffs have identified no reduction in output resulting from SESAC's

supposedly anticompetitive activities"; (ii) Professor Jaffe's "'hypothetical competitive world'

cannot establish harm to competition"; and (iii) SESAC's blanket licensing amounts to pro-

competitive bundling.  *Id*. at 34-42.  SESAC's assertions are wrong.

### 1.  Reduced Output Is Not The Only Way To Show Harm to Competition

As a threshold matter, SESAC is wrong that as a matter of law plaintiffs can only show

harm to competition by demonstrating a reduction in output.  As the Second Circuit has made

clear, to determine whether there has been an "adverse effect[] on competition," courts look to

"*increases in price*, *or* decreases in output or *quality*."  *United States v. Visa*, 344 F.3d 229, 238

---

[174] Pls.' 56.1 Stmt. ¶¶ 199-202.
[175] Pls.' 56.1 Stmt. ¶ 198.
[176] *Id.*

(2d Cir. 2003) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990).[177]

Consistent with that black-letter law, the applicable model jury instructions state: "In

determining whether the challenged restraint has produced competitive harm," a jury "may look

at the following factors: the effect of the restraint on *prices*, output, product quality and service

…."[178]  Indeed, even SESAC's economic expert conceded at his deposition that there are other

indicators of harm to competition beyond a reduction in output, including increased prices and/or

a reduction in quality that is in effect a price increase (which he did not analyze in this case).[179]

    As Professor Jaffe has explained, "competition was harmed by way of the elevation of

local television music performance license fees significantly above the competitive level (by

significantly increasing blanket license fees and by the degradation of the per-program license

offering)."[180]  In responding to SESAC's "no output reduction" argument, Professor Jaffe

explained that "[i]t is inherent in the nature of music use on television, and the structure of the

blanket license, that elevation of blanket license fees above the competitive level will not

generally result in any reduction in the extent of music performances in television" because

---

[177] SESAC's views are contrary to DOJ enforcement policy and antitrust law in this area.  For example, in defending the Government's ability to investigate alleged foreign misconduct of rights-holders who licensed the public performance right to their music and music videos exclusively through foreign PROs that they controlled, DOJ advocated that jurisdiction existed because the DOJ had reason to believe that the conduct it sought to investigate had a "significant anticompetitive effects on U.S. commerce," including higher costs to rights-users.  Post-Hr'g Mem. by the United States at 2, *United States v. Time Warner, et al.* (D.D.C. filed on Nov. 8, 1996).  "By requiring U.S. programmers to take a single blanket license from all the record companies instead of negotiating separately with individual companies, [the record labels that created foreign PROs] appear jointly and substantially to have *increased the prices* charged to these programmers for *essential inputs into their music programming services*."  *Id.* at 3.  Not surprisingly, the DOJ's petition to enforce their civil investigative demands was granted.  *United States v. Time Warner*, No. MISC.A. 94-338 (HHG), 1997 WL 118413 (D.D.C. Jan. 22, 1997).
[178] ABA SECTION OF ANTITRUST LAW, MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, 2005 Edition, A-7 (2005) (Rule of Reason; Proof of Competitive Harm).  *See also id.* at A-2 ("competition produces the best allocation of our economic resources, the *lowest prices*, the highest quality, and the greatest material progress") (Purpose; Sherman Act).
[179] Pls.' 56.1 Stmt. ¶ 302.
[180] Pls.' 56.1 Stmt. ¶ 299.

"once a licensee has obtained a blanket license, it may perform as much music as it wishes at that fixed cost, so there is no incentive to perform less as the price rises."[181]

