UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                     :

MEREDITH CORPORATION, THE E.W. SCRIPPS  :
COMPANY, SCRIPPS MEDIA, INC., HOAK MEDIA,  :       09 Civ. 9177 (PAE)
LLC, HOAK MEDIA OF NEBRASKA LLC, and HOAK  :
MEDIA OF DAKOTA, LLC,  :       OPINION & ORDER
                     :
           Plaintiffs,  :
                     :
          -v-  :
                     :
SESAC LLC and JOHN DOES 1–50,  :
                     :
          Defendants.  :
                     :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      This lawsuit is the latest in a line dating to the 1940s that have challenged, under federal

antitrust law, the practices of performing rights organizations ("PROs") that issue collective (or

"blanket") licenses to the rights to perform the copyrighted music of their members or affiliates.

In the United States, there are three such PROs.  For more than 50 years, the licensing practices

of the two largest—the American Society of Composers, Authors and Publishers ("ASCAP"),

and Broadcast Music, Inc. ("BMI")—have been subject to consent decrees entered into with the

United States Department of Justice ("DOJ") following antitrust litigation.  These decrees have

imposed significant restrictions on these PROs.  These include establishing a "rate court" to set

reasonable fees for performance licenses when the PRO and the licensee cannot agree; requiring

that the PRO's right to issue performance licenses to its members' music be non-exclusive; and

requiring that alternatives means of licensing such music be made realistically available to

would-be licensees.  These terms have factored prominently in the court decisions that, since

1950, have uniformly rejected antitrust challenges to ASCAP's and BMI's use of blanket licenses.

This case involves the third, and smallest, PRO:  SESAC LLC ("SESAC").  Unlike ASCAP and BMI, SESAC has never been subject to a consent decree.  However, in the years leading up to 2008, SESAC's latitude to set the terms of music licenses was otherwise limited: first by a series of industry-wide agreements it negotiated with the television broadcast industry; later, for the period April 2005 through December 31, 2007, by a contractual duty that bound SESAC to arbitrate its disputes with licensee stations.  Since January 2008, however, SESAC's range of motion has no longer been thus inhibited.  SESAC has been free unilaterally to set the terms on which it will issue licenses to perform the music of its more than 20,000 affiliated composers.

The issue in this putative class action is whether SESAC's licensing practices since 2008 have violated federal antitrust law.  Plaintiffs are groups of local television stations.[1]  They sue SESAC and 50 of its affiliated composers, who are named as "John Doe" defendants.  The plaintiffs allege that, in practice, they must obtain licenses for some music in SESAC's repertory.  That is because SESAC's repertory is large and includes works so ubiquitous that some are inevitably embedded in shows that the stations acquire and wish to air.

Plaintiffs contend that, since 2008, SESAC, with its affiliates' assent, has taken steps to make illusory any alternative to the blanket license it sells, which conveys the right to play the music of all SESAC affiliates.  Having insulated this product from competition and forced local television stations to acquire it, plaintiffs allege, SESAC has set an exorbitant price for that "all or nothing" license, even though stations have no interest in buying the rights to the entirety of

---

[1] They are Meredith Corporation ("Meredith"); the E.W. Scripps Company; Scripps Media, Inc.; Hoak Media, LLC; Hoak Media of Nebraska LLC; and Hoak Media of Dakota, LLC.

SESAC's repertory.  Plaintiffs assert that SESAC and its affiliates have thereby violated § 1 of

the Sherman Act, 15 U.S.C. § 1, by combining to unlawfully restrain trade; and § 2 of the same

Act, 15 U.S.C. § 2, by conspiring to monopolize the market for the performance rights to the

musical works within SESAC's repertory.  Plaintiffs also assert a monopolization claim against

SESAC under § 2.

Discovery is now complete.  SESAC[2] moves for summary judgment.  For the reasons

that follow, that motion is denied as to all three counts, save that, on the § 1 claim, the Court

grants summary judgment to defendants in two ways that narrow that claim.  Specifically, the

Court rejects plaintiffs' (1) *per se* theory of liability; and (2) claim of an agreement to restrain

trade among all 20,000-plus SESAC affiliates, as opposed to among only the far smaller subset

(under 1%) of affiliates who were party to a supplemental affiliation agreement with SESAC.

## I.      Background

### A.      Facts[3]

---

[2] Because plaintiffs at no point identified or served any "John Doe" defendants, SESAC is the lone defendant to move for summary judgment, although the arguments it makes appear to run equally to the benefit of its "John Doe" affiliates.

[3] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion—specifically, Defendant SESAC LLC's Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Def. 56.1") (Dkt. 131); Plaintiffs' Response to Defendant's Statement of Facts Pursuant to Local Rule 56.1 ("Pl. Resp. to Def. 56.1") (Dkt. 134); Defendants SESAC LLC's Reply Statement to Plaintiffs' Local Rule 56.1 Responses ("Def. Reply 56.1") (Dkt. 137); Plaintiffs' Local Rule 56.1 Supplemental Statement of Undisputed Facts ("Pl. 56.1") (Dkt. 133); Defendant SESAC LLC's Response to Plaintiffs' Local Rule 56.1 Supplemental Statement of Undisputed Facts ("Def. Resp. to Pl. 56.1") (Dkt. 136); the Memorandum of Law in Support of Defendant SESAC LLC's Motion for Summary Judgment ("Def. Br.") (Dkt. 130); Plaintiffs' Memorandum of Law in Opposition to Defendant SESAC, LLC's Motion for Summary Judgment ("Pl. Br.") (Dkt. 132); the Corrected Reply Memorandum of Law in Support of Defendant SESAC LLC's Motion for Summary Judgment ("Def. Reply Br.") (Dkt. 135); the Declaration of Susan J. Kohlmann in Support of SESAC LLC's Motion for Summary Judgment ("Kohlmann Decl.") and accompanying exhibits; the Declaration of Eric S. Hochstadt in Support of Plaintiffs' Opposition to Defendant SESAC

This case involves the process by which local television stations acquire the performance licenses necessary to permit them lawfully to broadcast programs containing copyrighted music. Plaintiffs claim antitrust violations arising out of the terms under which SESAC has aggregated such licenses and offered then for sale.  To understand these claims and SESAC's defenses, it is

LLC's Motion for Summary Judgment ("Hochstadt Decl.") and accompanying exhibits; and the Supplemental Declaration of Susan J. Kohlmann in Further Support of SESAC LLC's Motion for Summary Judgment ("Kohlman Supp. Decl.") and accompanying exhibits.  Citations to a party's 56.1 statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The parties each challenge the other's Rule 56.1 statement.  Plaintiffs attempt to justify their submission of a supplemental 56.1 statement by arguing that SESAC "has presented an incomplete record to the Court."  Pl. 56.1 at 1.   SESAC characterizes plaintiffs' submission as an "unnecessary and improper submission that distracts from the undisputed record of material facts set forth in SESAC's Statement of Undisputed Facts Pursuant to Local Rule 56.1"; it asks the Court to disregard plaintiffs' supplemental statement for several reasons.  Def. Resp. to Pl. 56.1 at 1–2. SESAC also makes specific objections to aspects of plaintiffs' supplemental 56.1 statement, as well as to plaintiffs' responses to SESAC's statement.

The Court has carefully considered both parties' arguments and competing 56.1 statements.   As to SESAC's 56.1 statement, many of plaintiffs' responses consist of improper argument or recitations of different facts; where plaintiffs have not cited an evidentiary basis to contest a factually supported statement by SESAC, the Court has taken that statement as established.  As to plaintiffs' supplemental 56.1 statement, the Court has found certain discrete statements related in it to be germane and factually supported; where defendants have not refuted these facts, the Court has taken them as true.  However, many of plaintiffs' 56.1 statements are improper:  They are argumentative or immaterial, rely on inadmissible hearsay, fail to cite supporting evidence, and/or marshal evidence in a manner perhaps appropriate for a legal brief, but not for a 56.1 statement.  As to other facts, plaintiffs needlessly repackage facts adequately addressed in SESAC's 56.1 statement.  Where plaintiffs' 56.1 statement is deficient in such ways, the Court has not relied on it.  The 56.1 statements on which the Court has relied are those cited herein.

necessary to explain the means by which music performance licenses are sold to such stations, both in general and by SESAC specifically.

### 1. Television Stations' Need for Music Performance Licenses

Almost all television programs contain music, whether as the central focus of a feature performance, as theme music played at the program's opening and closing, or as interspersed or interstitial background music used "to underscore or heighten certain moods, change the pace or otherwise enhance the desired effect of the program." *United States v. ASCAP*, No. 13 Civ. 95 (WCC) (MHD), 1993 WL 60687, at *2 (S.D.N.Y. March 1, 1993). Most such music is copyrighted under federal copyright law, *see* 17 U.S.C. §§ 1701 *et seq.* Def. 56.1 ¶¶ 1–2; Pl. Resp. to Def. 56.1 ¶¶ 1–2; Hochstadt Decl. Ex. 1 (Expert Report of Adam B. Jaffe ("Jaffe Rep.")) 10–11. To comply with that law, a station that seeks to broadcast programs containing copyrighted music must first obtain a license from the copyright holder to publicly perform it. Def. 56.1 ¶¶ 3–4; Pl. Resp. to Def. 56.1 ¶¶ 3–4; Jaffe Rep. 10.

As a practical matter, a television station cannot negotiate separately with the holder of the rights to each copyrighted work within each of its programs. Among other reasons, there are far too many musical works contained within these programs to make it realistic to undertake individual negotiations; and as to some works, the copyright holder may not be identified easily.

Instead, for many years, for most music that they have broadcast, local stations have obtained performance licenses from PROs. Def. 56.1 ¶ 18; Pl. Resp. to Def. 56.1 ¶ 18; Am. Compl. ¶ 10. The PROs affiliate with numerous composers and music publishers, and assist these rightsholders in various ways. These include serving as a clearinghouse for the licensing of public performance rights, monitoring performance of members' works, assuring that users pay

5

for such performances, and distributing royalties to the rightsholders.[4]  On their members'

behalf, the PROs sell—to TV stations and others that wish to perform such work—performance

licenses that cover, generally on an aggregated, or blanket, basis, the musical works of their

respective affiliates.  Def. 56.1 ¶ 19; Pl. Resp. to Def. 56.1 ¶ 19.

      As noted, in the United States, there are three such PROs: ASCAP, BMI, and SESAC.

Def. 56.1 ¶¶ 18-19; Pl. Resp. to Def. 56.1 ¶¶ 18–19.  SESAC, a private for-profit corporation

owned by investors, is the smallest.  Def. 56.1 ¶¶ 21–23; Pl. Resp. to Def. 56.1 ¶¶ 21–23.  The

three PROs have repertories of copyrighted music that are exclusive of one another.  Together,

the PROs' repertories account for virtually every copyrighted musical composition in the United

States and its territories.  Def. 56.1 ¶ 20; Pl. Resp. to Def. 56.1 ¶ 20.

### 2.  Locally-Produced and Third-Party Produced Television Programs

      Programming by local television stations falls broadly into two categories: those locally

produced and those produced by third parties.  Def. 56.1 ¶ 5; Pl. Resp. to Def. 56.1 ¶ 5.  A

station's need to obtain performance licenses from PROs is particularly acute in connection with

third-party programming.  Locally-produced programs, including local news programming, are

produced by the station itself.  Def. 56.1 ¶ 6; Pl. Resp. to Def. 56.1 ¶ 6.  As to such programs,

local stations can, with minor exceptions, determine for themselves what music they wish to

include.  Def. 56.1 ¶ 7; Pl. Resp. to Def. 56.1 ¶ 7.  A station could, therefore, largely avoid

music in the repertory of a particular PRO in its own locally-produced programming, albeit with

considerable effort.  Def. 56.1 ¶ 8; Pl. Resp. to Def. 56.1 ¶ 8.

---

[4] The Supreme Court has explained the origins of the PROs by noting that "those who performed
copyrighted music for profit were so numerous and widespread, and most performances so
fleeting, that as a practical matter it was impossible for the many individual copyright holders to
negotiate with and license the users and to detect unauthorized uses."  *BMI v. Columbia
Broadcasting Sys., Inc.*, 441 U.S. 1, 4–5 (1979) ("*BMI v. CBS*").

With respect to third-party programming, however, local television stations lack latitude to control music content.  Third-party programming includes syndicated series or shows, such as "Seinfeld," "House," or "Wheel of Fortune," movies, most sporting events, commercials, and infomercials, Def. 56.1 ¶¶ 9, 10; Pl. Resp. to Def. 56.1 ¶¶ 9, 10; Jaffe Rep. 9, 12, all of which may be critical to the station's success.  These programs are produced by outside persons or entities, and come to the local station complete or "in the can"; the stations do not control, nor can they alter, the music embedded therein.  Def. 56.1 ¶¶ 10, 11; Pl. Resp. to Def. 56.1 ¶¶ 10, 11.[5]

A station that broadcasts a copyright-protected performance of a musical work without permission faces the threat of statutory penalties for copyright infringement that can be as high as $150,000 per infringement.  17 U.S.C. § 504(c).  For a number of practical reasons, to assure that it has the legal right to broadcast all the music contained in its third-party programs and commercial announcements, a local station generally must acquire licenses from all three PROs.[6] Def. 56.1 ¶ 18; Pl. Resp. to Def. 56.1 ¶ 18.

For one, the sheer volume of music broadcast by a station across its third-party programs makes it likely that this music will draw upon the repertories of ASCAP, BMI, and SESAC.  For another, stations are contractually prohibited from altering, removing, or substituting alternatives for, the music embedded in third-party programming.  Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11; Jaffe

---

[5] A television station also cannot determine the music contained in third-party produced commercials aired during such programs ("incidental music") or in the background of broadcasted live events ("ambient music").  *See* Pl. Resp. to Def. 56.1 ¶ 7.

[6] There are limited exceptions to this, including in circumstances where a local station's network affiliate has obtained a "through to the viewer" license from the PRO that runs to the benefit of a local affiliate.  *See* Def. 56.1 ¶ 17; Pl. 56.1 Resp. to Def. 56.1 ¶ 17.  These circumstances are not relevant here.

Rep. 12, 53.  A station cannot strip out, or excise, music contained within the repertory of a PRO with whom it wishes not to contract.  It also may be difficult, or even impossible, for a station to identify, at the time it buys the rights to air a program, all music embedded in that program, let alone the PRO to whose repertory each musical work belongs.  Def. 56.1 ¶¶ 11−12; Pl. Resp. to Def. 56.1 ¶¶ 11−12.  Finally, the alternative sales channel for music performance rights that conceivably might have developed—in which the right to perform embedded music would be secured by the producer and sold to the station along with the third-party program—has not so developed.  Most rights the station needs to lawfully air the program, including rights relating to the script, visual images, acting, and direction, are typically conveyed along with the program itself.  Def. 56.1 ¶ 14; Pl. Resp. to Def. 56.1 ¶¶ 14, 16.  But, as a matter of what plaintiffs call "longstanding industry practice," performance rights to embedded music are generally not conveyed along with the program.  Am. Compl. ¶ 7.  The stations must separately secure such rights.  Def. 56.1 ¶¶ 14, 16; Pl. Resp. to Def. 56.1 ¶ 16.[7]

For years, therefore, local stations overwhelmingly have obtained, from each PRO, music performance licenses that cover the PRO's entire repertory.  Def. 56.1 ¶ 18; Pl. Resp. to Def. 56.1 ¶ 18.  In negotiations with the PROs regarding performance rights, the stations have been represented by a non-profit association, the Television Music License Committee ("TMLC").  Def. 56.1 ¶ 26; Pl. Resp. to Def. 56.1 ¶ 26.  TMLC, in turn, has co-founded Music Reports, Inc. ("MRI"), which provides music rights administration services, including per-program license reporting services, to television stations in the United States.  Def. 56.1 ¶ 28; Pl. Resp. to Def. 56.1 ¶ 28.

