**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| MEREDITH CORPORATION, et al. | : | |
| | : | |
| | : | |
| v. | : | Case No. 09 Civ. 9177 (PAE) |
| | : | |
| SESAC, LLC, et al. | : | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ...........................................................................................................3

I.   LITIGATION HISTORY ........................................................................................3

II.  THE PROPOSED CLASS ACTION SETTLEMENT ...........................................5

A.      Significant Long-Term, Industry-Wide, Conduct Relief...................................5

B.      Substantial Monetary Relief ............................................................................6

C.      Dismissal of Litigation and Mutual Release of Antitrust Claims .....................7

ARGUMENT ...............................................................................................................7

I.   THE  PROPOSED  CLASS  ACTION  SETTLEMENT  IS  THE  PRODUCT  OF
     NUMEROUS   ARMS-LENGTH   NEGOTIATION   SESSIONS,   INCLUDING
     INVOLVEMENT BY MEDIATORS...........................................................................7

II.  THE  PROPOSED  CLASS  ACTION  SETTLEMENT  IS  FAIR,  REASONABLE,
     AND ADEQUATE .....................................................................................................10

III. THE     PROPOSED     SETTLEMENT     CLASS     EASILY     MEETS     THE
     REQUIREMENTS OF RULE 23 ..............................................................................15

A.      The Proposed Settlement Class........................................................................15

B.      Provisional Certification of the Settlement Class is Proper for Settlement Purposes........15

        1.      The Requirements of Rule 23(a) Are Met ...........................................16

        2.      The Requirements of Rule 23(b)(2) Are Met ......................................19

        3.      The Requirements of Rule 23(b)(3) Are Met ......................................19

C.      Class Counsel Will Fairly and Adequately Represent the Settlement Class ....................21

D.      Settlement Notice and Administration Costs...................................................22

CONCLUSION...............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997).................................................................................. 19, 20-21

*Armstrong v. Bd. of Sch. Dir. of City of Milwaukee*,
   616 F.2d 305 (7th Cir. 1980), *overruled on other grounds*,
   *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)......................................................10

*ASCAP v. MobiTV Inc.*,
   681 F.3d 76 (2d Cir. 2012)...............................................................................12

*ASCAP v. Showtime/The Movie Channel, Inc.*,
   912 F.2d 563 (2d Cir. 1990)..............................................................................12

*BMI v. DMX, Inc.*,
   683 F.3d 32 (2d Cir. 2012)...............................................................................12

*Broad. Music Inc. v. Weigel Broad. Co.*,
   488 F. Supp. 2d 411 (S.D.N.Y. 2007), *aff'd*, 340 F. App'x 726 (2d Cir. 2009).....................16

*Browning v. Yahoo!, Inc.*,
   No. C04-01463-HRL, 2006 WL 3826714 (N.D. Cal. Dec. 27, 2006)....................................22

*Buffalo Broadcasting Co., Inc. v. ASCAP, et al.*,
   No. 78 Civ. 5760 (S.D.N.Y. Dec. 5, 1980) .......................................................16, 21

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)...........................................................................10, 14

*Consol. Rail Corp. v. Town of Hyde Park*,
   47 F.3d 473 (2d Cir. 1995)..............................................................................16

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007)...........................................................................17, 19

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. MDL 1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009)............................................14

*In re Auto. Refinishing Paint Antitrust Litig.*,
   2004 U.S. Dist. LEXIS 29162 (E.D. Pa. Oct. 13, 2004)................................................14

*In re Buspirone Patent & Antitrust Litig.*,
   210 F.R.D. 43 (S.D.N.Y. 2002) ........................................................................17

## TABLE OF AUTHORITIES (CONT.)

*In re Currency Conversion Fee Antitrust Litig.*,
224 F.R.D. 555 (S.D.N.Y. 2004). ...................................................................................20

*In re Currency Conversion Fee Antitrust Litig.*,
No. 01 MDL 1409, M-21-95,
2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006). ...........................................................11

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009). ..........................................................................14, 15

*In re Elec. Books Antitrust Litig.*,
11-md-2293 (DLC), 12-cv-3394 (DLC)
2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014) ...........................................................8, 11

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
142 F.R.D. 588 (S.D.N.Y. 1992) ..............................................................................14

*In re Holocaust Victim Assets Litig.*,
No. CV 06-0983, CV 96-4849, CV 97-0461, CV 99-5161,
2007 WL 805768 (E.D.N.Y. Mar. 15, 2007) ..............................................................8

*In re Initial Public Offering Sec. Litig.*,
226 F.R.D. 186 (S.D.N.Y. 2005) ..............................................................................10

*In re J.P. Morgan Chase Cash Balance Litig.*,
242 F.R.D. 265 (S.D.N.Y. 2007) ..........................................................................17-18

*In re Linerboard Antitrust Litig.*,
321 F. Supp. 2d 619 (E.D. Pa. 2004) .......................................................................14

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ..............................................................................18

*In re NASDAQ Market-Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y. 1997) ................................................................................11

*In re NASDAQ Market-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................................8

*In re Packaged Ice Antitrust Litig.*,
08-MDL-01952, 2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) ...........................14

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
986 F. Supp. 2d 207 (E.D.N.Y. 2013) .......................................................................14

## TABLE OF AUTHORITIES (CONT.)

*In re Plastic Tableware Antitrust Litig.*,
    1995 U.S. Dist. LEXIS 17014 (E.D. Pa. Oct. 25, 1995)......................................................14

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) ..........................................................................18, 21

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    584 F. Supp. 2d 697 (M.D. Pa. 2008) ..................................................................................14

*In re Prudential Sec. Inc. Ltd. P'ship*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ............................................................................. 10-11, 15

*In re Puerto Rican Cabotage Antitrust Litig.*,
    815 F. Supp. 2d 448 (D.P.R. 2011) ......................................................................................14

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
    No. 06 Civ. 5173, 2008 WL 1956267 (S.D.N.Y. May 1, 2008).........................................22

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) .........................................................................................20

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)..................................................................................................15

*In re WorldCom, Inc. ERISA Litig.*,
    No. 02 Civ. 4816, 2004 WL 2338151 (S.D.N.Y. Oct. 18, 2004),
    *order clarified, In re Worldcom, Inc. ERISA Litig.*,
    No. 02 Civ. 4816, 2004 WL 2922083 (S.D.N.Y. Dec. 17, 2004)..........................................8

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) ..........................................................................................18

*Meijer, Inc. v. 3M (Antitrust)*,
    No. 04 Civ. 5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006)..........................................14

*Meredith Corp. v. SESAC LLC*,
    No. 09 Civ. 9177, 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011) .............................................3

