UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

MEREDITH CORPORATION, et al.,

                              Plaintiffs,

            -v-

SESAC, LLC, et al.,

                            Defendants.

------------------------------------------------------------------X

09 Civ. 9177 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/19/15

PAUL A. ENGELMAYER, District Judge:

Named plaintiffs Meredith Corporation, The E.W. Scripps Company, Scripps Media, Inc., and Gray Television Group, Inc. ("plaintiffs") have moved for an order certifying a settlement class and approving the proposed settlement of this case and the proposed plan to allocate the settlement proceeds among the class. Plaintiffs also move for attorneys' fees and expenses. In an order dated October 31, 2014, the Court preliminarily approved the settlement; plaintiffs thereafter provided notice to class members as to the settlement terms.

On February 18, 2015, a fairness hearing was held, at which the Court stated that it intended to rule shortly. The Court today is issuing an order granting in its entirety the relief sought by plaintiffs. This Opinion and Order sets out the Court's reasons for certifying the settlement class, approving the settlement and the plan of allocation, and granting the applications for fees and costs.

I.     **Background**[1]

    A.     **Plaintiffs' Challenge to SESAC's Blanket Licenses**

This complex antitrust litigation has spanned more than five years and involves claims that SESAC, a performing rights organization ("PRO"), engaged in anti-competitive practices in issuing collective (or "blanket") licenses to the rights to perform the copyrighted music of its members or affiliates.  Plaintiffs brought suit on November 4, 2009 on behalf of a class of local commercial television stations that alleged that, since 2008, SESAC had taken steps to make illusory any alternative to the blanket license it sells, which gives a licensee the right to play the music of all SESAC affiliates.  Plaintiffs alleged that, by insulating this "all or nothing" license from competition and effectively forcing local television stations to purchase it,[2] SESAC was able to set an exorbitant price for its blanket license, even though the stations have no interest in purchasing the rights to SESAC's entire repertory.  Plaintiffs alleged that

---

[1] The Court's account of the case background is drawn heavily from its March 3, 2014 decision on SESAC, LLC's motion for summary judgment.  *See Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014).  That decision set out in detail the factual and legal background to the case and the facts adduced in discovery.  Because those topics are reviewed at only a general level here, a reader seeking a more thorough summary of the case is directed to that decision.  The Court also drew upon other entries in the extensive case docket, and upon the submissions made in connection with the various motions resolved here.  These include the Declaration of Teeravat Pawasittichot in Support of Plaintiffs' Unopposed Motion for Final Approval of Settlement, Dkt. 214; the Declaration of R. Bruce Rich in Support of Class Counsel's Motion for Award of Attorney's Fees and Expenses, Dkt. 209; and the Declaration of Will Hoyt in Support of Class Counsel's Motion for Award of Attorney's Fees and Expenses, Dkt. 210.  Finally, this decision incorporates representations by counsel during the February 18, 2015 fairness hearing, at which counsel addressed and responded to questions about the proposed settlement.  Except where specifically quoted or referenced, no further citation to these sources will be made.

[2] Plaintiffs alleged that they must acquire licenses for some music in SESAC's repertory because the repertory is large and includes works so ubiquitous that they are inevitably embedded in shows that the stations obtain and wish to air.

SESAC and its affiliates thereby violated § 1 of the Sherman Act, 15 U.S.C. § 1, by combining to unlawfully restrain trade; and § 2 of the same Act, *id.* § 2, by conspiring to monopolize the market for the performance rights to the musical works within SESAC's repertory.  Plaintiffs also asserted a monopolization claim against SESAC under § 2.

    As described more fully in the Court's decision on SESAC's motion for summary judgment, *see Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180 (S.D.N.Y. 2014), plaintiffs' claims turn on the process by which local television stations obtain the performance licenses necessary for them to lawfully broadcast programs, which contain copyrighted music.  Almost all television programs, especially third-party programming,[3] contain music protected under federal copyright law.  To broadcast programs that contain such music while complying with federal copyright law,[4] a television station must first acquire a license from the musical work's copyright holder to publicly perform that musical work.

---

[3] Third-party programs include syndicated series or shows (*e.g.*, "Seinfeld," "Friends," or "How I Met Your Mother"), movies, most sporting events, commercials, and infomercials. Local television stations lack latitude to control or alter the music embedded in such programming.

[4] A station that broadcasts a copyright-protected performance of a musical composition without permission may, under the statutory penalties for copyright infringement, be fined as much as $150,000 per infringement.  *See Beastie Boys v. Monster Energy Co.*, No. 12 Civ. 6065 (PAE), 2014 WL 6845860, at *7 (S.D.N.Y. Dec. 4, 2014)

For various practical reasons,[5] local television stations have historically obtained performance licenses from PROs.[6]  In the United States, there are three PROs: the American Society of Composers, Authors and Publishers ("ASCAP"); Broadcast Music, Inc. ("BMI"); and SESAC, the smallest of the three.  Because these PROs have repertories of copyrighted music that are exclusive of one another, together, their repertories account for virtually every copyrighted musical work in the United States and its territories.

In negotiations with the PROs regarding performance rights, local television stations have been represented by a non-profit association, the Television Music License Committee ("TMLC").  ASCAP and BMI are each subject to consent decrees entered following litigation with the United States Department of Justice ("DOJ").  The terms of these consent decrees have been designed, *inter alia*, to protect the interests of music licensees, by safeguarding them from the risk that the PROs would offer no practical alternatives to the blanket license while charging prohibitive fees for that license.  To that end, the consent decrees have established a "rate court" in this District that sets fees for performance licenses when the PRO and the licensee cannot agree.  They have also required that the PRO's right to issue performance licenses to  members' music be non-exclusive, and that alternative means of licensing such music be made realistically available to would-be licensees.

---

[5] "[A] television station cannot negotiate separately with the holder of the rights to each copyrighted work within each of its programs.  Among other reasons, there are far too many musical works contained within these programs to make it realistic to undertake individual negotiations; and as to some works, the copyright holder may not be identified easily." *Meredith Corp.*, 1 F. Supp. 3d at 187–88.

[6] PROs serve as clearinghouses for the licensing of public performance rights, monitor performance of members' works, assure that users pay for such performances, and distribute royalties to the rightholders.