### 2. Professor Jaffe Has Demonstrated That SESAC's Anticompetitive Conduct Harmed Local Stations

SESAC's attack on Professor Jaffe's "hypothetical competitive world" is a classic straw-man argument. SESAC appears to contend that because Professor Jaffe declined to predict with certainty that, but for SESAC's actions, the illustrative hypothetical competitive market he discusses would emerge, his analysis somehow does not demonstrate that competition has been harmed. What SESAC fails to note is that Professor Jaffe's analysis of the harm caused by SESAC's actions is not at all dependent on a "hypothetical competitive world." As Professor Jaffe explained, "[t]he purpose of the hypothetical structure is to illustrate the economic forces that are at work and to explain why it is inappropriate to think of the blanket license somehow as the only possible framework or structure by which performance rights could be acquired."[182] Professor Jaffe's actual analysis of the competitive harm includes pages of detailed discussion of precisely how: (i) SESAC's joint pricing; (ii) its restrictive agreements with key affiliates; and (iii) its unilateral changes to the per program license, have harmed competition, both individually and collectively.[183] All told, Professor Jaffe concluded that "[t]he combined effect of SESAC and its rightsholders' behavior has been to eliminate competition to license music from the SESAC repertory in local television. As a result, there are fewer licensing options available to stations, and license fee rates have been elevated far above the level that would prevail in the *absence of these anticompetitive acts*."[184]

---

[181] Pls.' 56.1 Stmt. ¶ 270.
[182] Pls.' 56.1 Stmt. ¶ 294; 56.1 Response ¶ 36.
[183] Pls.' 56.1 Stmt. ¶ 299.
[184] Pls.' 56.1 Stmt. ¶ 300.

SESAC also entirely ignores Professor Jaffe's quantification of the harm suffered by local stations as a direct result of SESAC's actions.  In that analysis, Professor Jaffe compared the actual fees that SESAC has been able to extract from local stations to those that would have been paid in a "but-for" world in which SESAC had not engaged in its anticompetitive acts. Importantly, the "but-for" world that Professor Jaffe considers is *not* the "hypothetical competitive world."  Instead, his analysis starts with the 2005 SESAC license fees set in arbitration – the only SESAC license fees that were set by a neutral third party based on evidence of actual and projected use of SESAC music by local stations.[185]  He then adjusted these fees over time to account for both changes in the use of SESAC music by local stations (calculated using statistically valid surveys designed to measure music use in local television programming) and general inflation in the economy.  Professor Jaffe's damages analysis demonstrates that SESAC has been able to harm the putative class by a conservatively estimated $32 million (prior to trebling and interest) over the 2008-2012 period.[186]  Because SESAC's anticompetitive activities are ongoing, this amount only stands to increase over time.  Thus, any fair reading of Professor Jaffe's analysis shows that plaintiffs have clearly established that SESAC's "illegality is … a material cause of [plaintiffs'] [antitrust] injury" and that "the injuries alleged would not have occurred *but for* [SESAC's] antitrust violation."  *Publ'n Paper*, 609 F.3d at 66 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) and *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986)) (emphasis in original).

Furthermore, while SESAC is correct that Professor Jaffe was unwilling to go so far as to definitively predict that the illustrative competitive market structure he discusses would emerge if SESAC's anticompetitive acts were enjoined, that is not to say that such a marketplace would

---

[185] Pls.' 56.1 Stmt. ¶ 302.
[186] *Id.*

not emerge.  In the context of modern-day local television, there is nothing unique about public performance rights that would necessitate the aggregation by a PRO of the performance rights of many thousands of otherwise competing rightsholders rather than having rightsholders compete to be engaged to write music for, or otherwise have their works included by the producer in television programming and commercial announcements.  This is precisely what has transpired in relation to theatrical motion picture music performance rights post-*Alden-Rochelle* and *Witmark*.  Motion picture theater exhibitors do not need blanket or any other forms of PRO licenses to exhibit motion pictures; for more than 60 years, the necessary public performance rights have been obtained efficiently at the source by film producers through competitive negotiations with rightsholders at the time of selection of music for inclusion in the motion picture.

The era of television being a spontaneous music use medium akin to the radio disc jockey's "itchy fingers" is long gone.  *BMI*, 441 U.S. at 22 n.37.  Today, the predominant television fare is pre-recorded programming.  Producers contract with composers to write original music for programs, comparable to the score of a motion picture, or to use existing works in a program's soundtrack, in which case they must at the same time secure a separate copyright right – a synchronization or "sync" right – permitting the producer to incorporate the selected music into the audiovisual program.[187]  It is entirely feasible for these producers to simultaneously bargain with the same composers and music publishers, as a part of the very same transaction, to obtain both the synchronization rights and the performance rights "at the source."  As noted, this is precisely what occurs in the licensing of motion picture theater performance rights.  Modern day television is in fact a quintessential example of a medium in

---

[187] Pls.' 56.1 Stmt. ¶ 143.

which "[changed] market conditions" warrant questioning "the necessity for and advantages of a blanket license," *BMI,* 441 U.S. at 21 – especially given the manner in which SESAC has utilized that form of license to strangle competition.