---

[7]  There are situations in which third-party producers or syndicators directly provide source licenses that convey the public performance rights to the embedded music.  *See* Pl. Resp. to Def. 56.1 ¶¶ 14, 16.  This circumstance is not relevant to the instant motion.

### 3.    Types of Licenses Available – and ASCAP's and BMI's License Terms

There are several types of music performance licenses that a user, such as a television station, may obtain: blanket licenses, per-program licenses, direct licenses, and source licenses.

**a.    Blanket licenses**:  Blanket licenses authorize a station to perform all compositions in a given PRO's repertory, and to do so an unlimited number of times; for this right, the station pays a fixed fee.  Def. 56.1 ¶¶ 29−32; Pl. Resp. to Def. 56.1 ¶¶ 29−32; Jaffe Rep. 17–18. Historically, local stations have acquired blanket licenses from all three PROs to assure that they obtained the public performance rights necessary for all of their programming.  Def. 56.1 ¶ 31; Pl. Resp. to Def. 56.1 ¶ 31; Jaffe Rep. 17–18.  Because each blanket license covers all music in that PRO's repertory, this practice allows the stations to air programming without any risk of music copyright infringement.  Def. 56.1 ¶ 33; Pl. Resp. to Def. 56.1 ¶ 33.

**b.    Per-program licenses**:  Like a blanket license, a per-program license ("PPL") allows a station to perform any composition in a PRO's repertory.  Unlike a blanket license, however, a PPL's fee is variable; it depends on how many programs broadcast by the station contain music in a given PRO's repertory for which the station has not independently obtained a direct license. *See* Def. 56.1 ¶¶ 37−39; Pl. Resp. to Def. 56.1 ¶ 38; Jaffe Rep. 27–29.  A station must pay the PRO only for any program that it broadcasts that contains one or more instances of that PRO's music, and then only if the station does not already have the required license for that music from another source, in the form of a direct or source license (discussed below).  Otherwise, the station need not pay the PRO.  *See* Def. 56.1 ¶¶ 38–39; Pl. Resp. to Def. 56.1 ¶¶ 38–39; Jaffe Rep. 27–28.  In other words, the PPL provides stations that independently obtain licenses a discount off the blanket license, and thus an incentive to seek out licenses by other means.

ASCAP and BMI offer PPLs.  *See* Def. 56.1 ¶ 37; Pl. Resp. to Def. 56.1 ¶ 37.  They are required to do so pursuant to consent decrees those entities entered into, decades ago, with DOJ, following antitrust litigation.  *See, e.g., United States v. ASCAP*, No. 41-1395, 1950 U.S. Dist. LEXIS 4341, at *10–*11 (S.D.N.Y. Mar. 14, 1950) (ASCAP Consent Decree Amended Final Judgment or "ASCAP AFJ"); *United States v. BMI*, No. 64 Civ. 3787, 1966 U.S. Dist. LEXIS 10449, at *7–*8 (S.D.N.Y. Dec. 29, 1966) ("BMI Consent Decree"); *see also BMI v. DMX, Inc.*, 683 F.3d 32, 36 (2d Cir. 2012) (tracing history of consent decrees); Jaffe Rep. 28, 30.  ASCAP is also required to use a specific formula to determine the PPL fee.  *See United States v. ASCAP*, 1993 WL 60687, at *52–*78; *see also* Jaffe Rep. 28 n.31.  It is undisputed, and expert economists for both sides have opined, that ASCAP and BMI's PPLs are economically viable and offer a "genuine alternative to the blanket license for many stations."  Jaffe Rep. 28; *see* Pl. Br. 2.

    **c.  Direct licenses**:  A direct license is a license for performance rights sold directly by the copyright holder ("the rightsholder") to a television station.  Def. 56.1 ¶ 69; Pl. Resp. to Def. 56.1 ¶ 69.  Under their consent decrees, ASCAP and BMI are required to permit stations to obtain direct licenses from rightsholders.  *See United States v. BMI (In re AEI Music Network, Inc.)*, 275 F.3d 168, 176 (2d Cir. 2001) ("AEI") (discussing ASCAP's and BMI's obligations under their respective consent decrees).

    **d.  Source licenses**:  A source license is a license for performance rights to the music in a particular television program that a television station obtains from the program's producer, as opposed to from a PRO.  Def. 56.1 ¶ 57; Pl. Resp. to Def. 56.1 ¶ 57; Jaffe Rep. App. C at 2.  Various plaintiff stations have executed direct and source licenses in the past.  Pl. 56.1 ¶ 196, Def. Resp. to Pl. 56.1 ¶ 196.

**e.   The rate court**:  The consent decrees with ASCAP and BMI each also create a rate

court, situated in this District.  Under specific circumstances, where ASCAP or BMI cannot

reach agreement with a music user, the user may ask the rate court to set a "reasonable fee" for a

license.  *See, e.g., BMI*, 683 F.3d at 37; *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d

563 (2d Cir. 1990) ("*ASCAP v. Showtime*") (affirming fee set by rate court for blanket license,

following dispute between ASCAP and operator of cable television networks).[8]

### 4.   SESAC and its Negotiations through 2007 with Local Television Stations

Founded in 1932, SESAC for years focused on narrow sectors of the music performance

market (*e.g.*, religious and European concert and stage music).  Def. 56.1 ¶ 41−42; Pl. 56.1

¶ 125; *see Affiliated Music Enters., Inc. v. SESAC, Inc.*, 160 F. Supp. 865, 867, 870 (S.D.N.Y.

1958) ("*AME v. SESAC*").  In 1992, after a change of ownership, SESAC expanded its repertory.

It did so in part by recruiting from ASCAP and BMI high-profile composers and publishers,

including ones whose music was embedded in syndicated television programs.  Pl. 56.1 ¶ 125;

Def. Response to Pl. 56.1 ¶ 125.  SESAC currently licenses more than 20,000 composer and

publisher rightsholders.  Pl. 56.1 ¶ 124; Def. Resp. to Pl. 56.1 ¶ 124; Def. 56.1 ¶ 41; Pl. Resp. to

Def. 56.1 ¶ 41.  SESAC pays royalties to these affiliates, generally on the basis of when, how,

---

[8] In recent years, following a decision of the Second Circuit involving BMI, *see AEI*, 275 F.3d at
176−77, the rate courts have required ASCAP and BMI to offer, in addition to an economically
viable PPL, a license known as an "adjustable fee blanket license," or AFBL.  An AFBL allows
the licensee to reduce its blanket license fee to reflect direct licenses it has obtained to perform
works within the PRO's repertory.  *See BMI v. DMX*, 683 F.3d at 40, 42−43, 46−47 (discussing
AFBLs requested from ASCAP and BMI); *see also WPIX, Inc. v. BMI*, No. 09 Civ. 10366
(LLS), 2011 WL 1630996 (S.D.N.Y. Apr. 28, 2011); *United States v. ASCAP*, 309 F. Supp. 2d
566, 581 (S.D.N.Y. 2004).  Most recently, ASCAP and BMI have been parties to rate court
actions regarding the acquisition of performance rights to the works in their repertories by
Pandora, an internet radio service provider.  *See BMI v. Pandora Media, Inc.*, No. 13 Civ. 4037
(LLS) (S.D.N.Y.); *In Re Petition of Pandora Media Inc.*, No. 12 Civ. 8035 (DLC) (S.D.N.Y.).

and how frequently their works are performed, although certain affiliates receive "advances" or guaranteed royalties.  Def. 56.1 ¶¶ 43−45; Pl. Resp. to Def. 56.1 ¶¶ 43−45.

SESAC has never been subject to a consent decree.  No rate court is in place to resolve disputes between SESAC and potential licensees.  Pl. 56.1 ¶¶ 161−162; Def. Resp. to Pl. 56.1 ¶ 161.

Prior to 1995, SESAC had negotiated directly with local television stations regarding its licenses.  Def. 56.1 ¶ 89; Pl. Resp. to Def. 56.1 ¶ 89.  In 1995, the TMLC approached SESAC to negotiate an industry-wide license.  Def. 56.1 ¶ 90; Pl. Resp. to Def. 56.1 ¶ 90.  Thereafter, SESAC negotiated a five-year blanket license with the TMLC that spanned October 1, 1995 (retroactively) through December 31, 2000.  Def. 56.1 ¶ 91; Pl. Resp. to Def. 56.1 ¶ 91.  The parties were able to negotiate another industry-wide blanket license, through settlement of arbitration, for the 2001–2004 period.  Def. 56.1 ¶ 92; Pl. Resp. to Def. 56.1 ¶ 92.  That agreement also provided that, should the parties prove unable to agree on terms for a subsequent license period, SESAC could elect to arbitrate.  Def. 56.1 ¶ 93; Pl. Resp. to Def. 56.1 ¶ 93.  In that case, the stations would have the right to obtain a PPL from SESAC, under terms set by the arbitrators.  *Id.*

The negotiations between SESAC and the TMLC for a license covering the 2005–2007 period were unsuccessful; SESAC thereafter exercised its option to proceed to arbitration.  Def. 56.1 ¶ 94; Pl. Resp. to Def. 56.1 ¶ 94.  An independent panel of arbitrators set an industry-wide blanket license fee of $16 million for the year 2005, $17.6 million in 2006, and $19.3 million in 2007.  Def. 56.1 ¶ 95; Pl. Resp. to Def. 56.1 ¶ 95.  They also set the terms of the first SESAC PPL, which covered the period between April 1, 2005 and December 31, 2007.  Def. 56.1 ¶ 40; Pl. Resp. to Def. 56.1 ¶ 40; Pl. 56.1 ¶¶ 170–71.  For the same period, the arbitrators, in 2006, set

some rate terms for SESAC's PPL, and SESAC and TMLC agreed on others.  Def. 56.1 ¶ 96; Pl. Resp. to Def. 56.1 ¶ 96; Pl. Resp. to Def. 56.1 ¶ 40.

In July 2007, SESAC and the TMLC began to negotiate an industry-wide license for the period beginning January 1, 2008.  Def. 56.1 ¶ 97; Pl. Resp. to Def. 56.1 ¶ 97.  After four months of negotiations, the negotiations broke down, without an agreement.  Def. 56.1 ¶ 98; Pl. Resp. to Def. 56.1 ¶ 98.  SESAC thereafter began dealing with the stations on an individual basis.  Def. 56.1 ¶ 99; Pl. Resp. to Def. 56.1 ¶ 99.

### 5.   The 2008−2012 Period and the Present

On November 27, 2007, SESAC sent offers for new licenses for the period between 2008 and 2012 to individual stations and station groups, including the plaintiff stations.[9]  Def. 56.1 ¶ 99; Pl. Resp. to Def. 56.1 ¶ 99; Pl. 56.1 ¶ 180.  SESAC's offers increased its blanket licensing rates by 10% over the prior license period, despite what plaintiffs assert was an overall decline in demand for SESAC's music on local television during the prior license period.  Pl. 56.1 ¶¶ 176, 181–82.

For the period between 2008 and 2012, SESAC also modified the PPL formula.  Several modifications, plaintiffs claim, substantially increased the cost of that license so as to diminish (if not eliminate altogether) its utility.  These included the addition of an "Incidental Ambient Use Fee," and increases in an administrative fee and in a "default multiplier" applied to certain programs.  Pl. 56.1 ¶¶ 255–58, 270.   These changes are discussed in more detail *infra* Part IV.D.1.

Since SESAC modified the PPL in these ways, no station has operated on a PPL, and SESAC has not been paid any PPL fees.  Pl. Resp. to Def. 56.1 ¶ 37; Jaffe Rep. 74−79;

---

[9] For 2013, in light of this pending lawsuit, SESAC maintained the status quo:  It offered local stations the same license rates as those demanded for the 2008–2012 period.  Pl. 56.1 ¶ 194.

Transcript of 10/7/13 Oral Argument ("Tr.") 27 (Dkt. 138).  By contrast, in 2005, 180 stations had utilized SESAC's PPL on a retroactive basis, saving a total of approximately $575,000 out of the total blanket license fee of some $16 million; in 2006, 185 stations took the PPL, saving slightly under $1 million, out of a total blanket license fee of $17.6 million; and in 2007, 248 stations took the PPL, saving approximately $2 million out of the overall blanket license fee of $19.3 million.  Pl 56.1 ¶ 250.  A disputed issue in this case is whether SESAC's current PPL provides an economically viable alternative to the blanket license.  *Compare* Def. Reply Br. 20–22 *with* Pl. Resp. to Def. 56.1 ¶ 37; Pl. 56.1 ¶¶ 249–270; Pl. Br. 22–24, 42–43.  Plaintiffs' claim that the pricing and restrictive terms associated with SESAC's PPL from 2008 forward "render it commercially infeasible," as reflected in the lack of use of this license.  Pl. Br. 22; *see infra* Part IV.D.1.

During the period 2008 forward, as before, each SESAC affiliate has been subject to a standard affiliation agreement.  Def. 56.1 ¶ 49; Pl. Resp. to Def. 56.1 ¶ 49.  The agreement makes SESAC the "sole and exclusive [PRO] to represent the affiliate," *see, e.g.*, Hochstadt Decl. Ex. 115, but it does not restrict direct licensing by the affiliate, and is silent as to the terms of the licenses SESAC will offer, Def. 56.1 ¶¶ 49, 70–71; Pl. Resp. to Def. 56.1 ¶¶ 49, 70–71. For between 99.5% and 99.7% of SESAC's affiliates, the standard affiliation agreement is the only agreement with SESAC.  Def. 56.1 ¶ 72; Pl. Resp. to Def. 56.1 ¶ 72.

Each of the remaining 0.3% to 0.5% of affiliates has entered into a supplemental affiliation agreement with SESAC.  These add terms to those in the standard agreement.   The supplemental agreements give the affiliate an advance or an otherwise guaranteed amount of money, sometimes well over $1 million a year.  *See, e.g.,* Kohlmann Decl. Exs. 98, 135; Hochstadt Decl. Exs. 131−133.  However, they expose the affiliate to large monetary penalties

for issuing a direct license. For one composer, the penalty is $500,000 for the first direct license to be issued, with penalties for issuing additional direct licenses escalating to $1 million and the termination of all royalty payments, *see* Kohlmann Decl. Ex. 135; other affiliates are required promptly to forfeit to SESAC the entire sales price obtained for the direct license, *see, e.g., id.* Exs. 81, 97, 98; Hochstadt Decl. Exs. 132−134. The effect of these terms, plaintiffs argue, is to eliminate any imaginable incentive for the affiliate to issue such a license. The agreements also require that the affiliate refer any request for a direct license to SESAC; and allow the affiliate to issue a direct license only if SESAC does not reach an agreement with the affiliate, and then only "at a rate no less than SESAC's current licensing rates." *See* Def. 56.1 ¶¶ 73–74, 79; Pl. 56.1 ¶¶ 19, 226−227, 243; *see also infra* Part IV.C.2.