*Meredith Corp. v. SESAC LLC*,
    1 F. Supp. 3d 180 (S.D.N.Y. Mar. 3, 2014) ................................................................ *passim*

*Nieves v. Comty. Choice Health Plan of Westchester, Inc.*,
    No. 08 CV 321, 2012 WL 857891 (S.D.N.Y. Feb. 24, 2012) ..............................................11

*Todd v. Retail Concepts, Inc.*,
    No. 3:07-0788, 2008 WL 3981593 (M.D. Tenn. Aug. 22, 2008)..........................................22

# TABLE OF AUTHORITIES (CONT.)

*United States v. ASCAP,*
  2001-2 Trade Cas. (CCH) ¶ 73,474 (S.D.N.Y. June 11, 2001) ................................................6

*United States v. ASCAP (In re Application of Buffalo Broadcasting Co.),*
  Civ. No. 13-95 (WCC) (MHD), 1993 WL 60687 (S.D.N.Y. Mar. 1, 1993) ..........................12

*United States v. BMI,*
  1996-1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. Nov. 18, 1994)................................................6

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011)....................................................................................................17, 19

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
  396 F.3d 96 (2d. Cir. 2005)..................................................................................................7, 10

**Rules**

Fed. R. Civ. P. 23 ................................................................................................... *passim*

**Other Authorities**

Newberg on Class Actions § 18.26 (4th ed. 2002) ............................................. 19-20

### INTRODUCTION

After nearly five years of complex antitrust litigation, the Named Plaintiffs[1] and SESAC have reached a proposed class action settlement in this case.  As set out below, the contemplated settlement provides significant conduct relief and a sizeable monetary recovery to approximately 1,200 full-power commercial television stations ("local stations") throughout the United States and is fully supported by the Named Plaintiffs and the Television Music License Committee.[2]

*First*, the proposed settlement will provide substantial, long-term, industry-wide relief. Under the contemplated settlement, SESAC will be bound *through 2035* by some of the *same* core conduct restrictions that constrain the anti-competitive potential, at least as it relates to their dealings with local stations, of the other two U.S. performance rights organizations ("PROs"), ASCAP and BMI, in their consent decrees with the Antitrust Division of the Department of Justice.  Namely, SESAC will be: 1) obligated to offer a viable alternative to its blanket license in order to access the public performance rights to the music in SESAC's repertory; 2) barred from preventing (directly or indirectly) its affiliated composers and publishers from entering into direct licenses with local stations; and 3) prevented from threatening local stations with copyright infringement lawsuits during license negotiations.  In addition, although not the same as the "rate courts" that oversee the ASCAP and BMI consent decrees, if the terms and conditions (such as fees) of industry-wide through to the viewer public performance licenses to

---

[1] The Named Plaintiffs are Meredith Corporation, The E.W. Scripps Company, Scripps Media, Inc., Hoak Media LLC, Hoak Media of Nebraska, LLC, and Hoak Media of Dakota, LLC.  By agreement of the parties, and as called for by the proposed class action settlement, the Named Plaintiffs will file an amended complaint to substitute Gray Television Group, Inc. for the Hoak named plaintiff entities to account for a recent transaction and resulting change in ownership.  *See* [Proposed] Second Am. Class Action Compl., ¶ 58, attached as Exhibit B to the Settlement Agreement, dated October 14, 2014.  A true and correct copy of the Settlement Agreement and its Exhibits are attached as Exhibit 1 to the Declaration of Eric S. Hochstadt ("ESH Decl."), which is being submitted herewith.

[2] The Television Music License Committee, LLC ("TMLC") is not a party to this litigation, but it is an organization funded by voluntary contributions from local stations that represents local stations in their dealings with ASCAP and BMI and, before 2008, SESAC.  *See* TMLC, at http://tvmlc.com/ (last visited Oct. 14, 2014).  The TMLC has funded this litigation on behalf of the industry and is a signatory to the Settlement Agreement.

the SESAC repertory for stations' primary channels, multiplex channels, websites, and other means of digital distribution cannot be agreed upon with the TMLC, then SESAC agrees to submit such disputes for resolution in binding arbitration.  These behavioral changes will yield substantial savings for the industry and other meaningful benefits, such as enhanced competition for the licensing of performance rights to the music in the SESAC repertory and licensing efficiencies.

*Second*, the proposed settlement will provide significant monetary relief to local stations. SESAC has agreed to pay $58.5 million into a settlement fund.  Those monies will be used to reimburse local stations for the claimed inflated license fees they have paid since 2008 as a result of the alleged anti-competitive conduct that was the subject of this lawsuit.  In addition, subject to Court approval, these monies will be used to reimburse the TMLC for its legal fees and associated costs incurred in funding this lawsuit on behalf of the industry.

The proposed class action settlement is the result of robust, arms-length, negotiations. The negotiations included active participation and supervision by representatives of the Named Plaintiffs.  In addition, representatives of the TMLC, which previously negotiated the terms and conditions of public performance licenses on behalf of local stations with SESAC from 1995 to 2007, actively participated and supervised the settlement discussions.  The negotiations also included four sessions overseen by experienced mediators U.S. District Court Judge Kimba M. Wood and U.S. Magistrate Judge James C. Francis.

The contemplated class action settlement easily meets the standard for preliminary approval.  As such, the Named Plaintiffs respectfully request that the Court, pursuant to Rule 23 of the Federal Rules of Civil Procedure, enter an order: (1) granting leave to file the Second

Amended Class Action Complaint; (2) provisionally certifying the settlement class defined therein; (3) granting preliminary approval of the settlement; (4) directing that settlement class members be given notice of the pendency of this litigation and the contemplated settlement in substantially the same form and manner set forth herein; and (5) setting dates for, *inter alia*, settlement class members to submit objections or opt out of the proposed settlement, and the hearing by the Court to consider final approval of the settlement.

## BACKGROUND

### I.     Litigation History

On November 4, 2009, the Named Plaintiffs filed this putative class action lawsuit. *See* Dkt. No. 1. In general, the Named Plaintiffs allege that, beginning on January 1, 2008 and through to the present, SESAC has engaged in a range of anti-competitive conduct to force local stations to take a blanket license at artificially inflated fees in order to obtain the performance rights to music in the SESAC repertory.[3] *See generally* Dkt. No. 25, First Am. Compl. ¶¶ 22-33. The Named Plaintiffs claim that SESAC's conduct constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, monopolization in violation of Section 2 of the Sherman Act, and a conspiracy to monopolize in violation of Section 2 of the Sherman Act. *See id.* ¶¶ 77-97. On March 9, 2011, Judge Buchwald denied SESAC's motion to dismiss and concluded that the Named Plaintiffs stated plausible claims for relief. *See Meredith Corp. v. SESAC LLC*, No. 09 Civ 9177, 2011 WL 856266, at *1 (S.D.N.Y. Mar. 9, 2011).