SESAC has never been subject to such a consent decree.  Until 2007, SESAC and the TMLC had successfully negotiated industry-wide blanket licenses or had arbitrated the terms of such licenses pursuant to a contractual duty to arbitrate disputes.  However, negotiations for an industry-wide license for the period beginning January 1, 2008 broke down in late 2007, and SESAC, which no longer was under a contractual duty to arbitrate, began dealing with local television stations individually.  Plaintiffs' lawsuit alleged that, once freed to set terms on its own, SESAC increased its blanket licensing rates by 10% over the prior license period, despite an overall drop in demand for SESAC's licensed music during this period, while putting in place a series of licensing practices, which, in practice, made it impossible or uneconomical for local television stations to obtain from SESAC anything but its blanket license.

During 2008, several TMLC representatives and plaintiffs' expert, Professor Adam Jaffe, met with the Antitrust Division of the DOJ, and urged the DOJ to sue SESAC for violating antitrust laws.  The DOJ, however, closed its investigation without taking action.

**B.      Procedural History of This Litigation**

On November 4, 2009, plaintiffs filed an initial Complaint, Dkt. 1, and, on March 18, 2010, an Amended Complaint, Dkt. 25, which alleged that SESAC and its affiliates had conspired to make SESAC's all-or-nothing blanket license the only viable option for a station to obtain the performance rights to any of SESAC's affiliates' music, even though the blanket license's price was unrelated to a local television station's actual usage of musical works in SESAC's repertory.  The Amended Complaint contrasted SESAC's licensing practices with those of ASCAP and BMI, which are significantly restricted as a result of their consent decrees.

On May 17, 2010, defendants moved to dismiss the Amended Complaint, Dkt. 26.  On March 9, 2011, the Honorable Naomi Reice Buchwald, to whom this case was then assigned, denied the motion to dismiss, holding that plaintiffs had plausibly alleged violations of §§ 1 and 2 of the Sherman Act.  No. 09 Civ. 9177 (NRB), 2011 WL 856266 (S.D.N.Y. March 9, 2011).

On March 23, 2011, defendants answered the Amended Complaint, Dkt. 35, and on April 13, 2011, amended that answer, Dkt. 38.

In May 2011, discovery began, and was extensive.  SESAC produced approximately one million pages of documents; plaintiffs produced more than 450,000 pages.  More than 50 subpoenas were issued to third parties to produce documents.  Approximately 50 depositions were taken of representatives of SESAC, the plaintiffs, absent class-member local stations, the TMLC, and other third parties.  Plaintiffs also retained Dr. Jaffe as their economic expert witness; SESAC engaged two such expert witnesses: Dr. David Evans, an economic expert, and Keith Zajic, an industry expert.  The three experts wrote reports that together totaled more than 300 pages.  Depositions of all three expert witnesses also were taken.

On September 28, 2011, in mid-discovery, the case was reassigned to this Court.  Dkt. 45.

On June 14, 2013, SESAC moved for summary judgment, challenging the adequacy of the evidence as to multiple elements of liability on plaintiffs' §§ 1 and 2 claims.  Briefing on summary judgment was extensive; the Court also heard lengthy argument on the motion.  In its decision, issued March 3, 2014, the Court held that the record evidence was sufficient to support a verdict in plaintiffs' favor on all three claims, while narrowing the § 1 claim in two ways.  First, the Court rejected plaintiffs' claim of liability *per se*.  Second, the Court rejected

planitiffs' claim of a conspiracy so broad as to embrace all 20,000 SESAC affiliates, holding

that the evidence could instead support only a conspiracy between SESAC and the less than

1% of its affiliates that had entered "supplemental affiliation agreements" that effectively

prevented stations from licensing those affiliates' music except through the blanket license.

###    C.    The Proposed Class Settlement

Following resolution of the summary judgment motion, the parties, at the direction and

with the encouragement of the Court, engaged in extensive settlement negotiations, assisted

by the Honorable Kimba M. Wood, United States District Judge.  (The Honorable James C.

Francis IV, United States Magistrate Judge, had assisted in the parties' previous settlement

negotiations.)  These negotiations eventually resulted in the settlement agreement at issue

here.  However, the settlement process at one point stalled and active litigation resumed, such

that, in July 2014, plaintiffs moved for class certification, offering the report of economic

expert Dr. Russell Lamb in support of class certification.  Discovery related to class

certification issues was ongoing at the time the parties reached agreement on the proposed

class action settlement.

On October 15, 2014, plaintiffs filed a motion for preliminary approval of the

settlement and forms of notice which, among other things, set out the terms of the settlement,

advised class members of their rights in relation to the settlement, set forth the proposed plan

of allocation of the settlement proceeds, detailed the maximum amount of attorneys' fees and

expenses that plaintiffs' counsel would request, and explained the process for filing a proof of

claim and release form.

The key terms of the settlement, which provides retrospective monetary relief and

forward-looking conduct restrictions, are as follows:

As to monetary relief, SESAC has agreed to pay $58.5 million into a settlement fund, to be placed into an interest-bearing escrow account for the benefit of the local stations. Of the funds, $16 million is designated for reimbursement of plaintiffs' counsel's attorneys' fees and expenses. The remaining $42.5 million is to be allocated by the TMLC to local stations in the settlement class for the alleged overcharges they paid since 2008, with the allocations based on the *pro rata* share of license fees each class member paid or projected to be paid to SESAC during the period between 2008 and 2014.

As to prospective relief, SESAC has agreed to various conduct restrictions that will govern its dealings during the next 20 years (from 2016 until 2035) with any local television station in the settlement class. Specifically, SESAC agreed to (1) offer all local stations a blanket license and viable alternatives to it, (2) relieve local stations from the threat of copyright infringement claims during the pendency of license negotiations, (3) enter into binding arbitration when the TMLC and SESAC are unable to reach agreement on industry-wide license fees and/or terms, and (4) neither prohibit nor interfere with the ability of SESAC's affiliates to enter into direct licenses with local stations.[7]

In return, under the settlement agreement, plaintiffs have agreed to dismiss the case on the merits and with prejudice upon entry of the parties' proposed Final Judgment and Order of Dismissal, subject to the Court's approval of the settlement agreement, plan of allocation, and request for attorneys' fees and expenses. As a result, SESAC avoids, in addition to further legal expenses, the risk of treble damage liability, which it potentially faced under § 4 of the

---

[7] As for 2015, under the settlement agreement, SESAC is permitted to charge its current rates for blanket licenses. However, per program rates modeled on those in place prior to 2008 are available to the local stations in 2015, and SESAC has freed its supplemental affiliates from the contractual terms that had prevented them from issuing direct licenses to stations.