### 3.   SESAC's Behavior Is Not Analogous to Pro-Competitive Bundling

SESAC attempts to avoid the import of its admitted "pooling of copyrights" by suggesting that this is simply "bundling" that is "commonplace in the economy," going so far as to compare its blanket license to how "multiple sections of a newspaper typically are sold together."  Mem. at 39-40.  But as Professor Jaffe explained, "what is happening in those situations [that are commonplace in the economy] is not, in fact, analogous to what SESAC is doing, because SESAC is combining the products of multiple distinct sellers."[188]  This lawsuit does not challenge the prerogatives given an individual rightsholder under U.S. copyright law as to whether, how, and at what price to license her works.  It instead centers on the *collective* pooling of the copyrights owned, in SESAC's case, by some 23,000 separate, and otherwise competing, composers and music publishers and the delegation to SESAC, often on a *de facto* exclusive basis, of the determinations as to the terms on which, and prices at which, this blanket license will be granted users who, as a result of SESAC's anticompetitive behavior, *must* purchase a SESAC blanket license covering all of them.[189]

Moreover, Professor Jaffe noted that these inapposite bundling examples are "drawn from situations where workable competition is generally present," not where the "seller controls 100% of sales in the relevant market."[190]  As SESAC's economic expert conceded, if somebody wants

---

[188] Pls.' 56.1 Stmt. ¶ 289.
[189] As a result, SESAC's reliance on *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200-01 (9th Cir. 2012) – a motion to dismiss ruling from outside the PRO jurisprudence where, among other things, the plaintiffs challenged vertical tying restrictions that lacked any horizontal collusion – is entirely misplaced.  Mem. at 40.
[190] Pls.' 56.1 Stmt. ¶ 289.

to read a newspaper and the price is too high, they can read a different newspaper.[191]  That is not

the case here.  SESAC has stacked the competitive deck such that *every* station must take a

SESAC license and the only viable license form for doing so is SESAC's competition-stifling

blanket license.

Not only does Professor Jaffe's analysis demonstrate that SESAC's activities lack pro-

competitive benefits, but he also that SESAC's actions fail to create *any* efficiency benefits that

might, to some degree, offset the competitive harm SESAC has caused.[192]  As Professor Jaffe

explained, forcing stations to acquire a SESAC license – on top of the ASCAP and BMI licenses

that they already must take – only serves to increase transactions costs.[193]  Thus, in stark contrast

to SESAC's claim that the bundled blanket license is pro-competitive, the SESAC blanket

license in its current form actually generates only transaction-cost harm that further exacerbates

the competitive harm caused by SESAC.

Ultimately unable to align its conduct with that of judicially-reined-in ASCAP and BMI,

SESAC reaches for a lifeline with the argument that "even if courts have suggested that

ASCAP's or BMI's 'pooling' of copyrights harms competition, it does not follow that the same is

true for SESAC, the smallest of the three PROs," because, "[w]hatever the courts may have

thought about ASCAP and BMI in the past, one cannot presume that they would reach the same

conclusions today."  Mem. at 42.  This is no more than hollow incantation.  As this Court

correctly noted in expressing "a little bit of *skepticism* about the argument that says that SESAC

is the smallest of the three [PROs][,] … the fact that they are the bronze medalist … doesn't …

change the analysis."[194]  Equally, if SESAC were correct in this surmise, it would have come

---

[191] *Id.*
[192] Pls.' 56.1 Stmt. ¶ 303.
[193] *Id.*
[194] *Meredith Corp. v. SESAC, LLC*, No. 09 Civ. 9177 (PAE), Apr. 12, 2013 Hearing Tr. at 12:24 – 14:5.  (Dkt. 107).