The music of the affiliates subject to these supplemental agreements is, characteristically, in high demand by television stations, including because it is embedded in popular programs; between 2007 and 2011, the music of six such affiliates together accounted for between 43% and 50% of SESAC's royalty distributions. Pl. Resp. to Def. 56.1 ¶ 73; Def. Reply 56.1 ¶ 73; Pl. 56.1 ¶¶ 131−138, 219. Such agreements are in place with, among others, for 2005 through 2016, the composer of music embedded in the programs "Seinfeld," "Will & Grace, "Less than Perfect," and "Reba," Pl. 56.1 ¶¶ 134, 226; for 2007 through 2013, the composer of music embedded in the programs "Grey's Anatomy," "Boston Legal," "Ally McBeal," "The Good Wife," and "The Bachelor," Pl. 56.1 ¶ 245; for 2007 through 2011, the composer of music embedded in the programs "Ugly Betty," "In Plain Sight," "Monk," "GCB," and "Medium," Pl. 56.1 ¶ 132; and for 2007 through 2011, two composers of music embedded in the programs "Entertainment Tonight," "Dr. Phil," "Rachel Ray," and "The Insider," Pl. 56.1 ¶¶ 133−136; *see, e.g.*, Hochstadt Decl. Exs. 131–134; Kohlmann Decl. Exs. 81, 97, 98, 107, 134–37. Clauses in

the supplemental agreements require the affiliates to keep their terms confidential. Def. 56.1 ¶ 56; Pl. Resp. to Def. 56.1 ¶ 56. As to source licenses, in 2009, MRI, acting on behalf of the TMLC and local stations, attempted to secure source licenses for local stations. Def. 56.1 ¶ 59; Pl. Resp. to Def. 56.1 ¶ 59; Pl. 56.1 ¶¶ 197, 200. MRI's efforts to obtain source licenses for music in SESAC's repertory were unsuccessful. Def. 56.1 ¶¶ 59, 64, 66; Pl. Resp. to Def. 56.1 ¶¶ 59, 64, 66; Pl. 56.1 ¶ 202.

During negotiations for the 2008–2012 license period, SESAC issued interim licenses to some local stations or station groups, Def. 56.1 ¶¶ 102, 105, 107, 110; Pl. Resp. to Def. 56.1 ¶ 102, including plaintiff stations associated with the Meredith, Scripps, and Hoak organizations, Def. 56.1 ¶¶ 104–110. To stations that had not yet signed licenses, SESAC sent cease-and-desist letters, threatening, upon the expiration of the interim licenses, to sue these stations for copyright infringement if the stations continued to broadcast programs containing music from SESAC's repertory. Pl. 56.1 ¶ 189; Hochstadt Decl. Ex. 114; *see also* Hochstadt Decl. Exs. 50, 104. According to representatives of many stations, they eventually felt compelled to capitulate to SESAC's demands and to take the blanket license, lest they face copyright infringement actions. Pl. Br. 21; Pl. 56.1 ¶¶ 189–93.

Some stations and station groups were able to obtain discounts on the blanket license: Groups operating three or more stations were offered a discount based on the magnitude of the stations groups' SESAC fees, Def. 56.1 ¶ 112; Pl. Resp. to Def. 56.1 ¶ 112; stations that had recently reduced their broadcasts of programs with SESAC music were offered a "programming discount," Def. 56.1 ¶ 113; Pl. Resp. to Def. 56.1 ¶ 113; and stations that had recently dropped SESAC's music from their local news were offered a "news music adjustment," Def. 56.1 ¶ 114; Pl. Resp. to Def. 56.1 ¶ 114. Plaintiffs, however, characterize these discounts as "de minimis,"

leaving the licenses "vastly inflated over reasonable rates."  Pl. 56.1 ¶ 186.  Plaintiffs also note

that the discounts did not reduce increases to their base license rates for later years, and that as

condition of taking the discounts, SESAC required stations to forego the opportunity to use the

PPL option during the five-year license term.  *Id.*

### 6.  DOJ's Investigation of SESAC

During 2008, while negotiations over the 2008–2012 license period were taking place,

several TMLC representatives, including one associated with plaintiff Meredith, and plaintiffs'

expert, Professor Adam Jaffe, met with the Antitrust Division of the DOJ.  Def. 56.1 ¶¶ 117–18;

Pl. Resp. to Def. 56.1 ¶¶ 117–18.  The TMLC representatives encouraged the DOJ to sue SESAC

for antitrust violations, and drafted a complaint for the DOJ to file against SESAC.  Def. 56.1

¶ 120; Pl. Resp. to Def. 56.1 ¶ 120.  The DOJ closed its investigation without taking action.  Def.

56.1 ¶¶ 121–22; Pl. Resp. to Def. 56.1 ¶¶ 121–22; Kohlmann Decl. Ex. 16 (Deposition of

Willard Hoyt) at 280–81.

### B.      Allegations of the Amended Complaint

On November 4, 2009, plaintiffs filed an initial Complaint, Dkt. 1, and on March 18,

2010, an Amended Complaint, Dkt. 25 ("Am. Compl.").[10]

In essence, the Amended Complaint alleges that, in practice, local television stations

cannot avoid songs in the SESAC repertory.  And, it alleges that, since 2008, SESAC has taken

steps to make its "all or nothing" blanket license the only viable option for a station to obtain the

performance rights to the music of SESAC's affiliates, *see* Am. Compl. ¶¶ 24-28, and has

charged a supra-competitive price for that license, one unrelated to stations' actual usage of

compositions in SESAC's repertory, *id.* ¶ 34.

---

[10] Both the Complaint and the Amended Complaint contained a jury demand.

The Amended Complaint identifies various techniques that SESAC has allegedly used to close off to stations alternative or less expensive sources of performance rights.  These include, (1) removing the incentive for a station to acquire a direct license by offering no fee credit against the cost of its blanket license for music the licensee has separately acquired from the copyright owner, *id.* ¶ 24; (2) making its PPL economically non-viable by revising the formula by which the cost for that license is calculated so that it invariably exceeds the cost of the blanket license, *id.* ¶¶ 25−27; and (3) promising its key affiliates—composers whose music is so ubiquitous that a station effectively cannot avoid—large upfront payments, and in return requiring these affiliates to enter into supplemental agreements that effectively bar them from offering direct licenses, *id.* ¶ 30.  The Amended Complaint alleges that SESAC has threatened to withhold access to any part of its repertory, *id.* ¶ 29, and refused to disclose the full contents of its repertory, to impede stations from making independent licensing arrangements, *id.* ¶ 32.

The Amended Complaint contrasts SESAC's practices with those of ASCAP and BMI. Among other things, it notes, these PROs, under their consent degrees, must issue a performance license to a station promptly upon request and at a "reasonable" rate subject to judicial review, and credit licensees for direct licenses they acquire.  *Id.*  It alleges, too, that SESAC has "strategically raided" ASCAP and BMI to recruit key composers whose musical work is essentially impossible for stations to avoid.  *Id.* ¶ 30.

### C.    Procedural History

On May 17, 2010, defendants moved to dismiss the Amended Complaint.  Dkt. 26–27. In a Memorandum & Order dated March 9, 2011, the Hon. Naomi Reice Buchwald, to whom this case was then assigned, denied the motion to dismiss, holding that plaintiffs had plausibly alleged violations of §§ 1 and 2 of the Sherman Act.  *See* Dkt. 33 ("MTD Op.").

On March 23, 2011, defendants answered the Amended Complaint, Dkt. 35; on April 13, 2011, they amended their answer, Dkt. 38.  The case then proceeded to discovery.

On September 28, 2011, the case was reassigned to this Court.  *See* Dkt. 45, 47.  On June 14, 2013, following the close of fact discovery and in keeping with the schedule stipulated to by the parties and endorsed by this Court, *see* Dkt. 114, defendants moved for summary judgment. Dkt. 130.  On August 2, 2013, plaintiffs submitted an opposition to that motion.  Dkt. 132.  On August 30, 2013, defendants submitted a reply in support of the motion.[11]  Dkt. 135.

On October 7, 2013, the Court heard argument on the motion for summary judgment, and reserved decision.  *See* Dkt. 138.

## II.    Overview of the Motion for Summary Judgment and the Court's Holdings

In moving for summary judgment, SESAC challenges the adequacy of the evidence as to multiple elements of liability on plaintiffs' § 1 and § 2 claims.

As to § 1, SESAC disputes that there is proof of concerted action among its affiliates, and in any event of concerted action constituting an unreasonable restraint of trade.  SESAC also argues that a PRO's offer of a blanket license to the music of its affiliates or members is not, as a matter of law, subject to *per se* condemnation under § 1.  As to rule of reason review, SESAC argues that plaintiffs have not established the requisite harm to competition, for two reasons: First, SESAC argues, the relevant market is not, as plaintiffs claim, the market for all works in SESAC's repertory.  Rather, it argues, musical works are not interchangeable with one another; each musical work must be taken as its own market, and SESAC's practices do not harm competition in these narrowly drawn markets.  Second, SESAC argues, the pro-competitive benefits of its blanket license product, like those of ASCAP and BMI, outweigh any anti-

---

[11] The original reply brief submitted by SESAC inadvertently exceeded the page limits agreed to by the parties, *see* Dkt. 116.  SESAC submitted a corrected reply brief.

competitive aspects.  As to § 2, SESAC disputes both that it possessed monopoly power in a relevant market and that it willfully acquired or maintained that power through exclusionary or otherwise improper means.

The Court has carefully reviewed the evidence in the summary judgment record and the parties' arguments as to that evidence.  For the reasons that follow, the Court holds, on all three claims, that the record evidence is sufficient to support a verdict in plaintiffs' favor, although, as to the § 1 claim, the Court rejects as a matter of law plaintiffs' theories of liability *per se* and of a conspiracy so broad as to embrace all SESAC affiliates.

Specifically, the Court, applying the rule of reason to the § 1 claim, holds that the relevant market is fairly defined as that for performance licenses of the music in SESAC's repertory, as plaintiffs propose.  This market definition has a solid basis in the evidence.  The evidence would also comfortably sustain a finding that SESAC, once freed in 2008 from the duty to arbitrate its disputes with the stations, engaged in an overall anti-competitive course of conduct designed to eliminate meaningful competition to its blanket license.  SESAC's steps toward that end are persuasively chronicled in the report of plaintiffs' expert, Professor Adam Jaffe, as developed below.  Whether this course of conduct resulted from concerted action, as required by § 1, presents a more difficult question, however.  There is a substantial argument that any restraint of trade was imposed solely by SESAC itself.  Based on its review, the Court holds that the evidence does not support plaintiffs' claim of a broad conspiracy to restrain trade among all of SESAC's more than 20,000 composer and musician affiliates, but that the evidence does permit, although does not compel, a finding of a much narrower such conspiracy among SESAC and the subset of affiliates who executed supplemental affiliation agreements.  That is because those agreements effectively eliminated direct licensing as a means by which stations could

license these affiliates' music.  A finder of fact could reasonably conclude that these affiliates entered into these agreements with SESAC with the intention of insulating SESAC's blanket license product from competition.  The Court also denies defendants' motion for summary judgment as to plaintiffs' monopolization and conspiracy-to-monopolize claims, brought under § 2.

The analysis below proceeds as follows.  The Court first reviews the history of antitrust litigation involving the PROs' licensing practices.  These precedents supply a critical framework for evaluating the arguments here.  The Court then considers the § 1 claim, assessing whether (1) the conduct plaintiffs assail is amenable to *per se* condemnation; (2) there is adequate evidence of concerted action among SESAC's affiliates to restrain trade; and (3) the evidence would support a conclusion that the anti-competitive effects of SESAC's conduct outweighed its pro-competitive tendencies, *i.e.*, whether a jury could find harm to competition.  The Court then considers the § 2 claims, addressing first the monopolization claim and then the claim of a conspiracy to monopolize.

The Court's review of SESAC's motion has been governed by familiar standards.  As movant, SESAC must "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  SESAC bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to plaintiffs, as the non-moving parties.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, plaintiffs must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  Plaintiffs "may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will preclude a grant of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Prior Antitrust Litigation Involving PROs

The conduct of the PROs in general, and ASCAP's and BMI's use of a blanket licenses in particular, has been much litigated, including in the Supreme Court and the Second Circuit. These precedents set a framework for, and inform the Court's assessment of, the claims and defenses here.  The Court, accordingly, begins by reviewing these prior decisions.

### A.    Early ASCAP Litigation

In 1941, the DOJ filed a complaint against ASCAP.  It alleged that ASCAP's blanket license was an illegal restraint of trade under § 1 of the Sherman Act, eliminating competition among ASCAP's member-affiliates and allowing them to fix prices for their music.  *See* Complaint, *United States v. ASCAP*, Civ. No. 13-95 (S.D.N.Y. 1941).  Shortly after the Complaint was filed, the case was settled by a consent decree.  Although liability was not conceded, the decree imposed extensive restrictions on ASCAP.  These required ASCAP to (1) offer a PPL, in addition to the blanket license; (2) license broadcasters upon request; and (3) allow membership to any composer of at least one work.  *See United States v. ASCAP,* 1940–1943 Trade Cases ¶ 56,104 (S.D.N.Y. 1941).

22

The next year, the operators of 200 movie theaters sued ASCAP.  *See Alden-Rochelle,*

*Inc. v. ASCAP*, 80 F. Supp. 888 (S.D.N.Y. 1948).  After trial, the district court held that

ASCAP's activities in licensing movie theaters violated §§ 1 and 2 of the Sherman Act.  The

agreements at issue between ASCAP and its members barred the members from assigning

performing rights to movie producers at the same time they assigned recording rights; required

producers to reserve for ASCAP alone the right to license performing rights; and provided that

the movie distributors and exhibitors would allow a film to be shown for profit only in theaters

with an ASCAP license.  *Id.* at 894.   The court stated that although each ASCAP member "is

granted by the copyright laws a monopoly in the copyright work, it is unlawful for the owners of

a number of copyrighted works to combine their copyrights by any agreement or arrangement,"

*id.* at 893; in effect, ASCAP could not use its members' individual copyright monopolies "to

create another monopoly," *id.* at 894 (internal quotation marks and citation omitted).  The court

held that ASCAP had violated § 1 by agreeing with the rightsholders to restrain trade, so as to

prevent competition among members, and had violated § 2 by monopolizing the market for

music used in movie production.  *Id.* at 893–94.  Although the *Alden-Rochelle* court found that

plaintiffs had not proven monetary damages, *id.* at 896–98, it awarded injunctive relief, *id.* at

898–900 & n.2.

That same year, a Minnesota district court reached a similar result, to wit, that ASCAP's

licensing practices with regard to movie theaters violated §§ 1 and 2, although the case arose in a

different posture.  *See M. Witmark & Sons v. Jensen*, 80 F. Supp. 843 (D. Minn. 1948).  The

plaintiffs were ASCAP members who sought damages from certain movie theater owners for

allegedly infringing their copyrights by showing films without first obtaining an ASCAP license;

they sought an injunction restraining future violations of their copyrights.  That court denied

relief on the equitable ground that the ASCAP-member plaintiffs themselves were violating the antitrust laws.  *Id.* at 850.  Granting relief, the court stated, "would tend to serve the plaintiffs in their plan and scheme with other members of A[SCAP] to extend their copyrights in a monopolist control beyond their proper scope."  *Id.*

In 1950, in response to those two decisions and to other complaints, the 1941 ASCAP consent decree was amended and expanded.  *See United States v. ASCAP,* No. Civ.A. 42–245, 1950 WL 42273,1950–1951 Trade Cases ¶ 62,595 (S.D.N.Y. July 17, 1950).  The amended consent decree required ASCAP to offer an economically viable alternative to the blanket license and allow its members to license their works directly—ASCAP could not demand that members license their works exclusively through it.  The amended consent decree also extended its protections to television broadcasters and provided that, if ASCAP and a putative licensee could not reach an agreement, the licensee could apply to a "rate court" to set a reasonable fee, with ASCAP bearing the burden of proof as to the reasonableness of its rate.