---

[3] For a more complete description of the background of this litigation, the claims asserted by the Named Plaintiffs, and the evidence in support thereof, the Named Plaintiffs incorporate by reference their Memorandum of Law in Opposition to Defendant SESAC, LLC's Motion for Summary Judgment (Dkt. No. 132 (ESH Decl., Ex. 2)) and their Memorandum of Law in Support of Class Certification (Dkt. No. 163 (ESH Decl., Ex. 3)). The latter filing, as well as the three expert reports cited herein, *see infra* nn. 14, 16, and 20, were previously filed under seal. The parties have met and conferred and, with limited exceptions, are putting these four documents on the public docket as part of this filing.

Following Judge Buchwald's ruling, the parties engaged in extensive fact and expert discovery.  *See* Dkt. No. 60.  SESAC produced approximately 1 million pages of documents and the Named Plaintiffs produced more than 450,000 pages of documents.  Over 50 subpoenas were issued to third parties for the production of documents.  Nearly 50 depositions were taken of representatives of SESAC, the Named Plaintiffs, absent class member local stations, the TMLC, and other third parties.  The Named Plaintiffs also retained Dr. Adam Jaffe as their economic expert witness on the merits of their claims.  SESAC engaged two expert witnesses on the merits of its defenses, Dr. David Evans, an economic expert, and Keith Zajic, an industry expert.  Together, written reports of the three merits expert witnesses totaled more than 300 pages.  The parties also took the depositions of each of these witnesses.

On March 3, 2014, this Court denied SESAC's motion for summary judgment and held, "on all three claims, that the record evidence is sufficient to support a verdict in plaintiffs' favor." *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 196 (S.D.N.Y. 2014).[4]  On July 11, 2014, the Named Plaintiffs moved for class certification.  *See* Dkt. No. 163.  The Named Plaintiffs retained Dr. Russell Lamb as their economic expert witness in support of class certification.  Discovery related to class certification issues was ongoing at the time the parties reached agreement on this proposed class action settlement.  *See* Dkt. No. 159.

---

[4] The Court did "reject[] as a matter of law plaintiffs' theories of liability *per se* and of a conspiracy so broad as to embrace all SESAC affiliates."  *Meredith*, 1 F. Supp. 3d at 196.

**II.     The Proposed Class Action Settlement**

   *A.       Significant Long-Term, Industry-Wide, Conduct Relief*

Under the proposed class action settlement, SESAC has agreed to a set of conduct

restrictions in its dealings with any local station in the settlement class.[5]  Specifically, SESAC

agrees to:

- offer all local stations both a blanket license and a viable per program license (for the initial 2016-2019 license period, the per-program license will be either in the form established by a panel of arbitrators for the 2005-2007 license period or as agreed upon by SESAC and the TMLC) for through to the viewer public performance rights to the music in the SESAC repertory for stations' primary channels, multiplex channels, websites, and other means of digital distribution;

- relieve local stations from the threat of copyright infringement claims during the pendency of license negotiations;

- enter into binding arbitration in the event that the TMLC and SESAC are unable to reach agreement on industry-wide license fees and/or terms for any of the five agreed upon four-year license periods between 2016 and 2035;[6] and

- cease prohibiting or interfering with the ability of its composer and publisher affiliates to enter into direct licenses with local stations and program producers.

*See* Settlement Agreement § 3.  Other than the process for resolving disputes over the terms and

conditions of public performance licenses in private, binding arbitration instead of in a public,

"rate court" proceeding, these are some of the core conduct restrictions in the ASCAP and BMI

---

[5] There will be a mechanism for local stations to elect that the TMLC represent them for licensing purposes with SESAC in order to obtain the benefits of the conduct relief.  *See* Settlement Agreement § 3(b).  However, no local station will be precluded from electing to negotiate individually with SESAC while obtaining the benefit of the conduct restrictions agreed to by SESAC.  *Id.*

[6] In the event of such binding arbitration, SESAC has further agreed that the license fees paid by local stations from January 1, 2008 through December 31, 2015 will not be treated as precedential in any way for the purposes of future fee negotiations.  *See* Settlement Agreement § 3(b).

consent decrees.[7]  With the exception of two limited termination rights, SESAC has agreed to

abide by these restrictions for *over twenty years* through 2035.[8]

     B.    *Substantial Monetary Relief*

The proposed class action settlement also requires SESAC to pay $58.5 million into a

settlement fund.  Settlement Agreement § 2(a).  Within a week, these monies will be placed into

an escrow account and interest will accrue for the benefit of local stations.  *Id*.  Subject to Court

approval, it is anticipated that:

- $42.5 million, or about 73% from the settlement fund, will be used to reimburse local stations in the settlement class for artificially inflated license fees they paid since 2008 as a result of the anti-competitive conduct that was subject of this lawsuit;

- the TMLC will allocate those monies using a methodology that fairly compensates each local station for its overpayment of SESAC license fees based on its *pro rata* share of license fees paid to SESAC during the class period;[9] and

---

[7] *See* ESH Decl., Ex. 4 (*United States v. ASCAP*, 2001-2 Trade Cas. (CCH) ¶ 73,474, Sections IV, VI, VII, & IX (S.D.N.Y. June 11, 2001)); ESH Decl., Ex. 5 (*United States v. BMI*, 1996-1 Trade Cas. (CCH) ¶ 71,378, Sections IV, VIII(B), & XIV (S.D.N.Y. Nov. 18, 1994)).

[8] As is common in class action settlements, SESAC has the option to terminate the settlement if local stations accounting for an agreed upon percentage of the total station license fees paid to SESAC for 2013 opt out of the settlement.  *See* Settlement Agreement § 12(b).  Also, if ASCAP or BMI are no longer subject to having their license fees and terms set through either a rate court mechanism, as at present, or binding arbitration, then SESAC will also have the option to no longer be subject to binding arbitration under the settlement after 2019.  *See id.* § 3(g).  Such a scenario is unlikely as neither ASCAP nor BMI has even asked that the Department of Justice remove such a rate-setting mechanism – only that the rate courts be replaced with binding arbitration.  *See* ESH Decl., Ex. 6 (Public Comments of the American Society of Composers, Authors and Publishers Regarding Review of the ASCAP and BMI Consent Decrees (Aug. 6, 2014)), *at* http://www.justice.gov/atr/cases/ascapbmi/ comments/307803.pdf); ESH Decl., Ex. 7 (Public Comments of Broadcast Music, Inc., U.S. Department of Justice, Antitrust Division, Review of Consent Decree in United States v. Broadcast Music, Inc. (Aug. 6, 2014)), *at* http://www.justice.gov/atr/cases/ ascapbmi/comments/307859.pdf).  If this scenario occurred and SESAC made such an election, then the release would not bar local stations and the TMLC from suing, or counterclaiming against, SESAC for violations of the antitrust laws based on the conduct that was the subject of this lawsuit.  *See* Settlement Agreement §§ 3(g), 13(a).