Clayton Act, 15 U.S.C. § 15.  *See In re Auction Houses Antitrust Litig.*, No. 00 Civ. 648 (LAK), 2001 WL 170792, at *7 (S.D.N.Y. Feb. 22, 2001).

Under the settlement agreement, the parties also agreed that a Second Amended Class Action Complaint, ("SACAC"), would be filed.  *See* Dkt. 175, Ex. 1; *see* Dkt. 205.  Under the SACAC, a modification within the group of named plaintiffs is to be made, replacing the Hoak entities[8] with Gray Television Group, Inc., which has since acquired the Hoak entities and succeeded to their music performance licensing rights.  The settlement class is also now defined (1) to include all stations owned and operated by the ABC and CBS television networks as well as NBCUniversal Media, LLC, and (2) to exclude stations owned and operated by the Univision and Telefutura (now known as UniMas) networks because those stations are separately licensed by SESAC and have never been among the stations on whose behalf the TMLC has negotiated or arbitrated.[9]

On October 31, 2014, the Court issued an order preliminarily approving the terms of the settlement and the form of the notice.  Dkt. 205.  More than 2,700 notices were thereafter sent by direct mail to prospective class members.  In addition, the notice was sent by email to class members and posted on TMLC's website.

---

[8] The Hoak entities are Hoak Media of Dakota, LLC, Hoak Media of Nebraska, LLC, and Hoak Media, LLC.

[9] On October 21, 2014, the Court directed the parties to explain the reasons for expanding the settlement class to include stations owned and operated by the ABC and CBS television networks and by NBCUniversal Media, LLC (the "O&Os"), and why expanding the class did not present fairness concerns for the existing members of the class or the stations plaintiffs proposed to add.  Dkt. 185.  On October 28, 2014, the parties, in a joint letter, explained that the O&Os had potential antitrust claims against SESAC arising out of the same conduct challenged in this case, and that, to settle, SESAC demanded a global resolution, *i.e.*, one that covered the O&Os.  Dkt. 201, at 1.  The O&Os consented to their inclusion, and the size of the settlement fund was increased to account for their inclusion.  *Id.* at 2.

On December 22, 2014, plaintiffs moved for an order certifying a settlement class and approving the settlement and the plan of allocation of the settlement proceeds.  Dkt. 212.  On November 20, 2014, plaintiffs also applied for attorneys' fees and expenses.  Dkt. 207.

On February 18, 2015, a fairness hearing was held, at which plaintiffs' counsel presented in support of the settlement, and counsel for both sides responded to the Court's questions.   No class member appeared at the conference to oppose the settlement, or otherwise communicated opposition to it, or, for that matter, to plaintiffs' counsel's application for fees and expenses.

## II.    Discussion

### A.    Certification of the Settlement Class

Pursuant to the proposed settlement agreement, the parties seek final certification of the class for settlement purposes pursuant to Rule 23.  The Class is defined for settlement purposes as:

> All owners of full-power local commercial television stations in the United States and its territories (including Puerto Rico) that obtained licenses from Defendant during the period from January 1, 2008 to the date of this Preliminary Approval Order [October 31, 2014], including those owned and operated by the ABC and CBS television networks as well as NBCUniversal Media, LLC, but excluding local television stations that are owned and operated by the Univision and Telefutura (now known as UniMas) networks.

Certification of a settlement class "has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants."  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995).  The Second Circuit has recognized that "[t]emporary settlement classes have proved to be quite useful in resolving major class action disputes."  *Weinberger v.*

*Kendrick*, 698 F.2d 61, 72 (2d Cir. 1982) (citation omitted).  For the following reasons, the

Court finds the requirements for certification of a settlement class satisfied in this case.

> **1.      Compliance with Fed. R. Civ. P. 23(a)**

Under Federal Rule of Civil Procedure 23(a), plaintiffs must meet the four

requirements of numerosity, commonality, typicality, and adequacy of representation.

The numerosity requirement of Rule 23(a) requires that the class be "so numerous that

joinder of all members is impracticable."  It is met here because the proposed settlement class

consists of owners of more than 1,200 local television stations.  *See Consol. Rail Corp. v.*

*Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (finding numerosity requirement met if a

class consists of at least 40 members).

The commonality requirement of Rule 23(a) requires that there be "questions of law or

fact common to the class."  It, too, is met here.  In general, "monopolization claims are

contingent upon a showing of monopoly power and an examination of the manner in which

such power was acquired or maintained.  These issues, along with others, are questions that

are undoubtedly common to all the members of the putative class."  *In re Buspirone Patent &*

*Antitrust Litig.*, 210 F.R.D. 43, 57 (S.D.N.Y. 2002) (citation omitted); *see also Cordes & Co.*

*Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107 (2d Cir. 2007) (where "each

class member allegedly suffered the same type of injury, the legal question of whether such an

injury is of the type the antitrust laws were intended to prevent and that flows from that which

makes defendants' acts unlawful is a common one.") (citation and internal quotation marks

omitted).  And there are a number of questions of fact and law in this case, relevant to either

plaintiffs' § 1 or § 2 claims or both, that are common to the proposed class.  These include:

whether SESAC and its key affiliates engaged in an unlawful agreement to fix prices; how the

relevant product market is to be defined; whether SESAC has monopoly power in that market; whether SESAC's licensing practices constitute exclusionary conduct; whether SESAC's conduct, if found unlawful, caused cognizable injury to class members; whether plaintiffs and members of the class are entitled to injunctive relief; and the appropriate measures of damages sustained. *See Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y. 2001) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (discussing commonality)).

Rule 23(a) also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Here, each class member's claim "arises from the same course of events," to wit, SESAC's adoption in 2008 of the practices that plaintiffs challenge, and each class member must "make similar legal arguments to prove the defendants' liability" as a result of these practices. *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993); *see also In re Blech Sec. Litig.*, 187 F.R.D. 97, 105–06 (S.D.N.Y. 1999) (discussing typicality). Although conceivably not all class members may be similarly situated as to damages, as to liability, the claims of the named plaintiffs here are typical of those of the class. To prevail, each would be required to show that SESAC's (and, where relevant, its affiliates') practices with respect to the blanket licenses violated § 1 or § 2 of the Sherman Act, and effectively forced class members to accept a SESAC blanket license with an artificially high price.