forward with cogent case authority to support its position, which it has completely failed to do. Vague generalizations along the lines that "antitrust law has evolved overwhelmingly towards closer judicial scrutiny of any claim that particular practices are anticompetitive" scarcely fills that analytical void.   If anything, SESAC's assertions run contrary to DOJ's stated competition policy with respect to PROs and history of updating the ASCAP and BMI consent decrees from time to time to ensure their ongoing usefulness.[195]   That is likely why SESAC's own economic expert expressly refused even to give an opinion as to how his analysis would apply to ASCAP and BMI,[196] which remain subject to their government consent decrees and are frequent respondents in federal rate court proceedings that have regularly established reasonable license fees for the local stations and myriad other user groups, at dramatically *lower* levels than sought by those PROs.[197]

Finally, SESAC's parade of horribles as to how "a ruling in the plaintiffs' favor would call into question the legality of a wide array of plainly lawful practices in the distribution of intellectual property," Mem. at 43, is pure hyperbole that ignores established Second Circuit law. The Second Circuit has twice held – without any untoward results – that "[t]rade is restrained, *frequently in an unreasonable manner*, when rights to use individual copyrights or patents may

---

[195] *See, e.g.,* n. *supra* 177.  Similarly, SESAC's novel view is belied by the express *non-exclusivity* provision enacted into law by Congress in 1995, at DOJ's urging, regarding the ability of copyright owners of sound recordings to designate common agents that serve a function analogous to the PROs, to negotiate certain licenses with users.  *See* 17 U.S.C. § 114(e)(1).  The DOJ made clear that "[t]he requirement of nonexclusivity is intended to preserve the possibility of direct licensing negotiations" to "*help prevent copyright owners from using a common agent to demand supracompetitive rates, because such demands might be avoided by direct negotiations with individual copyright owners.*"  Digital Performance Right in Sound Recordings Act of 1995: section-by-section analysis, 141 Cong. Rec. S 11954 (1995).  As demonstrated herein, SESAC has used exclusive arrangements with its key affiliates for precisely this anticompetitive purpose.

[196] Pls.' 56.1 Stmt. ¶ 304.

[197] *See, e.g., United States v. ASCAP (In re Application of Buffalo Broad. Co.),* Civ. No. 13-95 (WCC) (MHD), 1993 WL 60687, at *19 (S.D.N.Y. Mar. 1, 1993) (rejecting ASCAP's fee proposal as being unreasonable); *ASCAP v. Showtime/The Movie Channel, Inc.,* 912 F2d. 563, 565 (2d Cir. 1990) (setting fees at 60% of those sought by ASCAP); *ASCAP v. MobiTV Inc,* 681 F.3d 76, 82 (2d Cir. 2012) (rejecting ASCAP's fee proposal that amounted to some $15.8 million over a 6-plus year period, instead setting fees at $405,000 for that period – some 2.5% of those sought by ASCAP); *BMI v. DMX, Inc.,* 683 F.3d 32, 40-42 (2d Cir. 2012) (setting fees at 33% of those sought by ASCAP and 45% of those sought by BMI).

be obtained *only* by payment for a pool of such rights, but the opportunity to acquire a pool of rights does not restrain trade if an *alternative* opportunity to acquire individual rights is *fully available*." *CBS Remand*, 620 F.2d at 935; *Buffalo Broadcasting*, 744 F.2d at 925.

Thus, plaintiffs have unquestionably demonstrated genuine issues of material fact as to whether SESAC's licensing practices have harmed competition.

## CONCLUSION

Guided by Judge Buchwald's comprehensive motion to dismiss ruling concluding that the alleged SESAC licensing practices, if proven, have violated the antitrust laws, plaintiffs conducted their discovery and amassed evidence to prove their claims under the architecture established for this case.  Plaintiffs have now come forward with overwhelming fact and expert evidence that in any light, and especially in the light most favorable to plaintiffs, entitles them to an adjudication on the merits before a jury.  Accordingly, plaintiffs respectfully request that SESAC's motion for summary judgment be denied.

Dated: New York, NY
      August 2, 2013

Respectfully submitted,

By: _Steven Alan Reiss_

STEVEN A. REISS
R. BRUCE RICH
BRUCE A. COLBATH
BENJAMIN E. MARKS
ERIC S. HOCHSTADT
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, N.Y.  10153
(212) 310-8000

CARRIE M. ANDERSON
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, N.W.
Washington, D.C.  20005
(202) 682-7000

*Counsel for Plaintiffs*