### B.   Early BMI Litigation

BMI evolved along a largely parallel path.  In 1966, the DOJ filed a complaint against BMI.  It alleged that BMI constituted a combination both to restrain trade and to monopolize, and was thereby able to artificially depress rates and coerce composers to join BMI, harming competition.  In 1966, BMI and the DOJ settled the case with the entry of a consent decree.  *See United States v. BMI*, 1966 Trade Cases ¶ 71,941 (S.D.N.Y. 1966).  It prohibits BMI from prohibiting composers from entering into direct licenses, requires BMI to grant PPLs, and requires BMI to admit any writer with at least one published work.  Since 1994, BMI has also been subject to an amended consent decree and the jurisdiction of a rate court, to which users or

BMI may apply to determine a reasonable fee.  *See United States v. BMI*, No. 64 Civ. 3787, 1994

WL 901652, 1996–1 Trade Cases ¶ 71,378 (S.D.N.Y. Nov. 18, 1994).

>       **C.       Early SESAC Litigation**

Before this action, SESAC's licensing practices had only once been considered in a

private antitrust suit.  In *Affiliated Music Enterprises, Inc. v. SESAC*, *Inc.*, a court in this district

described SESAC's practices as "the classic pooling of rights and sharing of revenue struck

down as violative of § 1 of the Sherman Act in *Alden-Rochelle, Inc., v. A.S.C.A.P., D.C.*, 80 F.

Supp. 888, and *Witmark & Sons v. Jensen, D.C.*, 80 F. Supp. 843."  160 F. Supp. 865, 875

(S.D.N.Y. 1958).  The court held that SESAC's agreements restrained competition between the

copyright owners, allowing them to "agree on a fixed price and share in the common profits" and

making SESAC "too effective in resisting competition from unaffiliated copyright owners."  *Id.*

Such "pooling agreements" were, in that court's view, "per se violations of the antitrust laws."

*Id.*  However, because the plaintiff in that case was a competitor to SESAC (in fact, an affiliate

of BMI, which had funded the litigation) and had not proven antitrust injury as a competitor

under § 4 of the Clayton Antitrust Act, the court dismissed the complaint.  *Id.* at 876–77.  The

Second Circuit affirmed the dismissal.  *See* 268 F.2d 13, *cert. denied*, 361 U.S. 831 (1959).

>       **D.       *BMI v. CBS* (1979) and *CBS Remand* (1980)**

In 1975, Columbia Broadcasting System ("CBS") brought suit against ASCAP, BMI, and

their members and affiliates, for violations of §§ 1 and 2 of the Sherman Act.  After an eight-

week bench trial, Judge Lasker upheld the blanket license against this challenge, finding that

CBS had not demonstrated that it was compelled to take a blanket license, or that no feasible

alternatives existed.  *See CBS v. ASCAP*, 400 F. Supp. 737, 780–81 (S.D.N.Y. 1975) (Lasker, J.).

On appeal, the Second Circuit reversed, holding that the blanket license was, *per se*, illegal price-fixing.  *See* 562 F.2d 130 (2d Cir. 1977).

The Supreme Court granted certiorari, *see* 439 U.S. 817 (1978), and reversed, holding that the blanket licensing system was not price fixing "per se unlawful under the antitrust laws." *BMI v. CBS*, 441 U.S. 1, 4, 7 (1979).  The Court explained that whether an agreement or practice is so inherently anti-competitive as to be condemned as unlawful *per se*, or whether it instead must be evaluated under the rule of reason, "must focus on . . . whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" *Id.* at 19–20 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).  Courts should classify a business practice as *per se* unlawful only after "considerable experience" with that practice.  *Id.* at 9 (internal quotation marks and citation omitted); *see also id.* at 19 n.33.

Applying that principle, the Court noted that judicial experience with blanket licenses in particular did not favor finding such blanket licenses *per se* unlawful.  *Id.* at 9.  The Court reviewed the history of antitrust litigation against PROs, and other factors, including the Justice Department's view that such blanket licenses are not *per se* unlawful and may sometimes be reasonable restraints of trade (*e.g.*, where constrained by consent decrees, as with ASCAP and BMI).  *Id.* at 10–15.  The Court identified redeeming benefits that may be achieved by blanket licenses to perform the music of multiple artists.  Such an aggregate license, the Court noted, responded to "the practical situation in the marketplace," in which there are "thousands of users, thousands of copyright owners, and millions of compositions," and where "[m]ost users want unplanned, rapid, and indemnified access to any and all of the repertory of compositions, and the

owners want a reliable method of collecting for the sales of their copyrights." *Id.* at 20. A PRO's blanket license stood to promote "the integration of sales, monitoring, and enforcement against unauthorized copyright use." *Id.* The Court further stated that "a bulk license of some type is a necessary consequence of the integration necessary to achieve these efficiencies," and that the PRO set a price for this blanket license did not make it unlawful *per se*, because "a necessary consequence of an aggregate license is that its price must be established." *Id.* at 21. Further, "[t]he individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing in such other markets." *Id.* at 23–24. Accordingly, the Court held, the ASCAP and BMI blanket licenses were not unlawful *per se*, but were to be subjected "to a more discriminating examination under the rule of reason." *Id.* at 24–25.[12]

On remand, the Second Circuit affirmed Judge Lasker's ruling, finding the blanket license lawful under a rule-of-reason analysis. *See CBS v. ASCAP*, 620 F. 2d 930, 934 (2d Cir. 1980) ("*CBS Remand*").[13] On that question, the Second Circuit held, "the opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is fully available." *Id.* at 936. The court sustained Judge Lasker's finding that feasible alternative

---

[12] In support of the same outcome, the Court stated that the blanket license could be viewed as its own product, rather than the pooling of separate products: "[T]o the extent the blanket license is a different product, ASCAP is not really a joint sales agency offering the individual goods of many sellers, but is a separate seller offering its blanket license, of which the individual compositions are raw material." *Id.* at 22. The Court also suggested that ASCAP could be viewed as a "[j]oint venture[]," which is "not usually unlawful, at least not as [a] price-fixing scheme[], where the agreement on price is necessary to market the product at all." *Id.* at 23.

[13] In a threshold inquiry, the Second Circuit considered whether the blanket license should be considered a restraint at all. The Second Circuit declined to interpret statements in the Supreme Court's opinion as implying a view on this, holding instead that the Court had solely decided that the blanket license was not a *per se* violation of Section 1 and left for remand "the question of whether the license has any anti-competitive effect at all." *Id.* at 935.

options to the blanket license existed for CBS, including obtaining PPLs and direct licenses.  *Id.*

at 933.  The Second Circuit held that the blanket license, therefore, did not unreasonably restrain

trade and did not violate § 1.  *Id.* at 939.

### E.     *Buffalo Broadcasting v. ASCAP* **(1982)**

Soon thereafter, the Second Circuit considered blanket licenses again, this time, in the

context of a suit brought by a class of local television stations.  *See Buffalo Broad. Co., Inc. v.*

*ASCAP*, 744 F. 2d 917 (2d Cir. 1984) ("*Buffalo Broadcasting*").  The district court, after a bench

trial, had held that the blanket license unreasonably restrained trade.  It enjoined ASCAP and

BMI from, *inter alia*, granting blanket licenses to such stations.  *Buffalo Broad. Co., Inc. v.*

*ASCAP*, 546 F. Supp. 274 (S.D.N.Y. 1982).  The Second Circuit reversed.  It identified as the

critical question whether a "real" alternative existed to the blanket license.  *Buffalo*

*Broadcasting*, 744 F.2d at 925–26.[14]  Closely analyzing the factual record, the Second Circuit

rejected the district court's finding that there was no such alternative, concluding that, for the

stations, PPLs, source licenses, and direct licenses were viable alternatives to the blanket license.

*Id.* at 926–932.  The blanket license, therefore, did not violate § 1.  *Id.* at 933.

### F.     *National Cable Television Ass'n, Inc. v. BMI* **(1991)**

Most recently, in 1991, a federal district court in the District of Columbia examined the

blanket license, in the context of a challenge by representatives of cable program services and

cable television system operators.  *Nat'l Cable Television Ass'n, Inc. v. BMI*, 772 F. Supp. 614

(D.D.C. 1991).  Like the Second Circuit in *CBS Remand* and *Buffalo Broadcasting*, the court

focused on whether there were realistic alternatives to the blanket license.  *Id.* at 626–28.  It held

---

[14] The Second Circuit stated that the Supreme Court's decision in *NCAA v. Board of Regents of*
*the University of Oklahoma*, 468 U.S. 85 (1984), confirmed that that question was decisive.  *See*
*Buffalo Broadcasting*, 744 F.2d at 925.

that "plaintiffs, especially the cable programmers, do have a choice when it comes to obtaining music performing rights for the syndicated programming they transmit," *id.* at 628, including source licensing, per-program licensing, and direct licensing, *id.* at 628–36.

In so holding, the court rejected plaintiffs' claims that such alternatives were "illusory because, as a practical matter, the existence of the blanket license and the industry practices that have grown up around it[] serve as insurmountable obstacles to obtaining performing rights licenses through other avenues." *Id.* at 636. That program syndicators did not offer performing rights to stations was not a permanent condition—if the stations demanded such rights, "the syndication market would provide them to avoid the risk of losing sales." *Id.* at 637. That the music in syndicated programming came to stations pre-selected ("in the can") did not deprive the stations market power to control the price demanded for licenses. *Id.* at 638. Rather, "publishers work in a highly competitive market," and would want both to avoid the ill-will generated by coercive negotiating tactics and "to obtain as much exposure for the compositions in their catalogs as possible." *Id.* And the cable stations had economic power in the marketplace, including the power to exert "considerable leverage in any negotiations" with BMI. *Id.* at 640. Finally, the court stated, even had it treated the blanket license as a restraint, the restraint would have survived an inquiry under the rule of reason. *Id.* at 641–42.

## IV.    Plaintiffs' Section 1 Claim

### A.   Section 1: Elements and Principles

Section 1 of the Sherman Act outlaws "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. A violation of § 1 requires joint or concerted action: "Independent action is not proscribed." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984); *see also Am. Needle Inc. v. Nat'l Football*

*League*, 560 U.S. 183, 189–90 (2010); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–68 (1984); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010).  An antitrust plaintiff must therefore show: (1) "a combination or some form of concerted action between at least two legally distinct economic entities" and (2) "that the agreement constitute[s] an unreasonable restraint of trade either per se or under the rule of reason."  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).

As to the agreement prong, "[t]o survive a motion for summary judgment . . . , a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently."  *Matsushita Electric Insus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (internal quotation marks and citation omitted).  "The antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto*, 465 U.S. at 764 (internal quotation marks and citation omitted); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) ("Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified.").

"Although parallel business behavior 'is admissible circumstantial evidence from which the fact finder may infer agreement,' it does not itself constitute a violation of the Sherman Act, because it is 'consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'"  *Starr*, 592 F.3d at 321 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–54 (2007)).  Therefore, "courts have held that a plaintiff must show the existence of additional circumstances,

often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can

serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253–

54 (2d Cir. 1987). These plus factors include: "a common motive to conspire, evidence that the

parallel acts were against the apparent economic self-interest of the individual alleged

conspirators; or evidence of a high level of interfirm communications." *In re Publication Paper*

*Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012).

     The agreement must also have been to an "unreasonable restraint[]." *Leegin Creative*

*Leather Prods., Inc. v. PSKS*, 551 U.S. 877, 885 (2007); *see also Bus. Elects. Corp. v. Sharp*

*Elecs. Corp.*, 485 U.S. 717, 723 (1988) ("Since the earliest decisions of this Court interpreting

[§ 1], we have recognized that it was intended to prohibit only unreasonable restraints of trade.").

A restraint may be shown unreasonable in one of two ways. First, a limited number of categories

of agreements that "would always or almost always tend to restrict competition and decrease

output" have been deemed illegal *per se*, eliminating "the need to study the reasonableness of an

individual restraint in light of the real market forces at work." *Leegin*, 551 U.S. at 886 (internal

quotation marks and citation omitted). Such agreements are "'so plainly anticompetitive that no

elaborate study of the industry is needed to establish their illegality.'" *Texaco Inc. v. Dagher*,

547 U.S. 1, 5 (2006) (quoting *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 692

(1978)). Among these are horizontal agreements among competitors to fix prices and

agreements to divide particular markets. *Leegin*, 551 U.S. at 886.

     Application of the *per se* rule, however, is "appropriate only after courts have had

considerable experience with the type of restraint at issue, and only if courts can predict with

confidence that it would be invalidated in all or almost all instances under the rule of reason."

*Id.* at 886–87 (internal citations omitted). Accordingly, courts are "reluctan[t] to adopt *per*

*se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." *State Oil Co v. Khan*, 522 U.S. 3, 10 (1997) (internal quotation marks and citation omitted).

For most antitrust claims, courts instead apply the "'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Id.*; *see Copperweld Corp.*, 467 U.S. at 768 (rule of reason requires "an inquiry into the market power and market structure designed to assess [the] actual effect" of the restraint on trade). The rule of reason seeks to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin*, 551 U.S. at 886. Under it, "the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an *actual* adverse effect on competition as a whole in the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 506–07 (2d Cir. 2004) (internal quotation marks and citation omitted) (emphasis in original). Where plaintiffs sustain that burden, "the burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement. Assuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means. Ultimately, the fact finder must engage in a careful weighing of the competitive effects of the agreement—both pro and con—to determine if the effects of the challenged restraint tend to promote or destroy competition." *Id.* at 507 (internal citations omitted).

### B.  Plaintiffs' Claim of Liability *Per Se*

Plaintiffs claim here that SESAC and its affiliates have agreed with one another to unreasonably restrain trade through "agreements to fix, peg, raise, stabilize, effect, and tamper with market prices for licenses for copyrighted musical compositions in the SESAC Repertory," in particular, SESAC's blanket license.  Am. Compl. ¶¶ 78–79.  Plaintiffs claim that this conduct is *per se* anti-competitive, truncating the § 1 inquiry.  SESAC counters that the case law, notably the Supreme Court's decision in *BMI v. CBS*, 441 U.S. 1 (1979), makes *per se* liability inapplicable to concerted action consisting of the offer by a PRO of a blanket license aggregating its members' performance rights.  For the reasons that follow, on this point, SESAC is plainly correct:  If SESAC is to be found liable on the § 1 claim, such liability must derive from application of the rule of reason.

Plaintiffs identify two sets of agreements that, they claim are unlawful *per se*.

The first involves SESAC's offer of blanket licenses.  Plaintiffs argue that a jury could find that SESAC, with its affiliates' agreement and consent, "issues competition-foreclosing blanket licenses," Pl. Br. 27, and that these licenses have eliminated competition over the licensing of performing rights to the works in SESAC's repertory.  Plaintiffs cast this as a horizontal agreement to fix price of the sort condemned *per se*.