[9] SESAC has agreed to and has provided the TMLC, on a confidential basis, with an up-to-date list of the annual license fees billed to each member of the settlement class (or, as appropriate, ascribed to a licensee's local television broadcast operations for those stations who are licensed by SESAC as part of a broader negotiation with the ABC or CBS television networks or with NBCUniversal Media) from 2008 through 2013 and billed or to be billed for 2014. *See id.* § 11(a).

- $16 million, or about 27% of the settlement fund, will be sought for reimbursement of the TMLC's legal fees and associated costs incurred in funding this lawsuit on behalf of the industry.[10]

*Id*. §§ 2(c), 9, 11.

    C.    *Dismissal of Litigation and Mutual Release of Antitrust Claims*

In exchange for the substantial consideration being provided by SESAC summarized above, upon final approval of the proposed class action settlement, this lawsuit will be dismissed with prejudice. *See id*. § 6. Also, with certain limited exceptions for non-antitrust claims,[11] SESAC and the local stations have agreed to a mutual release of any antirust claims they have against each other from January 1, 2008 through the execution of the settlement. *Id.* § 13.[12]

## ARGUMENT

**I.**    **The Proposed Class Action Settlement Is the Product of Numerous Arms-Length Negotiation Sessions, Including Involvement By Mediators**

"A court may approve a class action settlement if it is 'fair, adequate, and reasonable, and not a product of collusion.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d. Cir. 2005) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000)). Indeed, a "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length

---

[10] SESAC has agreed not to object to the payment of attorney's fees and associated expenses incurred by the TMLC from the settlement fund in an amount not to exceed $16 million. *See id.* § 9.

[11] The release carves out: (i) local stations' disputes with or claims against SESAC that do not arise under the antitrust laws for amounts due, owing, or unpaid under existing licenses; and (ii) claims by SESAC involving its entitlement to non-*de minimis* amounts of license fees from identified local stations that SESAC asserts do not have the requisite performance broadcast licenses from SESAC as of the effective date of the settlement. *See id.* § 13.

[12] The local stations and the TMLC retain the right to sue SESAC or its affiliates for any future violations of the antitrust laws based on conduct that was not or could not have been asserted against SESAC or its affiliates in this lawsuit. *See id.* § 13(a), (c). Local stations and the TMLC also are free to sue any entity that SESAC now has, or in the future may have, an ownership stake or financial interest, or with which SESAC now has, or may in the future have a licensing or other business relationship, for violation of the antitrust laws; provided, however, that no claims of wrongdoing by SESAC are predicated on the complained of course of conduct that were or could have been asserted against SESAC in this lawsuit. *Id.* § 13(c). The local stations and the TMLC cannot, however, assert that SESAC and its affiliates are violating the antitrust laws if SESAC and its affiliates are abiding by the behavioral commitments described above. *Id.* § 13(a).

negotiations between experienced, capable counsel after meaningful discovery." *Id.* (quoting Manual for Complex Litigation, Third, § 11:41, at 87).  *See In re Holocaust Victim Assets Litig.*, No. CV 06-0983, CV 96-4849, CV 97-0461, CV 99-5161, 2007 WL 805768, at *23 (E.D.N.Y. Mar. 15, 2007) ("So long as the integrity of the arms-length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement.") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998)).

A presumption of fairness in support of settlement approval is further supported where an independent mediator was involved in the settlement negotiations.  *See, e.g., In re Elec. Books Antitrust Litig.*, 11-md-2293 DLC, 2014 WL 3798764, at *2 (S.D.N.Y. Aug. 1, 2014) ("The assistance of a well-known mediator . . . reinforces the conclusion that the Settlement Agreement is non-collusive."); *In re WorldCom, Inc. ERISA Litig.*, No. 02 Civ. 4816, 2004 WL 2338151, at *5 (S.D.N.Y. Oct. 18, 2004), *order clarified*, *In re Worldcom, Inc. ERISA Litig.*, No. 02 Civ. 4816, 2004 WL 2922083 (S.D.N.Y. Dec. 17, 2004) ("There is no basis to find that this settlement is tainted by collusion.  A respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged.").

Applied here, the proposed class action settlement is unquestionably the product of hard-fought, non-collusive, negotiations by seasoned counsel, assisted by the involvement of experienced judges in this District serving as mediators.  Counsel involved in these negotiations on both sides are very familiar with the music licensing industry and represented the parties in the arbitration proceedings to set terms of industry-wide licenses and rates with SESAC in 2002 (which settled) and again in 2006 (in which an award was issued).  The Court has previously

commended both sides for the lawyering in this case.  *See, e.g.,* Dkt. No. 140, at 2:14-21 ("one

thing that is beyond dispute is just the sheer caliber of the lawyering").

Further, the negotiations were overseen, and participated in, by representatives of the

Named Plaintiffs and the TMLC.  From 1995 to 2007, SESAC had negotiated the terms and

conditions of licenses for local stations with the TMLC.  *Meredith*, 1 F. Supp. 3d at 185.  As this

Court noted, "in the years leading up to 2008, SESAC's latitude to set the terms of music

licenses was otherwise limited" in part by "a series of industry-wide agreements it negotiated

with the television broadcast industry."  *Id*.  Thus, the TMLC's presence in the negotiations

added to the arms-length nature of the talks.

Following direct negotiations in the spring of 2013, the parties started the mediation

process with a session under the supervision of Magistrate Judge James C. Francis in June 2013.

After the summary judgment ruling in March 2014, the Court ordered an official "time out" in

the "interests of the parties, and of a just outcome" so the parties could "explore and discuss

whether there are terms on which this lawsuit can be amicably resolved."  Dkt. No. 144.  The

Court was "mindful that this case presents complex issues and that any settlement process would

likely have to take account of numerous business as well as legal considerations."  *Id.*  Taking

advantage of this opportunity made available by the Court, the parties participated in numerous

settlement sessions, both directly with representatives of the parties and through their counsel.  In

addition, in April 2014, the parties resumed the mediation process and participated in three

sessions supervised by District Judge Kimba M. Wood.  The parties resumed the litigation in the

summer of 2014, with the Named Plaintiffs filing their motion for class certification with a

supporting economic expert report, before the settlement was reached.

Thus, the proposed class action settlement was achieved after a robust, arms-length, negotiation process and should be credited with a presumption of fairness.