Finally, Rule 23(a)'s adequacy requirement tests whether: (1) the plaintiff's interests are antagonistic to the interests of the other members of the Class; and (2) plaintiff's counsel are qualified, experienced, and capable of conducting the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). There is no evidence of any conflict between the interests of the named plaintiffs and the members of the proposed

settlement class.  Some confirmation of that is supplied by the fact that no members of the prospective classes have opted out or opposed this settlement.  Finally, plaintiffs' counsel are highly skilled and well-suited, by background, training, and experience, to represent a class in a high-stakes, high-complexity antitrust lawsuit.  Further, counsel's performance in this case, exemplified by the result they achieved—in the form of a settlement that obtains, against SESAC, both relief for past injuries and prospective relief that supplies a fair replica of the restrictions to which its competitors ASCAP and BMI are subject to under their consent decrees with DOJ—validates their qualifications to represent the class.

### 2.    Compliance with Fed. R. Civ. P. 23(b)(2)

A class must also satisfy one of the three subparts of Rule 23(b).  Under Rule 23(b)(2), a class may be certified if SESAC "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Under this rule, "there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute.  Predominance and superiority are self-evidence." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011).  In this case, the challenged SESAC licensing scheme was directed at all members of the proposed settlement class.  And the contemplated settlement provides the future conduct relief necessary to protect all members of the proposed settlement class until 2035.

### 3.    Compliance with Fed. R. Civ. P. 23(b)(3)

Plaintiffs also seek class certification under Rule 23(b)(3), which requires that:

[T]he court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).  This rule is designed to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

The predominance test "is . . . readily met in certain cases alleging violations of the antitrust laws."  *Cordes*, 502 F.3d at 108 (citation omitted).   The central issue here, as noted, is whether SESAC (and where relevant its affiliates) engaged in anti-competitive conduct proscribed by § 1 or § 2 of the Sherman Act.  Resolution of this issue "will not vary among class members."  *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 279 (S.D.N.Y. 1999).  Further, although damages issues in antitrust cases may require use of differing measures of damages across some plaintiff classes, that is not so here because the proposed settlement has a unitary, and reasonable, formula for measuring damages and allocating the net settlement fund among the class.  Thus, the common questions of injury to members of the proposed settlement class, and damages, are both "subject to generalized proof, and thus applicable to the class as a whole."  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (citation and internal quotation marks omitted).  The predominance requirement of Rule 23(b)(3) is thereby satisfied.  *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 564 (S.D.N.Y. 2004).

Rule 23(b)(3) also requires that the class action be "superior to other available methods for fair and efficient adjudication of the litigation."  Courts have found that the superiority requirement is satisfied where:

> The potential class members are both significant in number and geographically dispersed. The interest of the class as a whole in litigating the many common

14

> questions substantially outweighs any interest by individual members in bringing and prosecuting separate actions.

*Cromer*, 205 F.R.D. at 133.  Here, there is great utility in resolving the claims of the many television stations in the class through the class action mechanism.  There are more than 1,200 class members who—assuming liability—were injured by SESAC's practices.  None has displayed any interest in bringing an individual lawsuit.  Nor does any class member appear to have any special circumstance that would be undervalued or ignored in the context of class litigation.  Further, the costs of bringing this lawsuit would have been prohibitive for any single television station or small group of them:  Between the costs of briefing, discovery, and expert witnesses, the price-tag for an individual station to bring this suit would have almost certainly dwarfed even the highest realistically imaginable recovery for that station.  Resolution of plaintiffs' claims against defendants through the proposed class settlement is, therefore, clearly superior to any other available method of resolution.

For the foregoing reasons, the Court therefore has ordered that the class be certified for settlement purposes.

### B.        Approval of the Settlement

A court may approve a proposed class action settlement, provided it determines that the settlement is "fair, adequate, and reasonable, and not a product of collusion."  *Joel V. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000).  Such approval "is within the Court's discretion, which 'should be exercised in light of the general judicial policy favoring settlement.'"  *Sumitomo*, 189 F.R.D. at 280 (citation omitted); *accord Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 361 (S.D.N.Y. 2002).  In undertaking this evaluation, a Court must consider "both the settlement's terms and the negotiating process leading to settlement"—in

other words, it must review the settlement for both procedural and substantive fairness.  *Wal-Mart Stores, Inc. v. VISA U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).

### 1.    Procedural Fairness

A presumption of fairness may attach to a proposed settlement when the terms of that settlement were reached by experienced counsel during arm's-length negotiations undertaken after meaningful discovery.  *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *3–4 (S.D.N.Y. July 27, 2007)*; see also In re Alloy, Inc., Sec. Litig.*, 2004 WL 2750089, at *1 (S.D.N.Y. Dec. 2, 2004) (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).  That presumption is well warranted here.

All parties to this case were represented by estimable, indeed outstanding, counsel with significant experience in litigating complex class actions brought under the antitrust laws as well as in the music licensing industry.[10]  Further, this settlement was the product of lengthy, arms-length negotiation, facilitated by experienced and wise mediators—Judges Wood and Francis.  And the case proceeded far before the parties arrived at settlement.  There was extensive discovery, including production of more than one million pages of documents, the taking of nearly 50 depositions, and the exchange of expert reports.  And the parties vigorously litigated SESAC's summary judgment motion and obtained a detailed ruling from the Court both winnowing and commenting on plaintiffs' claims.  As a result of this journey, counsel on both sides were well-situated to thoughtfully assess the potential outcomes of the case and the likelihoods of each occurring.  Counsel also had, as guideposts of some value, the outcomes of prior lawsuits involving antitrust claims against PROs, and the terms of the

---

[10] Counsel involved in the negotiations also represented the parties in the arbitration proceedings that set the terms of industry-wide licenses and rates with SESAC in 2002 (which settled) and in 2006 (in which an award was issued).

consent decrees that restrict the practices of ASCAP and BMI.  On the other side of the

equation, there is absolutely no basis to rebut the presumption of procedural fairness here.

The Court, accordingly, finds the settlement procedurally fair.

### 2.      Substantive Fairness

Courts in this Circuit use the nine-factor test set out in *City of Detroit v. Grinnell

Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), to evaluate whether a settlement is substantively

"fair, reasonable, and adequate."  *See, e.g.*, *Ouellette v. Cardenas (In re Sony Corp. SXRD)*,

448 F. App'x 85, 86–87 (2d Cir. 2011) (summary order); *McReynolds v. Richards-Cantave*,

588 F.3d 790, 804 (2d Cir. 2009).  The "*Grinnell* factors" are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction
> of the class to the settlement; (3) the stage of the proceedings and the amount
> of discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through the
> trial; (7) the ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best possible
> recovery; (9) the range of reasonableness of the settlement fund to a possible
> recovery in light of all the attendant risks of litigation.