*BMI v. CBS* squarely precludes this theory.  The Supreme Court there clearly held that the PROs' practice of issuing blanket licenses aggregating licensing rights for their members or affiliates is *not* a *per se* violation.  *See* 441 U.S. at 24.  Plaintiffs attempt to distinguish *BMI v. CBS* on the grounds that the blanket licenses at issue in that case were offered by PROs whose conduct was already constrained by consent decrees.  *See id.* (noting that, in assessing the legality of those PROs' conduct, "the substantial restraints" imposed by the consent decree on

ASCAP, BMI, and their affiliated rightsholders "must not be ignored").  As a result, plaintiffs

state, ASCAP and BMI were unable to make these blanket licenses the exclusive means by

which performance rights to their members' work were licensed, whereas SESAC can do so, and

has done so here.  Plaintiffs urge that the "court precedents addressing ASCAP's conduct *before*

it was reined in by its consent decree," such as *Alden-Rochelle* and *M. Witmark*, are more

relevant here.  Pl. Br. 28–29.

Plaintiffs, however, misread *BMI v. CBS*.  The Supreme Court there noted that ASCAP

and BMI were each subject to a consent decree.  *See* 441 U.S. at 10–12, 24.  But the Court did

not suggest that, absent the restraints imposed by these decrees, a blanket license would be *per se*

illegal.  To the contrary, the Court described, at length, the benefits provided by blanket licenses

that permit licensees to acquire at once rights to many disparate works.  Blanket licenses

developed as a practical solution to a market shortcoming, the Court noted, "designed to increase

economic efficiency and render markets more, rather than less, competitive."  *Id.* at 19–20

(internal quotation marks and citation omitted).  And the Court noted the *pro*-competitive

features of the blanket license.  *Id.* at 20–21.  Finally, the Court stated, "the blanket license

cannot be wholly equated with a simple horizontal arrangement among competitors.  ASCAP

does set the price for its blanket license, but that license is quite different from anything any

individual owner could issue."  *Id.* at 23; *see also id.* at 21–22 (stating that, with the blanket

license, "the whole is truly greater than the sum of its parts; it, to some extent, is a different

product").  In that sense, the Court stated, "ASCAP is not really a joint sales agency offering the

individual goods of many sellers, but is a separate seller offering its blanket license, of which the

individual compositions are raw material."  *Id.* at 22.

The Supreme Court's descriptions of the benefits conferred by a blanket license equally apply to that offered by SESAC.  And, contrary to plaintiffs' thesis, such a license still confers benefits even where no consent decree is in place to check anti-competitive abuses.  Like those at issue in *BMI v. CBS,* SESAC's blanket license addresses a market shortcoming; it, too, "accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use," *id.* at 20, lowering costs and decreasing administrative burdens.  SESAC's blanket license is also a product "different from anything an individual owner could issue."  *Id.* at 23.  The prospect of such benefits removes the practice of offering a blanket license from *per se* condemnation.  The lower courts to consider the question have, therefore, following *BMI v. CBS*, uniformly declined to hold that the blanket form license is *per se* invalid under the antitrust laws.  *See ASCAP v. Showtime,* 912 F.2d at 583; *Buffalo Broadcasting*, 744 F.2d at 924; *CBS Remand*, 620 F.2d at 939; *see also United States v. ASCAP*, 1993 WL 60687, at *17 (collecting cases).

Furthermore, as SESAC observes, the very purpose of deeming a practice unlawful *per se* is that it must be unlawful *regardless of* case-specific circumstances.  Def. Br. 29.  As the Supreme Court put the point in *BMI v. CBS*, when it overturned the Second Circuit's finding of *per se* illegality:  "Although the Court of Appeals apparently thought the blanket license could be saved in some or even many applications, it seems to us that the *per se* rule does not accommodate itself to such flexibility . . . ."  441 U.S. at 17.  Plaintiffs' notion that SESAC's blanket license can be held *per se* illegal because SESAC's blanket license is, on the evidence here, pernicious in a way that the other PROs' were not, misapprehends the concept of a *per se* rule.  Plaintiffs' bid to apply *per se* analysis based on case-specific facts, to condemn a practice that, on other facts, has been upheld as lawful, would defeat the purpose such a rule serves—

isolating, at the threshold, practices that are always anti-competitive.  Because *BMI v. CBS*
establishes that blanket licensing does not have "such predictable and pernicious anticompetitive
effect, and such limited potential for procompetitive benefit" as to be condemned *per se*, *State
Oil Co.*, 522 U.S. at 10, plaintiffs' § 1 claim, to the extent based on a claimed agreement among
SESAC and *all* its affiliates to offer a blanket license, must be assessed under the more nuanced
rule of reason.

        The second set of agreements on which plaintiffs focus is SESAC's supplemental
agreements with its key affiliates.  Plaintiffs note that these agreements restrict these affiliates'
ability to directly license performance rights to their works, by imposing steep fines for doing so.
Plaintiffs argue that these agreements are *per se* anticompetitive because they assure that "those
affiliates will not compete with SESAC or cheat on the SESAC cartel."  Pl. Br. 27.

        SESAC's supplemental agreements with its affiliates, however, are not subject to the *per
se* standard.  The parties make competing arguments whether these agreements are pro- or anti-
competitive.  But the decisive point as to the standard of review is that these agreements do not
fall within any recognized category of *per se* unlawful conduct.  They are not pure horizontal
agreements among competitors to fix prices of the sort condemned *per se*, but instead have a
significant vertical dimension:  Pursuant to the supplemental agreement, the affiliates give
SESAC the right to license their works, including to television stations, but are penalized for
issuing direct licenses to these same stations.   As such, the supplemental agreements can be
fairly classified as "vertical price restraints . . . to be judged according to the rule of reason."
*Leegin*, 551 U.S. at 882; *see also State Oil*, 522 U.S. at 22; *E&L Consulting, Ltd. v. Doman
Indus. Ltd.*, 472 F.3d 23, 29–30 (2d Cir. 2006) (exclusive distributorship arrangements are
governed by rule of reason).

To be sure, there can be said to be a horizontal aspect to these agreements. SESAC and its affiliates can also fairly be viewed as potential competitors in the licensing of the rights to the same works. As such, the supplemental agreements are a form of agreement among competitors. But the presence of even this significant horizontal dimension, alongside a vertical one, does not trigger *per se* review. This factor is instead relevant to the application of the rule of reason. *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (rule of reason is applied "even if [a] distributor and manufacturer compete at the distribution level, where . . . the manufacturer distributes its products through a distributor and independently"); *see also Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 409 (2d Cir. 1981).

Put differently, although the relationship between SESAC and its affiliates is not a "straightforward vertical one," Pl. Br. 36, nor is it a straightforward horizontal one. Indeed, *BMI v. CBS* itself recognized that the nature of this unusual product does not comfortably translate into conventional horizontal versus vertical terminology: "[T]he blanket license cannot be wholly equated with a simple horizontal agreement among competitors"; it is "different from anything any individual owner could issue." 441 U.S. at 23. The complex economic relationship between SESAC and its affiliates demands that a close factual analysis be applied to the agreements at issue, one for which rule of reason review, but not *per se* treatment, is well-suited.

This holding does not diminish the force of plaintiffs' claim that SESAC's supplemental agreements are in fact highly anti-competitive, in that they squelch an obvious form of competition with the blanket license. Plaintiffs argue that the financial penalty for issuing a direct license chills—and is unsubtly intended to chill—the affiliates from offering this

37

alternative license.  The Court addresses this argument, and SESAC's defense of the penalty

provision, below, *see infra* Parts IV.C.2 & IV.D.1.[15]  But those arguments are properly addressed

under the rule of reason.  The *per se* rule is limited to practices which, based on extensive

experience, can be categorically condemned as anti-competitive.  Plaintiffs do not point to any

judicial experience with arrangements like the supplemental agreements, let alone extensive

experience, that would justify holding such arrangements categorically unlawful.

   The Court, therefore, grants SESAC's motion for summary judgment on the Sherman Act

§ 1 claim, to the extent that plaintiffs pursue a theory of liability *per se*.  The Court turns to

SESAC's claim that the evidence cannot support liability under the rule of reason.

### C.      The Element of Concerted Action to Achieve an Unlawful Result

   Section 1 of the Sherman Act prohibits only concerted—not unilateral—conduct in

restraint of trade.  As to this element, SESAC makes two distinct arguments.  First, it argues,

there is insufficient evidence from which a trier of fact could find *any* concerted action, let alone

an agreement, between SESAC and its more than 20,000 affiliates.  Second, it argues, even if

some agreement could be found, there is no evidence of an agreement among affiliates to

unlawfully restrain trade, or, as the Supreme Court put the point in *Monsanto*, "to achieve an

unlawful objective." 465 U.S. at 764.  The Court addresses these arguments in turn.

### 1.      Evidence of Concerted Action

   SESAC, in challenging plaintiffs' claim of concerted action, argues that the evidence

shows only a written agreement between each affiliate and SESAC, in which the affiliate simply

authorized SESAC to license its works in return for royalty compensation.  SESAC argues that

there is no evidence of an agreement, explicit or implicit, *among* SESAC's affiliates or that they

---

[15] As noted, SESAC contends that the fines are necessary to protect and insure recovery of the
large guaranteed payouts it made to recruit these key affiliates.

otherwise acted in concert.  In particular, SESAC argues that the evidence would not permit a finding that its affiliates expected it to offer a blanket license aggregating rights to perform each of their musical compositions along with the rights to perform the music of other SESAC affiliates.

This argument is novel in the line of modern cases addressing challenges to PRO-issued blanket licenses.  The courts in *BMI v. CBS*, *CBS Remand, Buffalo Broadcasting*, and *National Cable Television Ass'n* each addressed claims of unlawful concerted action, in violation of § 1; each found no liability.  But those cases were not decided on the basis of a lack of evidence of concerted action.  Each decision instead held lawful the collective action of the PRO and its licensees, because, the court held, alternatives to the PRO's blanket license were realistically available.  On the element of concerted action, the Supreme Court and the Second Circuit in those cases took the fact of the blanket license itself to bespeak concerted action.  *See, e.g., BMI v. CBS*, 441 U.S. at 10 (recognizing that PROs' blanket license arrangements by their nature "plainly involve concerted action").

Here, however, SESAC argues that the evidence would not permit a jury to find that its affiliates agreed to pool their copyrights in a blanket license.  *See* Def. Br. 27.  SESAC relies on the text of its affiliate agreements, which, SESAC emphasizes, do not say anything about SESAC's issuing blanket licenses.  *See id.* at 24−25.  Such is true.  A review of SESAC's agreements with their affiliates reflects that they were executed over a period of years; and generally provided for their automatic renewal, subject to the affiliate's right to give a timely notice of termination.  *See, e.g.,* Hochstadt Decl. Ex. 106 (music writer's affiliation agreement effective for three years beginning January 1, 2002, with automatic three-year extension provision); *id.* Ex. 115 (affiliation agreement, effective for 12 years beginning January 1, 2005;

original agreement incorporated by reference had automatic three-year renewal period).  The agreements are silent as to how SESAC will license the affiliate's work for sale.  They do not refer to a blanket license, or, for that matter, to any other type of license.  As to licensing, the agreements state only that the affiliate cedes all licensing authority to SESAC during the agreement term.  *See, e.g., id*. Ex. 106, at ¶ 2 ("Writer grants to SESAC, during the term of this Agreement and throughout the world . . . [a]ll of Writer's rights to publicly perform and to license others to public perform, all or any part of Writer's Works, by any means or through any medium now known or hereafter devised[.]"); *id.* Ex. 115, at ¶ 2 (same).  SESAC seizes on this silence to argue the absence of an agreement among affiliates, and to argue that all that exists are some 20,000 separate bilateral agreements between individual affiliates and SESAC.  *See* Def. Br. 21 ("[T]he record contains no evidence of SESAC's affiliates agreeing among themselves about any of the practices of which plaintiffs complain.").

Plaintiffs' perplexing decision to take virtually no discovery of SESAC's affiliates has opened the door to this ambitious argument.   As SESAC emphasized in its summary judgment papers, plaintiffs, for reasons that are elusive, took only two depositions of its affiliates.  Both were of affiliates (Stephen Arnold and David Catalano) who were party to SESAC's supplemental affiliation agreement.  Plaintiffs took not one deposition of an affiliate who was party only to the standard affiliate agreement—99.5 to 99.7% of all SESAC affiliates.  As a result, such affiliates were never asked how they expected SESAC, to whom they had delegated licensing authority as to their music, concretely to go about doing so.  They were never asked whether they expected SESAC to offer a blanket license to perform the collective work of SESAC's affiliates.  The record on summary judgment is thus devoid of direct evidence as to the state of mind and expectations of SESAC's ostensible co-conspirators, both at the time each

entered into an affiliation agreement, and, for that matter, during the years thereafter when each affiliate did not exercise its contractual right to terminate.

Notwithstanding SESAC's vigorous advocacy and plaintiffs' curious lassitude on this point, the Court holds that there is sufficient evidence in the record from which the factfinder could find concerted action among SESAC's affiliates. The factfinder could reasonably find that SESAC's affiliates understood and expected that SESAC would collectively offer the rights to their works for sale in a blanket license. The basis for this conclusion consists largely of circumstantial evidence. Such evidence can suffice, of course, to establish concerted action— there need not be direct evidence of the alleged conspirators' states of mind. *See In re Electronic Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012) (noting that antitrust "conspiracies 'nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators,'" and thus, "to prove an antitrust conspiracy, 'the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the defendant and others had a conscious commitment to a common scheme designed to achieve an unlawful objective'" (quoting *Anderson News*, 680 F.3d at 184; *Monsanto*, 465 U.S. at 764) (brackets omitted)). Thus, summary judgment on a § 1 claim is inappropriate where "the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding." *American Tobacco*, 328 U.S. at 810.

Here, the key circumstances are historical, involving SESAC's longstanding offer of the blanket license product. Long before 2008, SESAC (like ASCAP and BMI) offered a blanket license. Indeed, as the case law canvassed above reflects, the blanket license was the signature product of each PRO. *See, e.g.*, *BMI v. CBS*, 441 U.S. at 5; *AME v. SESAC*, 160 F. Supp. at 869. That SESAC's standard affiliation agreements referred to licensing only generally, and did not

refer to a blanket (or any other type of) license specifically, would not alter the affiliate's expectation that SESAC would offer such a blanket license. Notably, in the years before 2008, when SESAC undisputedly offered, and its affiliates enjoyed the benefits of, the blanket license, SESAC's agreements addressed its licensing practices in equally generic terms. *See, e.g.*, Hochstadt Decl. Ex. 106 (agreement dated 2002); *id.* Ex. 115 (agreement dated 2005, attaching original agreement dated 2001). Nothing in the summary judgment record suggests at all that SESAC intended to stop offering its signature blanket license product, or ever communicated such an intention to any affiliate.