## II.   The Proposed Class Action Settlement is Fair, Reasonable, and Adequate

In the Second Circuit, courts examine the fairness, adequacy, and reasonableness of a class settlement by reference to the "*Grinnell* factors."  *See, e.g.*, *Wal-Mart*, 396 F.3d at 117 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)); *In re Initial Public Offering Sec. Litig.*, 226 F.R.D. 186, 190 (S.D.N.Y. 2005) (citing *Grinnell*, 495 F.2d at 463). These factors include: (1) the complexity, expense, and likely duration of litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  *Grinnell*, 495 F.2d at 463 (citations omitted).

At this preliminary approval stage, however, a full-blown *Grinnell* analysis is not required.  Rather, "the Court will be in a position to fully evaluate the *Grinnell* factors at the fairness hearing, where it can consider the submissions by proponents and potential opponents of the settlements as well as the reaction of the Class members.  At this stage of the proceeding, the Court need only find that the proposed settlement fits 'within the range of possible approval.'" *In re Prudential Sec. Inc. Ltd. P'ship*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995) (citing *Armstrong v. Bd of Sch. Dir. of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds*,

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)).  *See also Elec. Books,* 2014 WL 3798764, at *2

(concluding there was "probable cause to find that the proposed Settlement Agreement is within

the range of those that may be approved as fair and reasonable, such that notice to the class is

appropriate") (citations omitted); *Nieves v. Comty. Choice Health Plan of Westchester, Inc.*, No.

08 CV 321, 2012 WL 857891, at *4 (S.D.N.Y. Feb. 24, 2012) ("Preliminary approval of a class

action settlement, in contrast to final approval, 'is at most a determination that there is what

might be termed 'probable cause' to submit the proposal to class members and hold a full-scale

hearing as to its fairness.'"); *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409,

M-21-95, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006) ("Where the proposed settlement

appears to be the product of serious, informed, non-collusive negotiations, has no obvious

deficiencies, does not improperly grant preferential treatment to class representatives or

segments of the class and falls within the reasonable range of approval, preliminary approval is

granted.") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y.

1997)).

        The proposed class action settlement easily meets this standard.  SESAC has agreed to be

bound – *for the next twenty years* – by some of the same core restrictions that temper the ability

of ASCAP and BMI to engage in anti-competitive conduct, as well as a dispute resolution

mechanism for the determination of the terms and conditions of public performance licenses.

Taken together, these restrictions and dispute resolution mechanism will provide local stations

with relief from the anti-competitive conduct challenged in this case against SESAC, and are

poised to save the local station industry tens of millions of dollars in the coming years.  By way

of example, SESAC asserted that it was entitled to industry-wide blanket license fees up to $74

million over the 2005-2007 period.[13]  The arbitrators ultimately set industry-wide blanket license

fees of approximately $53 million for the period – $21 million (or 28%) less than that sought by

SESAC.  *See Meredith*, 1 F. Supp. 3d at 192.  In addition, local stations electing to take a per-

program license (with key terms and conditions established by the arbitrators) instead of a

blanket license achieved over $3 million in further total savings.[14]  Thus, as a result of license

fees being set in binding arbitration, not by SESAC unilaterally, and due to the presence of a

viable alternative to the blanket license with key terms established during that arbitration, the

local stations saved over $24 million during that three-year period or about $8 million per year.[15]

If that same level of savings is achieved over the course of the full duration of this settlement,

that results in $160 million of savings to the industry.

     Moreover, SESAC's changes to the way it deals with local stations as part of this

settlement will result in efficient licensing going forward as stations can be (if they so choose to

be) collectively represented by the TMLC for licensing purposes.  As noted above, the TMLC

has historically represented local stations in their dealings with ASCAP and BMI and, before

2008, SESAC, for performance rights licenses.  *See supra* n.2.  In addition, the automatic

licensing and dispute resolution mechanisms provided by this settlement assure local stations that

---

[13] *See* ESH Decl., Ex. 8 (Defendant SESAC LLC's Reply Statement To Plaintiffs' Local Rule 56.1 Responses, Dkt. No. 137-2, ¶ 95).

[14] See ESH Decl., Ex. 9 (Plaintiffs' Merits Expert Report of Adam B. Jaffe, dated March 4, 2013, at 47).

[15] This experience with SESAC is consistent with how federal rate court proceedings (that take place under the auspices of the ASCAP and BMI consent decrees) have regularly established license fees for local stations (and others) – on an industry-wide basis – at significantly lower levels than sought by those PROs.  *See, e.g.*, *ASCAP v. MobiTV Inc.*, 681 F.3d 76, 82 (2d Cir. 2012) (rejecting ASCAP's fee proposal that amounted to some $15.8 million over a 6-plus year period, and instead setting fees at $405,000 for that period – 2.5% of those sought by ASCAP); *BMI v. DMX, Inc.*, 683 F.3d 32, 40-42 (2d Cir. 2012) (setting fees at 33% of those sought by ASCAP and 45% of those sought by BMI); *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 565 (2d Cir. 1990) (setting fees at 60% of those sought by ASCAP); *cf. United States v. ASCAP (In re Application of Buffalo Broad. Co.)*, Civ. No. 13-95 (WCC) (MHD), 1993 WL 60687, at *19 (S.D.N.Y. Mar. 1, 1993) (rejecting ASCAP's fee proposal as being unreasonable).

they may go about their business without being threatened by or being sued for copyright infringement by SESAC or its affiliates.  Further, SESAC's changes to its per-program license and agreements with its top affiliates will provide some space for competition in this market. Local stations will now have more of an ability to negotiate and obtain direct licenses for at least some music in the programming aired on television without paying twice for those rights.

Even setting aside the substantial value of these conduct restrictions on SESAC's behavior, SESAC's agreement to pay $58.5 million into a settlement fund for the reimbursement of inflated license fees paid by local stations and attorney's fees and other associated legal expenditures is sufficient on its own to warrant preliminary approval.  Assuming $16 million is awarded for reimbursement of attorney's fees and other associated legal expenditures incurred by the TMLC, the $42.5 million for alleged overcharges in license fees paid by local stations to SESAC is greater than the most recent actual damages estimate of nearly $40 million from January 1, 2008 to June 30, 2014 put forth by the Named Plaintiffs' class certification expert Dr. Russell Lamb.[16]  This sum also represents approximately 26% of the total fees paid or to be paid to SESAC by the local stations in the putative class from January 1, 2008 until January 1, 2016