*Id.*  The Court considers each factor in turn.

### (a)      *The complexity, expense, and likely duration of the litigation*

The greater the "complexity, expense and likely duration of the litigation," *Grinnell*,

495 F.2d at 463, the stronger the basis for approving a settlement.  *In re Drexel Burnham

Lambert Group Inc.*, 130 B.R. 910, 927 (S.D.N.Y. 1991).  Here, these factors strongly favor

approving the settlement.  Prosecuting this case against SESAC for the past five years has

already imposed significant monetary costs on plaintiffs; these costs would have continued to

mount had the case proceeded to trial (which the Court had scheduled for March 2015) and,

potentially, appeal.  It is reasonable to project that the path to a final resolution on appeal

would have taken two years or more from the point at which the parties entered into the settlement agreement.

The settlement eliminates these costs and risks. It also obtains for the class prompt monetary compensation for prior antitrust injuries. And it provides forward-looking structural protections for the plaintiff television stations, modeled on the terms of the ASCAP and BMI consent decrees, against future misconduct. These benefits "weigh[] heavily in favor of approving" the settlement. *See In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 504, 510 (E.D.N.Y. 2003); *see also In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 124 (S.D.N.Y. 2009) (granting final approval where, absent settlement, the "action would have continued for years with . . . a possible trial, and the inevitable post-trial motions and further appeals").

(b)    *The reaction of the class to the settlement*

A positive reaction of the class to the proposed settlement favors its approval by the Court. *See Grinnell*, 495 F.2d at 462; *Maley*, 186 F. Supp. 2d at 362 ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001). The class here is sophisticated: It consists of the owners of commercial television stations. *No* class member at any point opted out of the class; and despite notice of the settlement having been sent to more than 1,200 stations, none objected to the settlement, in writing or in person. The class's reaction—uniform acceptance of the settlement terms—supports approval of the settlement.

(c)     *The stage of the proceedings and discovery completed*

This *Grinnell* factor inquires "whether the parties had adequate information about their claims," *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004), such that counsel "possessed a record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of settlement," *Maley*, 186 F. Supp. 2d at 364. That is certainly so here. The case progressed past protracted discovery and hard-fought motions practice on summary judgment. The parties also each retained multiple experts and conducted expert discovery. And, as noted, the parties had the benefit of the Court's assessment of the case, at least to the extent that evidence was brought to bear in connection with SESAC's motion for summary judgment. After ruling on that motion, the Court recognized that a "time out" in the case was in the "interests of the parties, and of a just outcome" so that the parties could "explore and discuss whether there are terms on which this lawsuit can be amicably resolved." Dkt. 144, at 1. The case thus certainly progressed to the point at which the parties were able to make an intelligent appraisal of the value of plaintiffs' case. And, as noted, the parties had the benefit of the insights of Judges Wood and Francis in reflecting on just and appropriate terms of settlement. In short, as of mid-2014, the parties were in an excellent position to make a thoughtful assessment of the strengths and weaknesses of each party's case and the rewards and risks presented both by continued litigation and the potential settlement.

(d)     *The risks of establishing liability, of establishing damages, and of maintaining the class action through trial*

The Court has considered these three risks of continued litigation independently, but it addresses them here together because they turn on interrelated facts.

Although plaintiffs amassed formidable evidence on which a jury could have found liability, as reflected in the Court's ruling largely denying SESAC's motion for summary judgment, a liability verdict was far from a foregone conclusion.  SESAC has consistently denied liability, and has made colorable arguments.  At the summary judgment stage, for example, SESAC raised significant challenges to plaintiffs' Sherman Act § 1 claim, arguing that the evidence did not show agreement between even the supplemental affiliates and SESAC on a restraint of trade.  A jury might have accepted the thesis that the challenged conduct was attributable to SESAC alone.  Such a finding would presumably have eliminated, too, plaintiffs' § 2 claim based on conspiracy to monopolize.  As for plaintiffs' § 2 claim of monopolization of the market for performance licenses works in SESAC's repertoire, a fair projection is that it could have turned on, among other factors, the persuasiveness of each side's expert witnesses, and of the justifications advanced by SESAC and its executives for the licensing practices that plaintiffs challenge.  The Court cannot handicap how a jury would have responded to such proof, but it is safe to say that neither side could have counted on prevailing at trial.  And on appeal, SESAC assuredly would have vigorously contested any adverse jury verdict, including by arguing, as it did on summary judgment, that the market definition pursued by plaintiffs and accepted by the Court was in error.[11]

_____

[11] In arguing why proving liability was uncertain, plaintiffs separately rely on the unsuccessful prior history of antitrust lawsuits challenging PRO licensing practices.  That argument is, however, unpersuasive as a basis for projecting a possible defense verdict here.  As this Court has noted, those lawsuits, which were decided at trial, were against ASCAP and BMI, *see Meredith*, 2011 WL 856266, at *12, and they post-dated the consent decrees against those PROs that have been in place for more than a half-century.  The conduct restrictions in those decrees have significantly weakened the strength of modern-day antitrust claims against ASCAP and BMI.  The existence of these restraints has assuredly helped insulate ASCAP and BMI from antitrust liability over the past 50 years.  This Court's summary judgment ruling, in fact, emphasized that SESAC, as the sole PRO unconstrained by a consent decree, stands in a fundamentally different posture from ASCAP and BMI.

As to damages, plaintiffs could not count on a jury's awarding generous damages even if it found liability. "[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998); *see also Visa Check*, 297 F. Supp. 2d at 511 (noting that proving damages to a jury is complex and difficult). On the issue of damages, a trial would likely have turned heavily on a "battle of the experts" between the parties' respective economists. It is impossible to predict which party's model of damages—if either—the jury would credit. *See Am. Bank Note*, 127 F. Supp. 2d at 426–27 ("In such a battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses."); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) ("[D]amages are a matter for the jury, whose determinations can never be predicted with certainty."), *aff'd*, 117 F.3d 721 (2d Cir. 1997). The risk of an underwhelming or negligible damages verdict at trial in this complicated case, involving an unusual market and a complex and uncommon product, supports the approval of a settlement ending this litigation.