Under these circumstances, SESAC's argument for summary judgment on the ground that there is no direct proof that its standard affiliates expected the rights to their works to be pooled and offered together in a blanket license has an air of unreality to it. On the summary judgment record, a reasonable jury could find that the blanket license was SESAC's *raison d'être*. Such a jury could find, based on SESAC's history, that, at all times, the affiliates who entrusted SESAC to sell performance rights to their work expected and intended SESAC to continue to pool their rights with those of other affiliates in a blanket license product. The record evidence further suggests that many affiliates joined SESAC in the 1990s or early 2000s. SESAC had long packaged the performing rights to their music for sale together with the rights to perform the music of its other affiliates. Based on this settled course of dealing, a juror could reject, as implausible and ahistorical, SESAC's claim that its affiliates did not expect blanket licensing to persist into 2008; and could find that each affiliate understood and expected SESAC to continue to offer this flagship product. Such a juror could also reasonably conclude that there was no need for SESAC to state this intention explicitly in its agreements, any more than

McDonald's, to get the point across to customers, needed to state explicitly that it intended to continue in the future to offer the Big Mac.

A reasonable juror could, therefore, find that an affiliate who, for the period of January 2008 forward, delegated its licensing rights to SESAC (whether by signing a new agreement or by failing to terminate an existing one), did so expecting SESAC to continue to bundle these rights for sale, along with the rights to other affiliates' works, in a collective blanket license.

Although not necessary to the Court's ruling, the Court notes that the record contains direct evidence, albeit limited, corroborating this expectation.  First, SESAC's own website touted the blanket license as the choice of its licenses.  The website stated:  "On behalf of many thousands of songwriters and music publishers, SESAC offers blanket license agreements that authorize the performance of all the compositions in the SESAC repertory."  Hochstadt Decl. Ex. 219.  There is no record evidence that any SESAC affiliate accessed and read this website statement, but it is reasonable to infer that some did.  Second, affiliate Stephen Arnold, whose deposition plaintiffs did take, testified that he, at least, understood that SESAC intended to offer a blanket license, because it was in the affiliates' collective interest.  *See id*. Ex. 34 (Deposition of Stephen Arnold ("Arnold Dep.")), at 179.  There is no reason to view his expectation as anomalous.[16]

The Court therefore rejects SESAC's argument that the evidence cannot support a finding of concerted action among its affiliates.  A juror could find that these persons affiliated with

---

[16] In addition, one provision of SESAC's standard affiliate agreement tends to reinforce such an expectation.  Section 5(a) states that in consideration for the affiliate's grant of rights to SESAC, "SESAC shall make payments to Writer [the affiliate] in an amount equal to the writer's share of the monies allocated by SESAC for distribution to its writer affiliates."  *See, e.g.* Kohlmann Decl. Ex. 106 at ¶ 5(a); *id.* Ex. 115 at ¶ 5(a).  Implicit is that there has been some prior aggregation by SESAC of licensing fees due to affiliates.

SESAC with each expecting and agreeing that the rights to the works of all SESAC affiliates would be jointly offered in a blanket license.

### 2.    Evidence of an Unlawful Objective

For there to be § 1 liability, however, an agreement alone is not enough.  The agreement must be to an unlawful objective.  *See Capital Imaging Assocs.*, 996 F.2d at 545 ("The plaintiff's evidence must prove the actors had an intent to adhere to an agreement that was designed to achieve an unlawful objective[.]"); *see also Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004).  A bare agreement among affiliates that their rights will be offered for sale in a pooled or blanket license does not, without more, meet this standard.  That is because, as *BMI v. CBS* and *Buffalo Broadcasting* hold, a blanket license is not inherently unlawful.  The issue is whether the context in which the blanket license is issued is one in which alternative means of licensing the same music are realistically available.  *See, e.g., ASCAP v. Showtime*, 912 F.2d at 583; *cf. United States v. ASCAP*, 1993 WL 60687, at *17 (noting that DOJ consent decree with ASCAP does not prohibit its use of such a license, but instead imposes conditions on it).

Here, plaintiffs' theory is that, by various stratagems—including by re-pricing its PPL to build in prohibitive costs and by imposing prohibitively high penalties on key affiliates who directly license their work—SESAC in 2008 closed off the other potential means of licensing its affiliates' performance rights, effectively forcing licensees to buy its blanket license.  SESAC argues, however, that even if this were so, the evidence does not show that its affiliates knew or expected that SESAC would take such anti-competitive actions.

As to the 20,000 affiliates who were party to the standard affiliation agreement, SESAC is correct.  On the summary judgment record, a reasonable jury could not find, other than by

sheer speculation, that these affiliates expected SESAC to act illegally, knew either generally or specifically of the steps that SESAC purportedly took in 2008 to impede alternative forms of licensing, or agreed, even tacitly, to any such course.

Significantly, such affiliates are, largely, individual musicians and composers.  None were deposed.  Depositions of even a small sampling of such affiliates might have yielded direct evidence as to how, concretely, they expected SESAC, to whom they had delegated authority to license their musical works, to advance their interests.   Did they expect SESAC, in 2008 and beyond, to offer PPLs, and if so, on terms that were viable for licensees?  Did they expect SESAC to restrict any affiliates' offer of direct licenses, and, if so, what restrictions and which affiliates?  Did they expect SESAC to voluntarily abide by licensing terms in line with those of ASCAP or BMI?   Or did they expect it to use its greater freedom to act to drive a harder bargain with licensees?  These matters were wholly undiscovered.  There is no competent evidence as to what any of these musicians or composers knew or assumed SESAC's practices had earlier been with regard to other forms of licenses, let alone evidence of what these affiliates expected SESAC's practices to be in 2008 and beyond.  Particularly given that the standard affiliate agreements were subject to automatic renewal provisions, there is no reason to conclude that such affiliates, from year to year, had any dealings with SESAC beyond receiving their royalty income, or paid any attention to SESAC's practices or business model.

Plaintiffs' theory would, furthermore, appear to require SESAC's ordinary affiliates to have understood that SESAC, effective 2008, intended to cross the line from legality into illegality.  There has been no claim that SESAC's practices before 2008 as to license terms were unlawful, let alone that any affiliate viewed them as such.  SESAC's license terms during the prior 13 years had, after all, resulted from arms-length processes that presumptively would not

have led to Sherman Act violations: first, negotiations with TMLC (1995−2004), and later, decisions by arbitrators to whose authority SESAC had acceded (2005−2007).  As of 2008, of course, SESAC had more latitude to close off alternatives to its blanket license, and plaintiffs have amassed substantial evidence that SESAC seized that opportunity.  But there is no evidence that SESAC telegraphed to its ordinary affiliates that it intended to restrain trade.  Plaintiffs have come forward with no evidence from which a jury could infer that the affiliates who were party to its standard agreement understood that SESAC had more leeway to set license terms beginning in 2008, let alone concluded that SESAC intended to exploit that freedom.

Section 1 liability therefore cannot be based on the theory that all 20,000-plus SESAC affiliates in fact agreed to restrain trade.  Plaintiffs' claim to that effect rests on sheer speculation; to permit the claim of such a vast illegal agreement to go to trial would indulge sloppy conspiracy theories and unfairly demean such affiliates.  To the extent SESAC's § 1 claim is based, then, on a claim of a sweeping pact among all its affiliates to restrain trade, the Court grants summary judgment to the defense.

As noted, however, plaintiffs also advance a narrower theory of unlawful agreement— and this one *is* viable.  Plaintiffs allege an unlawful agreement among SESAC and those affiliates (0.3% to 0.5%) who entered into supplemental agreements.  Those agreements (1) imposed prohibitive penalties on the affiliate for issuing a direct license, or required that proceeds of any sales of direct licenses be forfeited to SESAC; (2) required the affiliate to refer requests to renew existing direct licenses, or for new direct licenses, to SESAC in the first instance; and (3) permitted the affiliate to issue renewals, or new direct licenses, only if SESAC did not reach agreement with the affiliate, and then, only at a price equal to that for which SESAC would offer such a license.  *See, e.g.,* Kohlmann Decl. Ex. 135 (agreement covering

46

period 2008 through 2011, and providing for reduction by $500,000 of affiliate's monetary guarantee from SESAC for first issuance of a direct license, $750,000 for issuance of a second direct license, $1 million for issuance of third direct license, and termination of royalty payments for issuance of ensuing direct licenses); Hochstadt Decl. Ex. 131 (agreement dated September 25, 2007, covering three-year period beginning October 1, 2007 with six-year renewal right for SESAC, and providing for schedule of penalties on affiliate ranging from $100,000 to $500,000 per direct license, with penalty amounts keyed to names of more than 25 potential direct licensees); *see also* Kohlmann Decl. Ex. 81 (agreement covering period 2005 through 2007, with renewal right for SESAC, authorizing SESAC, in event affiliate issues direct license, to either "[t]ake payment of said monies received by said Writer for the direct license" or "[r]educe the amount of any payments due to Writer [under the agreement] by SESAC's then-standard licensing rate for the direct license"); Kohlmann Decl. Ex. 97 (agreement covering three-year period beginning July 1, 2005, with renewal right for SESAC, with same penalty provision for direct licensing as in Exhibit 81); Hochstadt Decl. Ex. 132 (agreement covering three-year period beginning April 1, 2005, giving SESAC three-year renewal right, and containing same penalty provision for direct licensing as in Exhibit 81); Hochstadt Decl. Ex. 133 (agreement covering three-year period beginning July 1, 2005, giving SESAC three-year renewal right, and containing same penalty provision for direct licensing as in Exhibit 81); Kohlmann Decl. Ex. 98 (agreement covering period 2008 through 2012, and providing that "[i]n the event that Writer and/or Publisher issue a Direct License, . . . Writer and/or Publisher shall, within five (5) business days of receipt of the license fee, send payment to SESAC in an equivalent amount"); Hochstadt Decl. Ex. 134 (agreement covering period of 2008 to 2012, and containing same penalty provision for direct licensing as in Exhibit 98).

A factfinder could reasonably find that any affiliate who assented to such a provision did so appreciating that it served to insulate SESAC's blanket license from competition, for the benefit of all SESAC affiliates.  Plaintiffs in fact adduced evidence of such an understanding on the part of composer Stephen Arnold, a signatory to a supplemental agreement.  Arnold testified that he understood that "everybody at SESAC wanted everybody to stay on a blanket, to my knowledge.  I didn't have to convince anybody."  Arnold Dep. at 179.   Further, in an email to Stephen Swid, a SESAC official, Arnold impliedly recognized that the penalty that he faced for direct licensing served to eliminate competition with the blanket license enjoyed by SESAC's affiliates:  "In my current agreement with SESAC, there is a $500,000 penalty if I execute a Direct License with a client-station.  I agreed to that condition and I respect it, knowing it is in everyone's best interest to keep my client stations on a Blanket License."  Hochstadt Decl. Ex. 194.

The other affiliate with such an agreement who was deposed, David Catalano, gave similar testimony.  Discussing a provision of his agreement with SESAC in which he committed not to issue a direct license for any amount less than SESAC would charge the license, Catalano testified that he agreed with that term.  *See* Kohlmann Decl. Ex. 6 (Deposition of David Catalano ("Catalano Dep.")), at 53 ("So do I agree with those terms?  Yes, I do.  And I want to qualify that by saying why would I as a business person accept less money for my services[?]").

The direct licensing restrictions in these agreements, along with this testimony of these two affiliates, together supply a sufficient basis on which a jury could infer that the affiliates who entered into these agreements with SESAC were well aware that these terms tended to choke off a key avenue of competition with the blanket license.   The inference logically follows from the fact of the restraint itself, and particularly from the prohibitive size of the direct-license penalty.

An affiliate aware of that penalty could easily infer that SESAC's broader goal was to inhibit such competition, to allow it to charge elevated fees for the blanket license, and to permit it to market itself to affiliates as paying higher royalties than ASCAP and BMI. *See* Hochstadt Decl. Ex. 198 (2007 email from Arnold to SESAC, stating: "the [direct license] rates you want me to quote make it literally impossible for any station to benefit from the per program, as the overall fee [] exceeds the blanket"); *see also* Pl. 56.1 ¶¶ 239, 247 (email from Arnold's attorney to Arnold reporting that SESAC had made direct licensing "nearly impossible" and to SESAC reporting that Arnold would not issue such licenses "because of the penalty clauses"); *see also* Pl. 56.1 ¶ 216.

To be sure, the evidence does not, by any means, *compel* the conclusion that the supplemental affiliates agreed with SESAC to restrain trade. Some affiliates entered into supplemental agreements years before January 2008, when it is not claimed that SESAC's licensing terms were anti-competitive. *See, e.g.,* Kohlmann Decl. Exs. 81, 97. And there is no evidence that any affiliate knew of any other step that SESAC took to, allegedly, insulate the blanket license from competition. Most notably, there is no evidence that any affiliate knew SESAC was re-pricing the PPL to make it a non-starter. Arnold and Catalano both testified that they had no involvement in SESAC's business decisions, and denied particular knowledge of how SESAC licenses its repertory. Def. 56.1 ¶ 53; *see* Arnold Dep. at 190; Catalano Dep. at 44−45, 158−59, 177−80. At trial, SESAC could plausibly argue that, if trade was restrained, it acted alone. But these are jury arguments, not arguments for summary judgment. To be held a part of a conspiracy, a conspirator need not know all dimensions of the wrongful conduct taken in its furtherance. *See U.S. Football League v. Nat'l Football League*, No. 84 Civ. 7484 (PKL) 1986 WL 10620, at *24 (S.D.N.Y. July 31, 1986) (instructing jury in antitrust case that "[o]ne

may become a member of a conspiracy without full knowledge of all the details of the conspiracy.  It is not necessary that a defendant be fully informed as to all the details of the conspiracy or its scope in order to be a member.") (jury instruction); *see also Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1279 (8th Cir. 1983), *cert. denied*, 465 U.S. 1026 (1984) (to prove antitrust conspiracy, "knowledge on the part of each member of the exact scope of the operation or the number of people involved is not required" (internal quotation marks omitted)); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 15 (D.D.C. 2004) ("Although Plaintiffs must show that each Defendant had knowledge of an agreement as to the overall conspiracy, they need not show . . . knowledge, on behalf of the Defendant, of every detail of the alleged conspiracy."). Plaintiffs can plausibly argue, and a jury could find, that an affiliate who signed on to provisions that eviscerated direct licensing could be under no illusions that SESAC was seeking to do anything other than stamp out competition with its blanket license.

In a separate argument, SESAC notes that each supplemental agreement contains a confidentiality provision, forbidding disclosure of the agreement's terms.  *See, e.g.,* Kohlmann Decl. Exs. 81, 97, 98, 107, 135; Hochstadt Decl. Exs. 131−134.  It argues that this provision means that such affiliates are necessarily unaware that other affiliates have similar agreements discouraging direct licensing.  This, SESAC argues, would prevent a juror from inferring an agreement among such affiliates to suppress that form of competition with the blanket license. *See* Def. Br. 23.

But a juror could also reasonably draw the opposite conclusion.  A juror could view the penalty for direct licensing as communicating to the affiliate signatory, loud and clear, that SESAC was taking decisive action to stamp out this form of competition with the direct license. The affiliate would have no reason to conclude that the provisions squashing direct licenses were

particular to himself or herself.  And a juror could reasonably take the confidentiality term to reflect something else entirely: the sensitivity of SESAC's arrangements with these elite affiliates.  Confidentiality served perhaps to prevent other affiliates from learning of the large guaranteed upfront royalty fees that SESAC agreed to pay.  Perhaps, too, confidentiality kept the huge penalties for direct licensing—penalties that might be viewed as "red flags" of anti-competitive intent—from catching the eye of an antitrust regulator.  A jury could fairly take that view, too.