---

[16] Dr. Lamb's estimates did not include an estimate of damages suffered by the local television stations that are owned and operated by the ABC and CBS television networks as well as NBCUniversal Media, LLC (collectively, the "O&Os").  *See* ESH Decl., Ex. 10 (Plaintiffs' Class Certification Expert Report of Russell L. Lamb, dated July 10, 2014, at ¶¶ 6, 78-80); *see also infra* n. 20.  Dr. Lamb and Dr. Jaffe utilized the same methodology for calculating damages.  Dr. Jaffe's calculation of damages covered 2008 to 2012 since his report was done in the spring of 2013. In order to calculate damages for the blanket license, Drs. Lamb and Jaffe used the blanket license fees determined by the arbitrators for 2005, which was the most recent year SESAC's blanket license fees were based on actual SESAC music use data, as the benchmark of what SESAC blanket license fees should have been during the class period.  Lamb Report at ¶¶ 81-90; Jaffe Report at 90-93.  Drs. Lamb and Jaffe tested that calculation based on the blanket license fees paid by local stations to ASCAP and BMI over that similar time period and based on changes in the Consumer Price Index and SESAC public performances of SESAC music in local television, as captured in the TMLC music use survey.  *Id.*  In order to calculate damages for the lack of a viable per-program license, Drs. Lamb and Jaffe assumed that the same number of local stations that took a SESAC per-program license in 2007 would take a per-program license during the class period and achieve the same level of savings.  Lamb Report at ¶¶ 91-95; Jaffe Report at 93-96.

(the beginning of the first license period in this proposed class action settlement).[17]  This level of recovery for alleged overcharges as a percentage of fees subject to the anticompetitive conduct is substantially more than most class action settlements in antitrust cases that have been approved by courts.[18]  And, unlike here, many class action settlements in antitrust cases piggy-back on successful government enforcement actions that serve as *prima facie* evidence of liability against the defendant.[19]  As SESAC has pointed out in this litigation, the Antitrust Division of the Department of Justice conducted an investigation of SESAC but chose not to take any enforcement action.  *See* Dkt. No. 130 (ESH Decl., Ex. 11 (Memorandum of Law in Support of Defendant SESAC, LLC's Motion for Summary Judgment at 11)).  Furthermore, SESAC's economic expert opined that there was no harm to competition or antitrust injury suffered by the local stations at all.[20]

---

[17] This calculation is based on data produced by SESAC on a highly confidential basis.  This calculation excludes the total fees paid or to be paid by the O&Os, but accounts for the full amount of requested attorney's fees and costs.

[18] *See, e.g., In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 212 (E.D.N.Y. 2013) (approximately 2.5% of total fees) (appeal pending); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 472 (D.P.R. 2011) (approximately 1.5% of sales); *In re Packaged Ice Antitrust Litig.*, 08-MDL-01952, 2011 WL 6209188, at *11 (E.D. Mich. Dec. 13, 2011) (approximately 2.2% of sales); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (approximately 9% of total fees); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MDL 1775, 2009 WL 3077396, at *9 (E.D.N.Y. Sept. 25, 2009) (approximately 10.5% of surcharges); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008) (approximately 1.5% of sales); *Meijer, Inc. v. 3M* (Antitrust), No. 04 Civ. 5871, 2006 WL 2382718 (E.D. Pa. Aug. 14, 2006) (approximately 2% of sales); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004) (less than 2% of sales); *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29162, at *10 (E.D. Pa. Oct. 13, 2004) (Defendants BASF and DuPont: approximately 2% of sales; Defendant Akzo: 4.2% of sales); *In re Plastic Tableware Antitrust Litig.*, 1995 U.S. Dist. LEXIS 17014, at *4 (E.D. Pa. Oct. 25, 1995) (3.5% of sales).  Further, to the best of our knowledge, these percentages do not deduct the sought-after attorney's fees and costs as was done here.  Thus, comparison with the above referenced cases is conservative.

[19] *See, e.g., Grinnell*, 495 F.2d at 455 ("[T]he only truly objective measurement of the strength of plaintiffs' case is found by asking: 'Was defendants' liability *prima facie* established by the government's successful action?'"); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement … agency has made the kill.  They did all the work on their own.").

[20] *See* ESH Decl., Ex. 12 (Amended Expert Report of David S. Evans, dated April 19, 2013, at ¶¶ 15, 276-93).

Taken alone, either the substantial long-term conduct relief or the significant monetary relief would provide "probable cause" to notify local stations about the settlement.  Together, the combined relief unquestionably "fits within the range of possible approval."  *Prudential Sec. Inc. Ltd. P'ship*, 163 F.R.D. at 210.

## III.    The Proposed Settlement Class Easily Meets The Requirements of Rule 23

   *A.    The Proposed Settlement Class*

In connection with preliminary approval of the proposed class action settlement, the Named Plaintiffs request that the Court certify the following class:

> All owners of full-power local commercial television stations in the United States and its territories (including Puerto Rico) that obtained licenses from SESAC during the period January 1, 2008 to the date on which preliminary approval is granted, including those owned and operated by the ABC and CBS television networks as well as NBCUniversal Media, LLC, but excluding local television stations that are owned and operated by the Univision and Telefutura (now known as UniMas) networks.[21]

   *B.    Provisional Certification of the Settlement Class is Proper for Settlement Purposes*

As set forth more fully in Plaintiffs' Memorandum of Law in Support of Class Certification (*see supra* n. 3), provisional class certification is appropriate in this case.  SESAC has transacted with local stations on an industry-wide basis since 1995.  SESAC's approach is entirely consistent with the industry-wide manner in which ASCAP and BMI have dealt with

---

[21] The Settlement Class definition is broader than the proposed class definition in the operative complaint in that it includes the O&Os.  *See* Dkt. No. 25 at ¶ 68.  Inclusion of the O&Os in the settlement class is appropriate here because the O&Os, like the rest of the settlement class, were injured by the same conduct of which the Named Plaintiffs complain, were left with no option but to pay supra-competitive license fees, and the effect of their inclusion is small relative to the overall settlement.  *See Currency Conversion Fee*, 263 F.R.D. at 125; *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004) (noting that there is nothing inappropriate about including persons who suffered the same economic harm and from the same actions in a settlement class).  A clarifying change to the class definition was also needed for local stations that are owned and operated by the Univision and Telefutura networks.  During confirmatory discovery as part of the settlement negotiation process, SESAC represented that those networks have separate licenses with SESAC that cover all of their programming since those stations carry only network programming.

local stations for over 50 years.  Indeed, courts in this District and the Second Circuit have recognized that local stations are "similarly situated" to each other in their dealings with the PROs.  *See Broad. Music Inc. v. Weigel Broad. Co.*, 488 F. Supp. 2d 411, 415-18 (S.D.N.Y. 2007), *aff'd*, 340 F. App'x 726, 727 (2d Cir. 2009).  Not surprisingly, Judge Gagliardi certified a similar putative class of local stations in their seminal antitrust lawsuit against ASCAP and BMI. *See* ESH Decl., Ex. 13 (*Buffalo Broadcasting Co., Inc. v. ASCAP, et al.*, Memorandum Decision, No. 78 Civ. 5760 (S.D.N.Y. Dec. 5, 1980)).