Finally, as to the prospect of maintaining a class, at the time of settlement, plaintiffs had filed their motion for class certification, and SESAC had stated its intention to oppose that motion. Without complete briefing on the point, the Court cannot handicap the likelihood that SESAC would have prevailed on this point, but it is at least possible that variations among the plaintiff stations or other factors might have complicated plaintiffs' class-certification bid. Further, in the event that a class was certified, conceivably SESAC would then have sought interlocutory appeal of that ruling pursuant to Rule 23(f). Had it achieved such review, the

scheduled trial date would have been delayed substantially.  The uncertainty of maintaining a class through trial therefore also supports approval of the settlement.

> (e)    *The ability of the defendants to withstand a greater judgment*

Under the settlement, SESAC has paid $58.5 million into an interest-bearing escrow account.  Plaintiffs take the position that that settlement amount is the greatest sum practically available from SESAC, absent a favorable jury verdict.  And, consistent with this, during settlement negotiations, SESAC's counsel represented to plaintiffs' counsel that SESAC's litigation set-aside was substantially exhausted by this settlement.  Not privy to SESAC's books, the Court cannot be sure that SESAC did not have further funds with which to fund a settlement or adverse verdict, but the Court accepts that the cost of the settlement represented a very substantial hit to SESAC.  And, under the case law, the possibility that a defendant could have sustained a greater judgment is not determinative of substantive unfairness "where, as here, the other *Grinnell* factors weigh in favor of approval."  *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 U.S. Dist. LEXIS 36093, at *23–24 (S.D.N.Y. May 1, 2008).  "Class actions are strong medicine.  They may confront defendants with potentially ruinous financial exposure."  *Auction Houses*, 2001 WL 170792, at *5.  "[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate."  *Sony*, 2008 U.S. Dist. LEXIS 36093, at *23.

> (f)    *The range of reasonableness of the settlement fund in light of the best possible recovery and the attendant risks of litigation*

The adequacy of the amount achieved in settlement is not to be judged "in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case."  *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987).  The Court instead need only

find that the settlement falls within a "range of reasonableness." *PaineWebber*, 171 F.R.D. at 130 (citation omitted). That range must recognize "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent" in litigation. *Wal-Mart Stores*, 396 F.3d at 119.

Here, the settlement amount falls well within the range of the reasonable. The monetary relief that SESAC will pay and that the class will receive is significant. The $42.5 million net recovery to the class[12] for SESAC's alleged overcharges appears to constitute approximately 26% of the class's license fees at issue, which is in line with, or in excess of, the percentage of fees recovered by the class in many antitrust class action settlements involving alleged overcharges. *See, e.g.*, *Currency Conversion Fee*, 263 F.R.D. at 124 (approximately 9% of total fees); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. MDL 1775, 2009 WL 3077396, at *9 (E.D.N.Y. Sept. 25, 2009) (approximately 10.5% of surcharges). Further, the net recovery is greater than the most recent actual damages estimate of nearly $40 million—for the period between January 1, 2008 and June 30, 2014—as calculated by plaintiffs' class-certification expert, Dr. Lamb.[13] Thus, the net settlement, by plaintiffs' expert's calculations, entitles the class to close to a full "single recovery" of its monetary damages during the 2008-2014 class period. To be sure, had this case continued, and the class prevailed at trial, plaintiffs would have been entitled to treble damages. But, "the received wisdom [from the Second Circuit] is that the adequacy of antitrust class action

---

[12] This recovery reflects deductions to the gross settlement amount for the attorneys' fees and expenses approved by the Court. *See infra* Section II.D.

[13] The Court notes, however, that Dr. Lamb's estimates did not include an estimate of damages suffered by the local television stations later added to the settlement class—those owned and operated by ABC, CBS, and NBCUniversal Media, LLC.

settlements is to be tested against an estimate of single rather than treble damages." *Auction Houses*, 2001 WL 170792, at *7.

Further, the long-term conduct relief provided for in the settlement will yield, in the Court's assessment, an even greater long-term recovery to the settlement class. For the next 20 years, SESAC will be (1) obliged to offer prospective licensees who wish to access the public performance rights to the music in SESAC's repertory a viable alternative to SESAC's blanket license; (2) barred from preventing (directly or indirectly) its affiliated composers and publishers from entering into direct licenses with local stations; and (3) prevented from threatening local stations with copyright infringement lawsuits during license negotiations. And although the settlement does not provide for the "rate courts" that the ASCAP and BMI consent decrees require, its compulsory arbitration term supplies a fair proxy: If the terms of industry-wide public-performance licenses to SESAC's repertory are not agreed upon between SESAC and the TMLC, SESAC has committed to resolve these disputes (*e.g.*, reasonable license fees) in binding arbitration.

The Court finds that the recovery here is highly reasonable in light of these favorable terms, particularly when measured against plaintiffs' potential recovery and the meaningful risks that further litigation presented for the plaintiff class.

Considering the *Grinnell* factors in totality, the Court finds that the settlement is fair, reasonable, and adequate. The Court therefore has approved the settlement.

### C.      Approval of the Plan of Allocation

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized—namely, it must be fair and adequate." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (quoting *Maley*, 186 F. Supp. 2d at 367). As

many courts have held, a plan of allocation need not be perfect.  Instead, "[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *WorldCom*, 388 F. Supp. 2d at 344 (quoting *Maley*, 186 F. Supp. 2d at 367); *accord In re NASDAQ Market-Makers Antitrust Litigation*, No. 94 Civ. 3996 (RWS), 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000).  Thus, "[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel."  *EVCI*, 2007 WL 2230177, at *11.

Under the plan of allocation here, the TMLC will allocate the settlement funds among the class on a *pro rata* basis, using the following approach:  First, the TMLC will determine the total license fees paid by each individual station owned by any class member to SESAC between 2008 and 2013 and paid or payable to SESAC for 2014.[14]  Second, the TMLC will determine each station's *pro rata* share of the total license fees, paid or payable to SESAC during these period.  The TMLC will then distribute, from the net settlement fund, *pro rata* shares to the class member that currently owns the station in question.  If any amounts remain in the settlement fund in excess of 1% of the fund, that residual amount will be part of a second distribution made on a *pro rata* basis, as aforementioned.  Otherwise, all remaining amounts in the settlement fund remain with the TMLC.