There is, in sum, sufficient evidence on which a fact finder could infer, among the affiliates subject to the supplemental affiliation agreement, a "conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto*, 465 U.S. at 764 (internal quotation marks and citation omitted), to wit, to suppress competition with SESAC's blanket license.  As noted, the fact finder could read the evidence otherwise, and conclude that any impetus to restrain competition came from SESAC alone, or did not exist at all.  But, viewing the evidence in the light most favorable to plaintiffs, as the Court must on this motion for summary judgment, there is a genuine dispute of fact as to whether SESAC and the affiliates subject to the supplemental agreement agreed to unreasonably restrain trade.   Plaintiffs have adduced sufficient evidence of such an agreement for their § 1 claim to go to a jury.

### D.  The Element of an Unlawful Restraint

SESAC also moves for summary judgment on the second element of § 1 liability: unlawful restraint.  Under *CBS Remand* and *Buffalo Broadcasting*, the Court considers first whether the challenged practice is a "restraint"; if so, the Court inquires whether the restraint is reasonable, *i.e.*, whether the challenged behavior had "an *actual* adverse effect on competition as a whole in the relevant market."  *Geneva Pharms. Tech. Corp.,* 386 F.3d at 506−507 (internal

quotation marks and citation omitted) (emphasis in original).  As to both these points, the

evidence adduced by plaintiffs easily clears the summary judgment bar.

### 1.   Evidence of a Restraint

First, plaintiffs have adduced abundant evidence on which a jury could find that no

economically feasible alternative to SESAC's blanket license existed.  The report of plaintiffs'

expert economist, Professor Adam Jaffe, supplies, in fact, a highly persuasive analysis of why,

since 2008, neither SESAC's PPLs, nor its direct licenses, have been economically viable for

prospective licensees.

On the per-program side, Jaffe closely analyzes the features of the PPL offered by

SESAC for the 2008–2012 license term.  He explains that SESAC made three changes to the

formula used to calculate the PPL during the preceding 2005–2007 period, and that these

changes made the 2008–2012 PPL commercially infeasible.

First, SESAC began to charge per-program licensees twice for performing "incidental"

and "ambient" music, meaning music captured in commercials or unintentionally during

broadcasts of public events.  *See* Jaffe Rep. 10, 74.  One such charge appeared in the "blanket

license base" used to determine the fee for programs containing SESAC music; another came

with the addition of, effectively, a new 15% charge for incidental and ambient music.  *Id.* at 75.

That charge is not imposed in connection with ASCAP or BMI's PPL, nor had it been imposed

in connection with the arbitration-imposed 2005–2007 SESAC PPL.[17]  Jaffe opines: "There is no

economic justification for this change and no economic purpose other than to make the per-

---

[17] Technically, Jaffe explains, SESAC in 2008 achieved the extra 15% charge by eliminating a
previous 15% deduction (representing incidental and ambient music) that had been subtracted
from the blanket license "base," which in turn is used as a multiplier to tabulate the PPL's cost.
The ASCAP, BMI, and 2005–2007 SESAC PPLs were priced based on a formula that contained
that deduction.  *Id.* at 74–75; Hochstadt Decl. Ex. 152.

program license less attractive to licensees"; the only rational inference, he states, is that SESAC intended to increase the cost of the PPL, "to make it less viable as a competitive alternative." *Id.*; *see also id.* at 73–83 & App. D (illustrating operation of PPL formula).

Second, effective 2008, SESAC modified the complex mechanism it used in calculating the cost of a PPL, to account for the possibility that music in a program not affirmatively identified as part of the SESAC repertory might nevertheless be so. The formula, to simplify, applies a "weighting factor" to programs that may contain such unidentified music. Under the PPL formula set by the SESAC arbitration panel, that weighting factor had been 5% prior to 2008. *See id.* Since 2008, however, SESAC has applied a 50% weighting factor, 10 times higher than before. Although that is the same factor used in ASCAP's PPL formula, SESAC's repertory is significantly smaller (about one-tenth the size) of ASCAP's. *See id.* at 75–76. As Jaffe explains, the probability that a program with unidentified music contains music from SESAC's repertory is much smaller than the probability that it contains ASCAP-repertory music. Moreover, in ASCAP's case, because ASCAP's music is more ubiquitous, programs will already have one or more identifiable ASCAP compositions, meaning that the user will already be obliged to pay the per-program fee; thus, as to such programs, the licensee pays nothing extra to ASCAP to reflect the possibility that unidentified music in the program is from the ASCP repertory. However, SESAC's smaller repertory makes it less likely that PPL fees will already be due to SESAC, and therefore the frequency with which the 50% weighting factor comes into play is greater. *Id.* at 77. Jaffe credibly opines that this change cannot be justified economically on the grounds articulated by SESAC: that SESAC has merely matched ASCAP's weighing factor, or that the increased rate incentivizes stations to identify unidentified music. *Id.* at 79–80.

Jaffe illustrates the effect of these changes with respect to a single actual station in a particular month, whose 133 programs included 10 with identifiable SESAC music, 18 without such music, and 105 (accounting for 29% of the station's program revenue) without identifiable SESAC music but with some unidentified music.  Under the formula in place in 2005–2007, the cost of the PPL to the station would have been $5,452, a savings of 17% off of the blanket license.  However, under SESAC's 2008 formula, the PPL fee would have been $11,714, a 78% increase over the cost of a blanket license.  *Id.* at 80–81.[18]

Finally, Jaffe notes, SESAC changed the language of its PPL to omit a provision regarding the programs to be treated as containing unidentified music, which potentially augmented SESAC's revenues pursuant to the 50%-payment-rate formula discussed above. Under the PPL terms set by arbitrators, where a station had in its own possession a "cue sheet" identifying the music contents of a program, the program was not treated as containing unidentified SESAC music.  However, under the present version of SESAC's PPL, SESAC will treat a program as containing unidentified SESAC music, unless SESAC itself possesses a valid cue sheet; in effect, SESAC's new terms preclude the use of cue sheets from other sources.  Jaffe notes that several prospective licensees protested this term, but SESAC did not respond.  *Id.* at 82–83.  Although this license feature does not appear as consequential as the first two, Jaffe plausibly construes SESAC's position as further bespeaking a lack of interest in offering a viable PPL.  *Id.* at 82.

---

[18] Jaffe's report recounts various communications by stations to SESAC after these changes were imposed to the effect that the PPL, as newly priced, was not viable.  One station wrote:  "[Y]our 50% attributable multiplier for programming with unknown music is illogical and a penalty on us that makes the Per Program unusable." *Id.* at 81 (internal quotation marks and citation omitted). Another wrote that, "by increasing your multiplier from 5 to 50% -- a ten times increase [--] you rendered the per program option as worthless." *Id.* (internal quotation marks and citations omitted).

In light of these terms, Jaffe opines that SESAC's PPL has, since 2008, ceased to supply a viable alternative to its blanket license.  Statistical data corroborates Jaffe's determination.  In 2007, 248 stations, representing approximately 24% of total blanket license fees, used SESAC's PPL.  However, in the years since SESAC's post-2007 PPL formula took effect, not a single local station chose the PPL.  *Id.* at 82 (citations omitted); *see also* Pl. 56.1 ¶¶ 193, 250, 268–69; Tr. 27 ("THE COURT:  Is it right that there is literally no affiliate who has elected the PPL? MS. KOHLMANN:  There is no affiliate who has elected the PPL.").

Consistent with this, in written communications to SESAC,[19] and in deposition testimony,[20] stations repeatedly attributed the decision to forego a PPL to its prohibitive cost. *See* Pl. 56.1 ¶ 261 (collecting examples of stations' written complaints to SESAC that its changes made the PPL unusable).

As Jaffe reasonably explains, without a viable PPL option, the options of direct and source licensing options as to a particular musical work make little economic sense for a station, because such a station would still need to secure a blanket license to cover its licensing needs.

---

[19] One station wrote that "the per program license would cost us more than the blanket license, so it has no value to us."  Jaffe Rep. 81 (internal quotation marks and citation omitted).  Another wrote that "[w]e would prefer to use a Per Program License Agreement, but the terms imposed by SESAC are both onerous and operationally cumbersome for a small market TV station." *Id.* at 82 (internal quotation marks and citations omitted).  Another wrote that for years it "has operated under a per program arrangement with ASCAP, BMI, and SESAC.  Unfortunately, the new terms and conditions offered by SESAC are so complex that they render this option all but useless." *Id.* (internal quotation marks and citations omitted).  A fourth wrote: "SESAC imposed much of this unreasonable fee increase by eliminating what had been a reasonably viable per program license option, and replacing it with a sham per program scheme, under which it is virtually impossible to achieve any benefit." *Id.* (internal quotation marks and citation omitted).

[20] Elizabeth Haley of Allbritton Communications Company, which owns and operates several broadcast stations, for example, testified that "[a]t the end of th[e] negotiations both Albritton [*sic*] and SESAC agreed Albritton [*sic*] stations could not save money under the per program license."  Hochstadt Decl. Ex. 9 (Deposition of Elizabeth Haley) at 172–73.

And, as affiliate Stephen Arnold testified, "if a station is on a blanket, then there is no reason for

a direct license.  You just would be paying the composer twice, or the composer would in theory

be paid twice."  Arnold Dep. at 91.

As reviewed earlier, the record contains substantial evidence of a separate means—the

penalties for direct licensing in the supplemental affiliate agreements—by which a jury could

find that SESAC effectively forced local stations to buy its blanket license.  Jaffe persuasively

explains that this penalty deterred the composers whose work was most in demand from

independently licensing their music.  *See* Jaffe Rep. 67–73.  This left stations that wished to air

any such music with no choice but to buy the blanket license.  *See* Pl. 56.1 ¶¶ 221–22.

SESAC makes two arguments in response to this formidable showing.  First, it argues

that, as a matter of law, the prospect of a station's having to pay twice for the same music (once

through a blanket license, another through a direct or source license) does not make source or

direct licensing unavailable.  Def. Br. 35−36.  But *CBS Remand*, on which SESAC relies for this

point, is inapposite, and does not assist SESAC.  In *CBS Remand*, the Second Circuit rejected

CBS's argument that, as a result of the PROs' licensing practices, direct licensing was

functionally unavailable because "any money spent to acquire performance rights from

individual copyright owners would be wasted once CBS had already paid ASCAP and BMI for

performance rights to all music."  620 F.2d at 937.  In rejecting that argument, the Court noted,

that, in that case, "nothing prevented CBS from attempting to obtain from the copyright owners

performance rights for some interval following expiration of the term of the blanket license."  *Id.*

And, upon such expiration, CBS had a viable alternative:  Both ASCAP and BMI were obliged

under their respective consent decrees to offer a viable PPL.  In other words, CBS *could* allow its

blanket license to expire, and still acquire the necessary performance rights−indeed, at the time

56

of the oral argument, "CBS h[e]ld[] no license from ASCAP."  *Id.* at 937 n.8.  By contrast, here, SESAC is not required to offer a viable PPL; and there is strong evidence that its PPL is, in fact, illusory.  Thus, based on the summary judgment record, a jury could find that a local station cannot avoid SESAC's blanket license, because no alternative to it is realistically available.

Second, SESAC defends its practices on the facts.  SESAC denies intending to insulate its blanket license from competition.  It notes that only a small fraction of its affiliates are subject to the supplemental agreements.  *See* Def. 56.1 ¶ 73.  It also defends the penalty provisions in those agreements as benign, claiming that they are aimed at protecting and assuring a return on the significant advances SESAC had made to recruit these artists.  *See id.* ¶ 74; Tr. 33.  Plaintiffs factually counter by emphasizing that the affiliates subject to the supplemental agreements together account for between 43 and 50% of SESAC's total royalties, *see* Pl. Resp. to Def. 56.1 ¶ 73; *see also* Hochstadt Decl. Ex. 139–42, and represent the class of affiliates whose music is popular and ubiquitous on television.  By deterring direct licensing by affiliates whose music is "virtually unavoidable," plaintiffs argue, SESAC effectively compels stations to buy its blanket license.  Pl. Br. 18.

At this juncture, the Court need not resolve the parties' dispute as to the inferences to be drawn from the facts in the record.  With SESAC alone having moved for summary judgment, the only issue before the Court is whether there is sufficient evidence on which a jury could find that SESAC's practices qualified as a restraint, *i.e.*, that those practices closed off viable alternatives to its blanket license.  For the reasons stated here and chronicled in more detail in Jaffe's expert report, there is sufficient such evidence.  Because plaintiffs have not moved for summary judgment, and the Court has not been presented with expert analysis from SESAC, the

Court has no occasion to consider the sufficiency or strength of SESAC's contrary case on this point.

### 2.   Pro-Competitive Benefits Versus Anti-Competitive Effects

The Court next considers, under the rule of reason, whether there is evidence on which a jury could find that the anti-competitive impact of SESAC's licensing practices outweighs their pro-competitive benefits, *i.e.*, whether there is harm to competition.

### a.       Market Definition

To demonstrate harm to competition, a plaintiff must first prove a relevant market. The test that courts most often utilize to define a relevant product market is the "cross-elasticity of demand," in other words, the extent to which one product is reasonably interchangeable with another. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 470 (1992); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 400, 404 (1956); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003). Where there is such interchangeability, those products fall within the same market; conversely, where there is not, those products exist in different markets. *See E.I. du Pont*, 351 U.S. at 400.

Here, plaintiffs claim that the relevant market is the market for television-performance rights to works within SESAC's repertory. *See* Pl. Br. 6, 40−41. The facts in the summary judgment record offer strong support for plaintiffs' proposed market definition. Specifically, the evidence in the record, construed in the light most favorable to plaintiffs, strongly supports each of the three propositions that, when cast as allegations, Judge Buchwald held together sufficed to allege this product market. *See* MTD Op. at 25.

*First*, virtually all composers affiliate with only one of the three PROs. *See* Def 56.1 ¶ 20; Pl. 56.1 ¶ 209; Jaffe Rep. 17. *Second*, almost all local stations have licenses from all three

PROs.  *See* Pl. 56.1 ¶¶ 206, 207; Jaffe Rep. 22.  As a practical matter, a station must have such licenses, because it is unable to control—or, sometimes, even identify—what music is contained within third-party programs.  *See* Jaffe Rep. 22.  *Third*, local stations have not responded to SESAC's price increases by replacing SESAC licenses with alternative licenses.  *See* Pl. 56.1 ¶¶ 190, 192, 193, 214, 215, 271; Jaffe Rep. 50, 56, 85−86.  Together, this evidence supplies an ample factual basis on which the finder of fact could conclude that the relevant product market is bounded, or defined, by SESAC's repertory.  *See Eastman Kodak*, 504 U.S. 82 ("[t]he proper market definition . . . can be determined only after a factual inquiry into the commercial realities faced by consumers" (internal quotation marks and citation omitted)).