At summary judgment, this Court concluded that "[t]he evidence would . . . comfortably sustain a finding that SESAC, once freed in 2008 from the duty to arbitrate its disputes with the stations, engaged in an overall anti-competitive course of conduct designed to eliminate meaningful competition to its blanket license."  *Meredith*, 1 F. Supp. 3d at 196.  Because SESAC's alleged "overall anti-competitive course of conduct" was not limited to the Named Plaintiffs, and applied to *all* class members, the Rule 23 requirements are easily met here.

1.      The Requirements of Rule 23(a) Are Met

Plaintiffs have unquestionably satisfied the numerosity, commonality, typicality, and adequacy of representation requirements under Rule 23(a).

*Numerosity*: The Rule 23(a)(1) requirement that the class be "so numerous that joinder of all members is impracticable," is presumed if the class consists of at least 40 members.  *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d. Cir. 1995).  Here, the proposed settlement class is numerous because it is comprised of the owners of more than 1,200 local stations.  *See Weigel*, 488 F. Supp. 2d at 413.

*Commonality*: The Rule 23(a)(2) commonality requirement that there be "questions of law or fact common to the class" demands that the class members' "claims . . . depend upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Where, as here, "each class member allegedly suffered the same type of injury, the legal question of whether such an injury is of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful is a common one." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107 (2d Cir. 2007) (citation and internal quotation marks omitted). *See also In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43, 57 (S.D.N.Y. 2002) ("[M]onopolization claims are contingent upon a showing of monopoly power and an examination of the manner in which such power was acquired or maintained. These issues, along with others, are questions that are undoubtedly common to all the members of the putative class.") (citation omitted). Here, there are ample common questions such as: the determination of the relevant product market; whether SESAC has monopoly power in that market; whether SESAC's licensing practices constitute exclusionary conduct; whether SESAC and its key affiliates engaged in an unlawful agreement to fix prices; whether SESAC's conduct caused injury to plaintiffs' and class members' business or property; whether plaintiffs and members of the class are entitled to injunctive relief; and the appropriate measure of damages sustained.

*Typicality*: Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality requirement "does not require

that the factual background of each named plaintiff's claim be identical to that of all class members."  *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 272-73 (S.D.N.Y. 2007).  *See also In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998) ("Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff[s].  Personal traits or variables . . . are irrelevant to the typicality criterion.").  "[T]he . . . plaintiff[s] must simply raise claims that 'arise from the same course of events' as the class claims and make 'similar legal arguments to prove the defendant's liability.'" *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 105 (E.D.N.Y. 2012) (quoting *Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir. 1993)).  In the antitrust context, this requirement "will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants." *Playmobil*, 35 F. Supp. 2d at 241 (internal citation omitted).  Here, the Named Plaintiffs claim that every member of the proposed settlement class was forced to take a SESAC blanket license at artificially inflated levels.

> *Adequacy*: Rule 23(a)(4) requires that the Named Plaintiffs will "fairly and adequately protect the interests of the class."[22]  This prong of the class certification analysis will be deficient only if it can be shown that there are "fundamental" conflicts between named plaintiffs and the interests of the settlement class.  To impede class certification, it is simply not enough to "rais[e] the possibility of hypothetical conflicts or antagonisms among class members" that are not "apparent, imminent, and on an issue at the very heart of the suit."  *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 513-14 (S.D.N.Y. 1996) (internal citation omitted). Here, there is no evidence of any conflict between the interests of the Named Plaintiffs and the

---

[22] For the reasons set forth in Section III.C. herein, counsel for the Named Plaintiffs also satisfy this test.

members of the proposed settlement class.  In fact, their interests are entirely aligned in obtaining

past and future relief against SESAC for the anticompetitive conduct that is the subject of this

lawsuit.

2.      The Requirements of Rule 23(b)(2) Are Met

A Rule 23(b)(2) class may be certified if the Named Plaintiffs demonstrate that SESAC

"has acted or refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Under

this Rule, "there is no reason to undertake a case-specific inquiry into whether class issues

predominate or whether class action is a superior method of adjudicating the dispute.

Predominance and superiority are self-evident."  *Dukes*, 131 S. Ct. at 2557-58.  Here, the

challenged SESAC licensing scheme was directed at all members of the proposed settlement

class.  Likewise, the contemplated settlement provides the future conduct relief necessary to

protect *all* members of the proposed settlement class going forward until 2036.

3.      The Requirements of Rule 23(b)(3) Are Met

The proposed settlement class also satisfies the standards of Rule 23(b)(3), which require

that questions of law or fact common to the members of the class "predominate over any

questions affecting only individual members and class [treatment is] superior to other available

methods for the fair and efficient adjudication of the controversy."  *Amchem Prods., Inc. v.

Windsor*, 521 U.S. 591, 615, 623 (1997).

*Predominance*: The predominance test "is . . . readily met in certain cases alleging

violations of the antitrust laws."  *Cordes,* 502 F.3d at 108 (citation omitted).  *See also* 6 Alba

Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS § 18.26 (4th ed. 2002) ("In antitrust

suits, the issues of conspiracy, monopolization, and conspiracy to monopolize have been viewed

19

as central issues which satisfy the predominance requirement.").  As amply demonstrated by the evidence the Named Plaintiffs presented at the summary judgment stage, the central issue of this case is SESAC's anti-competitive conduct – conduct that "will not vary among class members." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 279 (S.D.N.Y. 1999).  Accordingly, the core issues in this action "are subject to generalized proof, and thus applicable to the class as a whole" in satisfaction of Rule 23(b)(3).  *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 564 (S.D.N.Y. 2004).  Thus, common questions of injury and damages to the Named Plaintiffs and the members of the proposed settlement class will easily predominate over any individual questions.

*Superiority*: The second requirement of Rule 23(b)(3) is a finding that "a class action be superior to other available methods for fair and efficient adjudication of the controversy."  *Id.* at 566.  In the Second Circuit, district courts consider four factors in conducting the superiority analysis: (a) the class members' interest in individually controlling the prosecution; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation in a particular forum; and (d) the difficulties likely to be encountered in the management of the class action.  *See, e.g., id*.  Proceeding with certification of a settlement class is plainly superior to the prosecution of individual actions.  No local station has demonstrated any interest in litigating individually, nor does any class member have special circumstances or unique damage such that it has an interest in controlling the litigation.  There have not been management difficulties in this case, but in any event, this consideration is not pertinent to approving a settlement class.  *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a

20

district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.").  Finally, as recognized by the Court's order granting a "time out" in the litigation following summary judgment, *see* Dkt. No. 144, settling the claims of approximately 1,200 local stations in the context of this instant class action would conserve judicial and private resources and hasten recovery.