This plan of allocation has an obvious rational basis, appears to treat the class members equitably, faced no objections from class members, and has the benefit of simplicity. It was also devised by experienced and estimable class counsel.  The Court accordingly finds it fair and adequate.

---

[14] SESAC has provided the TMLC, on a confidential basis, with an up-to-date list of the annual license fees billed to each class member for this period between 2008 and 2013 and the fees billed or to be billed for 2014.

The Court therefore has issued an order approving the plan of allocation.

**D.       Attorney's Fees**

The plaintiff class has been represented throughout this litigation by the law firm of Weil, Gotshal & Manges LLP ("Weil").  Weil has applied for an award of attorney's fees and expenses totaling $16 million, representing approximately 27% of the $58.5 million settlement fund.  Of this, $11.8 million, or approximately 20.2% of the settlement fund, is for legal fees.

It is black letter law that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  The Second Circuit has authorized district courts to employ a percentage-of-the-fund method when awarding fees in common fund cases.  *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  The Circuit, however, has also encouraged district courts, in assessing the reasonableness of the fee request, to cross-check the percentage fee against counsel's "lodestar," meaning the sum yielded by multiplying counsel's hourly rate by the hours spent. *Id.* at 50.  "It bears emphasis that whether calculated pursuant to the lodestar or the percentage method, the fees awarded in common fund cases may not exceed what is 'reasonable' under the circumstances."  *Id.* at 47.

When considering the reasonableness of such an award, the Court must consider the following familiar "*Goldberger*" factors:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50; *see also Mba v. World Airways, Inc.*, 369 F. App'x 194, 199 (2d Cir. 2010) (summary order); *Central States S.E. & S.W. Areas Health & Welfare Fund, v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 249 (2d Cir. 2007).

Turning first to the percentage of the fund represented by the fee request, the 20.2% of the settlement fund that Weil's fee request represents here is well within the mainstream of fee awards approved for class counsel in this District.  Indeed, in numerous common fund cases, fees have been awarded that represent one-third of the settlement fund.  *See, e.g.*, *Strougo v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003); *Maley*, 186 F. Supp. 2d at 370; *In re Net Ease.com, Inc. Sec. Litig.*, No. 01 Civ. 9405 (RO) (S.D.N.Y. May 16, 2003), Dkt. 19; *Newman v. Caribiner Int'l Inc.*, No. 99 Civ. 2271 (GEL) (S.D.N.Y. Oct. 25, 2001), Dkt. 31; *Lemmer v. Golden Books Family Entm't Inc.*, No. 98 Civ. 5748 (AGS) (S.D.N.Y. Oct. 13, 1999), Dkt. 28; *Maywalt v. Parker & Parsley Petroleum Co.*, 963 F. Supp. 310, 313 (S.D.N.Y. 1997).  Particularly significant, Weil's fee request, measured as a percentage of the settlement fund, is in line with, and indeed below some of, those approved in complex class actions in this District.  *See, e.g.*, *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM) (GWG), 2014 WL 1883494, at *12–13 (S.D.N.Y. May 9, 2014 ) (33%); *In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151, 165 (S.D.N.Y. 2011) (33%); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (33%); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 750 (S.D.N.Y. 1985) (25%).

The fee request is all the more reasonable and proportionate if the prospective benefits to the class during the next 20 years are monetized and added to the estimated class recovery.  There is, of course, no precise way to estimate this benefit.  Weil estimates that during the 2005–2007 period, when SESAC was committed to arbitrating with local stations, stations

achieved a collective benefit of approximately $8 million a year in arbitration.  Even

discounting this projection by half and assuming that the settlement's forward-looking

conduct relief yields $4 million in relief to the class each year relative to the status quo, the

estimated benefit to the class would then grow by some $80 million above the amount

allocated to the class in the settlement fund.

As to the lodestar cross-check, it is not uncommon for fees to be awarded that reflect

multiples of plaintiffs' counsel's lodestar.  *See, e.g.*, *In re Hi-Crush Partners L.P. Sec. Litig.*,

No. 12 Civ. 8557 (CM), 2014 WL 7323417, at *18 (S.D.N.Y. Dec. 19, 2014) (multiplier of

1.41); *Visa Check*, 297 F. Supp. 2d at 524 (multiplier of 3.5); *In re Citigroup Inc. Sec. Litig.*,

965 F. Supp. 2d. 369, 401 (S.D.N.Y. 2013) (multiplier of 2.8).  This practice is commonly

justified on the ground that counsel risked money and time, and may have foregone other

engagements and clients, to pursue an uncertain representation of the class.  *See In re Payment

Card Interchange Fee & Merch.Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 441 (E.D.N.Y.

2014) ("If not for the attorneys' willingness to endure for many years the risk that their

extraordinary efforts would go uncompensated, the settlement would not exist."); *Am. Bank

Note*, 127 F. Supp. 2d at 432–33 (granting 25% of the settlement fund for attorneys' fees, in

part, because "[t]he significant outlay of cash and personnel resources by Plaintiffs' Counsel

has been completely at risk"); *NASDAQ*, 187 F.R.D. at 488 ("From the inception of the action,

there existed a significant possibility that Class Counsel would achieve no recovery, and thus

no compensation.").  Here, Weil's fee request is somewhat *below* its lodestar.  That is because

the amount Weil seeks reflects (and does not exceed) its billings to TMLC to date, and at the

outset of the case, Weil afforded TMLC a substantially reduced (by about 25%) hourly rate.[15] Unlike in the paradigmatic class settlement, Weil does not seek fees that include a risk premium. The lodestar cross-check thus strongly confirms the reasonableness of plaintiffs' fee request.

Turning to the *Goldberger* factors:

### 1. The time and labor expended by counsel

Weil's lawyers have expended substantial time and effort pursuing this case since its inception more than five years ago. The firm represents that its lawyers have devoted approximately 30,360 hours to this matter. As noted, the projects these lawyers completed included (1) drafting the complaint and amended complaint, (2) opposing SESAC's motion to dismiss, (3) conducting extensive document discovery, (4) taking or defending some 50 depositions, (6) opposing SESAC's motion for summary judgment, (7) moving for class certification, (8) participating in mediation and negotiation sessions to resolve this matter, and (9) drafting the settlement agreement and preliminary approval papers.

In light of these efforts and the size of the settlement fund, and based on its close familiarity with the history and record in this case, the Court finds that this *Goldberger* factor supports the award of a 20.2% fee.