As Jaffe explains, moreover, plaintiffs' market definition is confirmed by applying the "SSNIP" test used by the DOJ and the Federal Trade Commission in evaluating potential horizontal mergers.  *See* Jaffe Rep. 55−57.  The test helps assess whether a given merger or acquisition will harm competition in a given market; it inquires how buyers would respond to a hypothetical monopolist's imposition of a "small but significant and non-transitory increase in price," or SSNIP.  *See* United States Dep't of Justice & Federal Trade Comm'n, Horizontal Merger Guidelines, *available at* www.ftc.gov/os/2010/08/100819hmg.pdf (Aug. 19, 2010) (the "Guidelines").  The test asks whether buyers would respond to such a price increase by opting for alternatives, thus rendering the price increase unprofitable; if so, the proposed product market is drawn too narrowly.  *See id.* at 8−10.  By contrast, a market is "properly defined under the Guidelines when a hypothetical profit-maximizing firm selling all of the product in that market could charge significantly more than a competitive price, *i.e.*, without losing so many sales to other products that its price became unprofitable."  *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 352 (S.D.N.Y. 2009) (Kaplan, J.) (internal

quotation marks and citation omitted).  Here, there is evidence that, despite a material increase in the price of a SESAC blanket license during 2008–2012, the relevant consumers (local television stations) did not respond by substituting another product (ASCAP or BMI licenses); "[i]ndeed, essentially 100% of local television stations continued to license performance rights from SESAC despite this increase, rather than switching to some other product," Jaffe Rep. 56**.**

The evidence would not permit the conclusion, and SESAC does not argue, that the market parameters can be drawn more broadly, to also include the music in the ASCAP and BMI repertoires.  That proposition is defeated by two facts:  (1) stations that already possess blanket licenses from ASCAP and BMI nonetheless consistently purchase SESAC licenses; and (2) the price for licenses for ASCAP and BMI music has not held back the price for licenses of SESAC music, which rose significantly during the period 2008 to 2012.  *See* Jaffe Rep. 22, 62.

SESAC instead proposes a narrower market definition—defined at the level of the performance rights to each musical work.  Under longstanding industry practice, the right to perform music embedded in a television program is sold separately from, and later than, the program itself.  As a result, as all parties concede, a television station that acquires a third-party program is "locked in" to playing the music embedded in, or baked into, that program.  Def. Br. 44−49.  Relying on the testimony of plaintiffs' expert Jaffe, SESAC argues that, from the standpoint of a station that has already committed to broadcasting a particular program, the right to perform one piece of music is not interchangeable with the right to perform any other piece of music, and thus any one SESAC song is not readily substitutable for another.  *See id.* at 47.  Whatever the price of the license to play a given song, a station that wishes to buy a completed program will not—and cannot—replace within that program an expensive song with another, less expensive song.  Thus, SESAC argues, there is no interchangeability among songs, and

plaintiffs cannot prove a broader relevant market, let alone harm to competition in such a market. *See id.* at 44−49.

For several reasons, the Court finds SESAC's contrary market definition unconvincing as a basis for granting summary judgment.  First, market definition "is a highly factual one best allocated to the trier of fact."  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992).  Only SESAC has moved for summary judgment; and thus, the only issue before the Court as to market definition is whether there is sufficient evidence on which a trier of fact *could* adopt plaintiff's market definition.  *See* ABA Section on Antitrust Law, *Antitrust Law Developments* 620 (6th ed. 2007) ("Definition of the relevant market is generally considered a question for the trier of fact . . . . The jury may accept the market definition proposed by either party or may develop its own definition based upon the evidence."); *see also Lewis v. Philip Morris Inc.*, 355 F.3d 515 (6th Cir. 2004) ("defining the product market . . . is a factual inquiry for the jury; the court may not weigh evidence or judge witness credibility" (internal quotations marks and citations omitted)).  For the reasons reviewed above, there clearly is such evidence in the record, and indeed it is strong.

More fundamentally, SESAC's definition of the market is problematic.  It takes as a given a quirky feature of current market structure—*i.e.*, the cleaving into two separate markets (1) the sales of television programs and (2) the performance rights as to the musical work embedded in those programs—that itself may well be traceable to the longstanding practice of the PROs in collectivizing into one product the performance rights of multiple artists' work. Absent the offer of blanket licenses by the PROs, the market for performance rights to the songs in third-party programming might well have developed differently.  *See United States v. ASCAP*, 1993 WL 60687, at *17 (noting the need, given the existence of PROs regulated by consent

decree, to "recreate" a "theoretical competitive market" of "competing licensors" in setting

reasonable prices for music licenses); Jaffe Rep. 18−20 (explaining that, absent the advent of the

blanket license, there might have been price competition among songs at each stage, such that

the cost of the rights to one song would affect the price to another, and more interchangeability

among songs, such that television stations, considering which programs to buy, might have been

forced to factor in the licensing costs of embedded songs). And, as to the two largest PROs,

ASCAP and BMI, consent decrees have long been in place to cabin the widely recognized

potential of this practice to harm competition. *See, e.g., ASCAP v. Showtime*, 912 F.2d at 570

(noting that "as a potential combination in restraint of trade, ASCAP has been disinfected by the

[consent] decree'" (internal quotation marks and citation omitted) (alteration in original)).

Furthermore, SESAC's bid to define the market as at the level of each song would place

SESAC's blanket license outside the scope of the antitrust laws. On this theory, SESAC and its

affiliates could band together to fully insulate the blanket license from all competition, and then

charge as high a price as they wanted for this all-or-nothing license to their collective work,

without any recourse for aggrieved parties in the antitrust laws. When asked at argument, were

each song treated as its own market, how there could ever be liability for a PRO, SESAC's

counsel could not identify any such scenario, barring a "change [in] the dynamics of the market."

Tr. 24; *see also id.* at 23–25. The Court is unwilling to accept SESAC's premise that its

behavior with regard to the offer to television stations of its blanket license is an antitrust-free

zone.

Finally, it is no answer that the development of the modern market for performance rights

may not be SESAC's fault. While the dynamics in the market for performance rights for music

in third-party programming may well have predated SESAC's rise, *see* Def. Br. 37 (stating that

SESAC "played a relatively minor role in performance rights licensing until the 1990s"); Jaffe Rep. 41−42, market definition is unconcerned with fault. As a market participant, SESAC is subject to the strictures of the Sherman Act regardless of the timing and circumstances of its market entry.

### b.        Harm to Competition

The remaining issue is whether, within the market for the performance rights to works within SESAC's repertory, the evidence could support findings that SESAC's conduct harmed competition, and that this harm outweighed any pro-competitive benefits of that conduct. The evidence is more than sufficient to support such findings.

Taking the evidence in the light most favorable to plaintiffs, a trier of fact could find harm to competition in the market for performance rights in connection with third-party programming. As Jaffe's report convincingly articulates, since 2008, fewer licensing options are realistically available to stations, and stations must pay supra-competitive prices for the one license that is available—SESAC's blanket license. *See* Jaffe Rep. 64–83. This evidence is sufficient to establish competitive harm. *See Visa*, 344 F.3d at 238 ("substantial adverse effects on competition" include "increases in price, or decreases in output or quality").

SESAC responds by articulating various pro-competitive benefits of its blanket license, including those identified by the Court in *BMI v. CBS*: "the integration of sales, monitoring, and enforcement against unauthorized copyright use." 441 U.S. at 20. At trial, SESAC will be at liberty to defend its licensing practices as more pro-competitive than anti-competitive. And plaintiffs, for their part, will be at liberty to attempt to "prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means." *Geneva Pharms. Tech. Corp.*, 386 F.3d at 507. It is not for the Court, on SESAC's motion for

summary judgment, to resolve this debate, particularly without the benefit of SESAC's expert analysis or competing evidence on these points.  The weighing of these contentions is properly left for trial.  *See id.* ("Ultimately, the *factfinder* must engage in a careful weighing of the competitive effects of the agreement—both pro and con—to determine if the effects of the challenged restraint tend to promote or destroy competition." (emphasis added)); MTD Op. 30 (noting that "[w]hile the previous antitrust challenges to the ASCAP and BMI licenses have been unsuccessful, . . . all were decided after full trials on the merits").

In sum, plaintiffs have adduced evidence upon which a jury could find, between SESAC and those affiliates who have entered into supplemental affiliation agreements, a combination in restraint of trade, in violation of § 1.  SESAC's motion for summary judgment on Count One is, therefore, denied.

## V.       Plaintiffs' Section 2 Claims

### A.  Sherman Act Section 2 Standard

Section 2 of the Sherman Act addresses unilateral, as opposed to concerted, conduct.  It prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of . . . trade or commerce."  15 U.S.C. § 2.  To establish a § 2 violation, a plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp*., 384 U.S. 563, 570–71 (1966); *see also Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("*Trinko*"); *Pepsi-Co, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).

This second element plays a critical role in limiting the § 2 cause of action. As the Supreme Court has emphasized, "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Trinko*, 540 U.S. at 407. "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Id.* (emphasis in original). Accordingly, the conduct that can support a § 2 violation is narrower than the conduct on which a conspiracy in restraint of trade in violation of § 1 may be found. *See Copperweld*, 467 U.S. at 767, 769. That is because concerted conduct among multiple entities presents special antitrust dangers not presented by unilateral conduct, "warrant[ing] scrutiny even in the absence of incipient monopoly." *Id.* at 769.

Specifically, § 2 proscribes "[t]he use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak*, 504 U.S. at 482–83 (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)). "'[E]xclusionary [conduct] comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) (quoting 3 Philip Areeda & Donald F. Turner, *Antitrust Law* 78 (1978)). Examples of such conduct include predatory pricing, some unilateral refusals to deal with rivals, and the tying of distinct products such that a seller sells a product only on condition that the buyer purchase a separate, "tied" product. Like the test for § 1 liability, the determination of § 2 liability calls for a weighing of the exclusionary conduct against any "valid business reasons" for it. *Eastman Kodak*, 504 U.S. at 483; *see also United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)

("[I]f a plaintiff successfully establishes a *prima facie* case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a procompetitive justification for its conduct . . . . [I]f the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." (internal quotation marks omitted)).

## B. Monopolization

Plaintiffs argue here that SESAC has monopoly power in the market for performance rights to the works in its repertory, and has maintained it through "overt exclusionary acts." These include

> (i) preventing select SESAC-affiliated composers from entering into direct license agreements with music users; (ii) tying together all musical compositions, including both unwanted and desired compositions . . . into an all-or-nothing blanket license; (iii) refusing to offer Plaintiffs and members of the Class a viable alternative form of license to its all-or-nothing blanket license; (iv) refusing to offer users fair and reasonable interim licenses pending resolution of negotiations; and (v) refusing to negotiate in good faith, which have restrained and impeded the growth of its existing or potential competitors and competitive licensing arrangements.

Am. Compl. ¶ 86.

Assuming that the relevant market is found to be that for performance rights to music in SESAC's repertory, it is undisputed that SESAC possesses monopoly power in that market. *See* Def. Br. 58 ("plaintiffs have defined the relevant market in such a manner that SESAC inevitably will have overwhelming market share"); *see also* MTD Op. 39 ("where SESAC holds nearly 100% of the relevant market it is clear that [plaintiffs] have established monopoly power"). It also appears undisputed that SESAC has the power to control prices over that market as currently structured. *See* Jaffe Rep. 57–64, 86–89.

SESAC instead challenges the second element.  It argues that "[a]s a matter of logic, SESAC's 'monopoly' over its own product—a product that, by definition, nobody else can sell—cannot have resulted from conduct that is wrongful."  Def Br. 58–59.  But that does not necessarily follow.  As Jaffe explains, but for SESAC's actions to squelch alternatives to its blanket licenses, the sellers in the market for performance rights to the music of its affiliates would also include the individual rightsholders themselves.  These composers or publishers could, for example, issue direct licenses to stations, much as ASCAP's and BMI's members do.  Put differently, although SESAC by definition has a monopoly over "its own product"—the blanket license to SESAC affiliates' music—it does not inexorably have a monopoly over all performance rights to such music.

The issue then is whether there is evidence on which a jury could find that SESAC has engaged in exclusionary conduct.  Here, the claimed exclusionary conduct is much the same as formed the basis of the § 1 claim:  It includes the penalties imposed on direct licensing by affiliates, and the unrealistic pricing of SESAC's PPL.  And, for the same reasons that there is sufficient evidence to survive summary judgment on Count One, there is sufficient evidence to survive on Count Two.  In sum, there is sufficient evidence upon which a jury could find that SESAC took action to maintain and fortify its monopoly over licensing of its affiliates' work, by adopting licensing practices that eliminated all realistic competition with its blanket license.  SESAC does not appear to dispute that, as a matter of law, the claimed acts of exclusion are legally cognizable under § 2.

In a separate argument, SESAC asserts that it cannot be liable for precluding its affiliates from competing when these affiliates are the "alleged beneficiaries of the purported scheme to monopolize."  Def. Reply Br. 24.  But that does not follow.  Plaintiffs are free to argue at once

that affiliates benefit from a collusive scheme a PRO has fashioned for their benefit *and* that the

PRO has done so by barring them from offering competing products to its own.  SESAC cites no

authority to the effect that, where the monopolist is a PRO, its acts to block affiliates from

offering competitive products are immune from review under § 2.  In considering this point, the

unique relationship between SESAC and its affiliates cannot be ignored.  In a competitive world,

affiliates could license their rights directly to stations and compete with SESAC.  The long line

of cases involving ASCAP and BMI is, in fact, premised on the value of preserving and enabling

competition with the PROs' blanket licensing, including via direct licensing by an affiliate of its

own music.

Finally, as to the § 2 claim, the Court must consider the balance of pro-competitive

benefits and anti-competitive effects.  Neither party has argued that this balance is to be analyzed

any differently under § 2 than under § 1.  As under § 1, the Court finds that plaintiffs have

adduced sufficient evidence upon which a jury could find that the anti-competitive effects of

SESAC's licensing practices outweigh their pro-competitive virtues.  Summary judgment is

therefore denied as to Count Two.

### C.  Conspiracy to Monopolize

Having held that the evidence is sufficient to warrant a finding of concerted action among

SESAC and certain affiliates, and also sufficient to warrant a finding of § 2 liability for

monopolization, the Court must also sustain Count Three, which alleges a conspiracy to

monopolize among SESAC and the affiliates subject to supplemental affiliation agreements.

"Under § 2 of the Sherman Act, the offense of conspiracy to monopolize requires proof

of (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to

monopolize."  *Volvo N. Amer. Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 74

(2d Cir. 1988); *see also Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795

(2d Cir. 1987).  Neither party argues that Count Three presents unique issues; they agree that this

claim is based on the same conduct as its monopolization claim.  *See* Def. Br. 57; Am. Compl.

¶¶ 94–96.  For the reasons already stated, the evidence is sufficient to prove concerted action and

a specific intent to monopolize.  As to the second element, overt acts in furtherance of the

conspiracy, any one of the alleged practices of which plaintiffs complain would constitute an

overt act in furtherance of the conspiracy.  *See Volvo N. Amer. Corp.*, 857 F.2d at 74.  The Court

therefore finds the evidence adduced sufficient to withstand SESAC's motion for summary

judgment on Count Three.

## CONCLUSION

For the foregoing reasons, SESAC's motion for summary judgment is denied as to all

three counts, save that the Court narrows the § 1 claim in two ways:  The Court rejects, as a

matter of law, plaintiffs' (1) *per se* theory of § 1 liability; and (2) claim of an agreement to

restrain trade among all 20,000-plus SESAC affiliates, as opposed to among only those affiliates

who were party to a supplemental affiliation agreement with SESAC.

The Clerk of Court is respectfully directed to terminate all pending motions in this case.

The Court will issue shortly an order with respect to next steps in this case.


SO ORDERED.

*Paul A. Engelmayer*
_____
Paul A. Engelmayer
United States District Judge


Dated: March 3, 2014
       New York, New York