C.      *Class Counsel Will Fairly and Adequately Represent the Settlement Class*

Pursuant to Rule 23(g), a court must appoint class counsel who can "fairly and adequately represent the interests of the class."  *Playmobil*, 35 F. Supp. 2d at 242.  The court must evaluate counsel according to (1) their work in identifying and investigating plaintiff's claims; (2) their experience in similar litigation; (3) their knowledge of applicable law; and (4) the resources they will commit to prosecuting the action.  Fed. R. Civ. P. 23(g)(1)(A).

Weil, Gotshal & Manges LLP ("Weil") easily meets these criteria.  Weil investigated and drafted the class action complaint, successfully opposed SESAC's motion to dismiss, uncovered and developed ample fact and expert evidence in discovery, successfully opposed SESAC's motion for summary judgment, and has moved for class certification.  Weil also prepared confidential submissions to U.S. District Court Judge Kimba M. Wood and U.S. Magistrate Judge James C. Francis as part of the mediation process, and participated in numerous negotiations with representatives of SESAC and/or its counsel.  Weil has extensive familiarity with the music licensing industry; indeed, it represented the local stations and the TMLC during the 2002 and 2006 arbitration proceedings with SESAC, in the antitrust proceeding captioned *Buffalo Broadcasting Co., Inc. v. ASCAP, et al.*, No. 78 Civ. 5670 (S.D.N.Y. Dec. 5, 1980), and in

numerous rate court proceedings against ASCAP and BMI. Accordingly, Weil is fully capable of fairly and adequately representing the interests of the proposed settlement class.

      D.    *Settlement Notice and Administration Costs*

The TMLC is ideally situated to ensure that all members of the settlement class receive individual notice via direct regular mail and email (if known), as well as publication notice via the TMLC website. *See* Settlement Agreement § 10(a). The TMLC has long represented full-power local commercial television stations in the negotiation of industry-wide licenses with the other two U.S. PROs (ASCAP and BMI) and, at one time, SESAC. *See Meredith,* 1 F. Supp. 3d at 185. The TMLC also has, for decades, handled the allocation of those industry-wide license fees among the individual stations. *See* ESH Decl., Ex. 14 (Steier Dep. Tr. at 27:7-18, 32:9-17, 33:5-20). As a result, the TMLC regularly communicates with the local stations. *See* ESH Decl., Ex. 15 (Hoyt Dep. Tr. at 53:20-25). Using the TMLC's well-developed methods for communicating with local stations – by direct regular mail and email (if known), as well as publication notice on the TMLC's website – will be the most practicable and efficient method for providing all members of the settlement class of notice of the settlement.[23] To ensure that notice is disseminated easily and adequately, SESAC has agreed to and has already provided the TMLC, on a confidential basis, with an up-to-date list of the mailing addresses of each member of the settlement class. *See* Settlement Agreement § 10(a). This additional information from

---

[23] Courts in this District and elsewhere have approved notice plans that employed a combination of direct mail, e-mail, and publication notice via website. *See, e.g.*, *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173, 2008 WL 1956267, at *4 (S.D.N.Y. May 1, 2008) (permitting notice program that utilized a website and e-mail); *Browning v. Yahoo!, Inc.*, No. C04-01463-HRL, 2006 WL 3826714, at *8 (N.D. Cal. Dec. 27, 2006) (same); *Todd v. Retail Concepts, Inc.*, No. 3:07-0788, 2008 WL 3981593, at *2-3 (M.D. Tenn. Aug. 22, 2008) (permitting notice that involved mass e-mailing a customer list and publication via website and store postings).

SESAC's records will supplement the TMLC's existing records, thereby ensuring that notice is disseminated easily and adequately in this case.

In addition, the contents of the proposed settlement notice to be sent via the TMLC's normal means of communicating with local stations plainly satisfies the requirements of Rule 23 and Due Process.[24] *See* ESH Decl., Ex. 1 (Ex. E thereto).  In clear and concise language, it provides the objective information class members will need to make an informed decision about participating in the contemplated settlement, objecting to any aspects of it, or deciding to opt out from the settlement class.  Within five days of a ruling on this motion, the TMLC will follow the notice procedure outlined above.  The proposed deadline for postmarking an opt-out letter would be thirty-five days thereafter.

Further, the TMLC has agreed to fund the costs associated with distributing the settlement notice, allocating, and distributing the settlement fund to class members.  *See* Settlement Agreement § 10(b).  Thus, unlike many other class action settlements, the settlement fund in this case will not be reduced by settlement notice and administration costs.

Since the TMLC can easily disseminate the settlement notice and there is no claims submission process contemplated in the proposed settlement, a lengthy settlement approval process is not necessary here.  Accordingly, the Named Plaintiffs propose the following schedule of events for the Court's approval:

---

[24] A class notice "must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B).

| Notice mailed to settlement class members and posted on https://tvmlc.com/sesac/sesac-settlement/ | Within 5 days after entry of the proposed preliminary approval order (the "Notice Date") |
|---|---|
| Class counsel to file a request for an award to reimburse the TMLC for its legal fees and associated costs of this lawsuit | 15 days after the Notice Date [20 days after entry of the proposed preliminary approval order] |
| Deadline for submitting objections to the proposed settlement or requests to be heard at the final approval hearing | 35 days after the Notice Date |
| Requests for exclusion or to "opt out" from the settlement must be postmarked | 35 days after the Notice Date |
| Deadline for filing reply papers in support of the proposed settlement | 14 days after the deadline for filing objections to the settlement |
| Final approval hearing | At the Court's convenience |

## CONCLUSION

For the foregoing reasons, the Named Plaintiffs respectfully request that this Court enter an order: (1) granting leave to file the Second Amended Class Action Complaint; (2) provisionally certifying the settlement class defined therein; (3) granting preliminary approval of the settlement; (4) directing that settlement class members be given notice of the pendency of this litigation and the contemplated settlement in substantially the same form and manner set forth herein; and (5) setting dates for the settlement approval process as proposed herein.

Dated: October 15, 2014
New York, New York

Respectfully submitted,


/s Steven A. Reiss

STEVEN A. REISS
R. BRUCE RICH
BENJAMIN E. MARKS
ERIC S. HOCHSTADT
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, N.Y.  10153
(212) 310-8000

CARRIE MAHAN ANDERSON
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, N.W.
Washington, D.C.  20005
(202) 682-7000

*Counsel for Plaintiffs*

25