---

[15] Weil represents that although TMLC has paid some of the legal fees it owes Weil, by agreement, much of those fees (nearly $8 million) are still outstanding. The fee award here would enable TMLC to pay Weil the outstanding fees and compensate TMLC for the fees it previously paid. Weil estimates that had it charged TMLC its ordinary hourly rate, the lodestar would have been approximately $17.4 million for the 30,360 hours worked, and expenses.

### 2.   The magnitude and complexities of the litigation

Antitrust class actions "are notoriously complex, protracted, and bitterly fought." *Visa Check*, 297 F. Supp. 2d at 510; *see also NASDAQ*, 187 F.R.D. at 477 ("[C]lass actions 'have a well deserved reputation as being most complex.'") (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)).  Such was certainly true here.  As each stage in the briefing process underscored, the case presented complex issues of fact, law, economics, and litigation strategy.  The range and nature of the issues covered in the Court's 2014 decision resolving SESAC's motion for summary judgment illustrates the point.  And every metric—the number of plaintiff stations, the number of SESAC affiliates, the duration of the case, the volume of document discovery, the number of depositions taken, the length of expert reports, and the number of briefs filed—underscores the magnitude and scale of the litigation.  This *Goldberger* factor, too, supports Weil's fee request.

### 3.   The risk of the litigation

In considering the risk of litigation as it pertains to fee awards, the Court notes that Weil took on a substantial risk, for several reasons.  Establishing liability—and obtaining meaningful damages—was far from a foregone conclusion, for the reasons reviewed earlier.  From the outset, it was likely that litigation would be lengthy and hard-fought.  And Weil's client, TMLC, was not in position to pay Weil's regular hourly rates or to front all the fees and expenses that Weil incurred.  As a result, by agreement, Weil gave the TMLC a meaningful discount off its base fees and agreed to a deferral of payment of some fees,

meaning that Weil, for years, bore some of the risk of defeat.  These risks also support the fee requests.

### 4.  The requested fee in relation to the settlement and quality of representation

The Court has previously noted that the amount of the fee, measured in relation to the settlement, is objectively reasonable.  The quality of Weil's representation further justifies the fee request.  The Court has previously commended counsel for both sides for their excellent lawyering.  The point is worth reiterating here.  Both Weil and its adversaries representing SESAC—Jenner & Block LLP and, late in the case, Joseph Hage Aaronson LLC—were vigorous, effective, and creative throughout this long litigation.

To these kudos may be added wisdom, for the settlement terms in this case, in the Court's view, reflect evident thoughtfulness, care, and realism on the part of all parties and counsel, not to mention due attention to the consent decree terms that have guided licensing by ASCAP and BMI for years.  Today's settlement carries the promise of peace for a generation between SESAC and the television stations.  In providing for long-term structural relief, this civil settlement between private parties is also a significant landmark in the long history of litigation between PROs and prospective licensees.  The ASCAP and BMI consent decrees, by contrast, resulted from lawsuits or the threat of regulatory action by DOJ.  Weil's achievement in obtaining valuable recompense and forward-looking protections for its clients is particularly noteworthy given the caliber and vigor of its adversaries.  Further, unlike in many class actions, the case against SESAC was not built on following, or piggybacking on, regulatory investigation or settlement.  "[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill.  They did all the work on their own." *In re Gulf*

*Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992).  Plaintiffs' counsel (and their teams and experts) were truly the authors of the favorable outcome for the class.

The Court, therefore, finds that these *Goldberger* factors, too, support the award of a 20.2% fee.

### 5.   Public Policy Considerations

Private antitrust lawsuits "provide a significant supplement to the limited resources available" to public antitrust regulators.  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979).  The recognition of this role has led to the "commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest."  *Goldberger*, 209 F.3d at 51.  In accordance with this sentiment, the Court finds that public policy supports the award of a 20.2% fee in this case, which fee in turn may "attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so."  *WorldCom*, 388 F. Supp. 2d at 359.

For the foregoing reasons, the Court is today granting the application of plaintiffs' counsel for attorneys' fees in the amount sought, of $11,891,751, to be paid from the settlement fund.  The Court finds this award fair and reasonable.

### E.      Expenses for Plaintiffs' Counsel

Weil also requests an award of $4,225,012 to recompense it for expenses incurred in this action.  It is well established that counsel who obtain a common settlement fund for a class are entitled to the reimbursement of expenses that they advance to a class.  *See, e.g.*, *Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, No. 01 Civ. 11814 (MP), 2004 WL 1087261, at *6–7 (S.D.N.Y. May 14, 2004) (citations omitted).  "Courts in the Second Circuit normally grant

expense requests in common fund cases as a matter of course."  *EVCI*, 2007 WL 2230177, at

*18 (citations omitted); *see also Am. Bank Note*, 127 F. Supp. 2d at 433.

Here, substantial expenses were necessary in this complex antitrust case.  They cover,

among other things, expert fees for testifying and consultant experts, e-discovery expenses,

expenses for document review by contract attorneys, legal fees and expenses of separate

counsel who represented absent class member stations complying with SESAC's subpoenas,

and deposition expenses.  Reviewing the affidavits submitted by Weil, the Court finds the

expense requests to be reasonable and justified.

Accordingly, the Court grants the application of plaintiffs' counsel for payment of

expenses in the amount of $4,225,012.

## CONCLUSION

In summary, and as reflected in more detail in a separate order that is being issued

contemporaneously with this decision:

It is hereby ORDERED that the class is certified for settlement purposes pursuant to

Rule 23.

It is FURTHER ORDERED that the settlement and plan of allocation of the proceeds

are approved as fair, reasonable, and adequate.

It is FURTHER ORDERED that the Court hereby awards attorneys' fees of

$11,891,751, of the Settlement Fund after payment of expenses of $4,225,012, plus interest on

those expenses at the same rate as earned on the Settlement Fund.  The awarded attorneys'

fees and all of the awarded expenses, and interest earned thereon, shall be paid to plaintiffs'

counsel from the Settlement Fund immediately after the date this Order is executed subject to

the terms, conditions, and obligations of the proposed settlement agreement and in particular

Section 2 thereof, which terms, conditions, and obligations are incorporated herein.

It is FURTHER ORDERED that the Court hereby awards plaintiffs' counsel expenses

in an aggregate amount of $4,225,012, plus interest at the same rate earned on the Settlement

Fund.

The Court will enter Judgment in this case forthwith.


SO ORDERED.


_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge


Dated: February 19, 2015
New York, New York